**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**PADUCAH DIVISION**

| | |
|---|---|
| JANE DOE (T.W.), AN INDIVIDUAL, | |
| Plaintiff, | |
| v. | CIVIL ACTION NO:  5:24-cv-8-BJB |
| WYNDHAM HOTELS AND RESORTS, INC.; WYNDHAM HOTEL GROUP, LLC; SUPER 8 WORLDWIDE, INC.; KY MOTEL INC. D/B/A SUPER 8; SONESTA INTERNATIONAL HOTELS CORPORATION; RED LION HOTELS CORPORATION; MATA PITA, INC. D/B/A AMERICA'S BEST VALUE INN; VHGI FRANCHISING, INC.; and VHGI, INC. | |
| Defendants. | |

**ORIGINAL COMPLAINT**

Plaintiff Jane Doe (T.W.) files this Original Complaint against Defendants, Wyndham Hotels and Resorts, Inc.; Wyndham Hotel Group, LLC; Super 8 Worldwide, Inc.; Ky Motel Inc. d/b/a Super 8; VHGI, Inc.; VHGI Franchising, Inc.; Red Lion Hotels Corporation; Sonesta International Hotels Corporation; Mata Pita, Inc. d/b/a America's Best Value Inn; and respectfully shows the Court as follows:

**SUMMARY**

1.    Jane Doe (T.W.) files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking that she endured in Paducah, Kentucky at Super 8 Motel and America's Best Value Inn, owned, operated, maintained, and controlled by Defendants and their agents and employees.

1

2.      Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[1] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

3.      Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

4.      Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, *et seq*, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

5.      In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

6.      As discussed herein, Defendants derived financial benefit from facilitating sex trafficking by providing venues where traffickers could exploit victims, including victims like Jane Doe (T.W.), with minimal risk of detection or interruption. Defendants continued supporting traffickers, including Jane Doe (T.W.)'s trafficker, despite evident and apparent signs of widespread and ongoing sex trafficking in these hotels. Each Defendant was, therefore, knowingly

---

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.

receiving a benefit from participation in a venture that each Defendant knew or should have known was engaged in sex trafficking.

## **PARTIES**

7.     Plaintiff Jane Doe (T.W.) is a resident of Casselberry, Florida.

8.     Jane Doe (T.W.) is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of causing her, through force, fraud, or coercion, to commit a commercial sex act.

9.     The trafficking of Jane Doe (T.W.) occurred in or affected interstate commerce.

10.     Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of Jane Doe (T.W.).

11.     Wyndham Hotels & Resorts, Inc., ("WHR") is a for-profit Delaware corporation with its principal place of business and mailing address at 22 Sylvan Way, Parsippany, New Jersey 07054 (Attn: Paul Cash, General Counsel). WHR as set forth herein transacts business in Kentucky, derives substantial revenue from services rendered in Kentucky, and caused a tortious injury in Kentucky that arose out of its doing business in Kentucky or out of its persistent course of conduct or derivation of substantial revenue within Kentucky. WHR may be served under KRS 454.210 through the Kentucky Secretary of State, Office of the Secretary of State, Summons Branch, 700 Capital Avenue, Suite 86, Frankfort, KY 40601. Defendant WHR is responsible, as successor, for all liabilities of Wyndham Worldwide Corporation and its predecessor subsidiaries related to franchising, controlling, and operating the Paducah Super 8. All references to WHR include the acts and omissions of predecessor entities for which WHR is responsible, including Wyndham Worldwide Corporation and its former subsidiaries.

12.     Wyndham Hotel Group, LLC ("WHG") is a for-profit Delaware company with its principal place of business and mailing address at 22 Sylvan Way, Parsippany, New Jersey 07054 (Attn: Paul Cash, General Counsel). WHG as set forth herein transacts business in Kentucky, derives substantial revenue from services rendered in Kentucky, and caused a tortious injury in Kentucky that arose out of its doing business in Kentucky or out of its persistent course of conduct or derivation of substantial revenue within Kentucky. WHG may be served under KRS 454.210 through the Kentucky Secretary of State, Office of the Secretary of State, Summons Branch, 700 Capital Avenue, Suite 86, Frankfort, KY 40601. Upon information and belief, WHG is a wholly owned subsidiary of WHR and a former subsidiary of Wyndham Worldwide Corporation.

13.     Super 8 Worldwide, Inc. ("S8W") is a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. S8W may be served through its registered agent for service: Corporate Creations Network Inc., 101 North Seventh Street, Louisville, KY 40202. Upon information and belief, S8W is a direct subsidiary of WHG, an affiliate or indirect subsidiary of WHR, and a former subsidiary of Wyndham Worldwide Corporation.

14.     WHR, WHG, and S8W are referred to collectively as the "Wyndham Brand Defendants."

15.     Upon information and belief, at all relevant times, the Wyndham Brand Defendants, either directly or through the acts of predecessors for which they are responsible, owned, operated, controlled, and/or managed the Super 8 located at 5001 Hinkleville Road, Paducah, Kentucky 42001 ("Paducah Super 8").

16.     Ky Motel Inc. d/b/a Super 8 ("Ky Motel") is a for-profit Illinois corporation with its principal place of business in Carbondale, Illinois. Ky Motel may be served through its registered agent for service: Nicholas Holland, 300 Broadway St., Paducah, Kentucky 42001.

4

Upon information and belief, at relevant times, it owned, operated, controlled, and/or managed the Paducah Super 8.

17.    VHGI, Inc., formerly known as Vantage Hospitality Group, Inc., is a Florida corporation with its principal place of business and mailing address at 10800 W. Sample Road, Coral Springs, FL 33065 (Attn: Bernard T. Moyle). VHGI, Inc. as set forth herein transacts business in Kentucky, derived substantial revenue from services rendered in Kentucky, and caused a tortious injury in Kentucky that arose out of its doing business in Kentucky or out of its persistent course of conduct or derivation of substantial revenue within Kentucky. VHGI, Inc. may be served under KRS 454.210 through the Kentucky Secretary of State, Office of the Secretary of State, Summons Branch, 700 Capital Avenue, Suite 86, Frankfort, KY 40601.

18.    VHGI Franchising, Inc., f/k/a Vantage Franchising, Inc., is a Florida corporation with its principal place of business and mailing address at 10800 W. Sample Road, Coral Springs, FL 33065 (Attn: Bernard T. Moyle). VHGI Franchising, Inc. as set forth herein transacts business in Kentucky, derived substantial revenue from services rendered in Kentucky, and caused a tortious injury in Kentucky that arose out of its doing business in Kentucky or out of its persistent course of conduct or derivation of substantial revenue within Kentucky. VHGI Franchising, Inc. may be served under KRS 454.210 through the Kentucky Secretary of State, Office of the Secretary of State, Summons Branch, 700 Capital Avenue, Suite 86, Frankfort, KY 40601.

19.    Upon information and belief, during the time that Jane Doe (T.W.) was being trafficked, VHGI, Inc., and VHGI Franchising, Inc., owned the America's Best Value Inn (ABV Inn) brand and licensed it to entities—referred to as "members"—that owned hotels, which were then operated under the ABV Inn brand system. When VHGI, Inc. (then known as Vantage Hospitality Group) first started operating, it was structured as a membership organization that

5

subjected the members to brand standards. However, over time, Vantage Hospitality began providing more services and exercising more control over its members such that it has referred to the fact that it became an "accidental franchisor." By the time of Jane Doe (T.W.)'s trafficking, VHGI, Inc., and VHGI Franchising, Inc. exercised significant control over and had significant involvement in operations of ABV Inn properties.

20.     Red Lion Hotels Corporation ("Red Lion") is or was a Maryland corporation with its last known principal place of business at 1550 Market St., Suite 425, Denver, CO 80202-2678. Red Lion and/or its predecessors in interest, as set forth herein, transacted business in Kentucky, derived substantial revenue from services rendered in Kentucky, and caused a tortious injury in Kentucky that arose out of its doing business in Kentucky or out of its persistent course of conduct or derivation of substantial revenue within Kentucky. Red Lion may be served under KRS 454.210 through the Kentucky Secretary of State, Office of the Secretary of State, Summons Branch, 700 Capital Avenue, Suite 86, Frankfort, KY 40601. In 2016, Red Lion acquired the brands and brand operations of VHGI, Inc. and its subsidiaries. This included all or substantially all VHGI, Inc.'s operating assets, including the Americas Best Value brand, which Red Lion continued to operate at locations around the United States, including in Kentucky. Upon information and belief, Red Lion is a successor to the liability of VHGI, Inc. and its subsidiaries, including VHGI Franchising Inc., for acts and omissions related to the Paducah ABV Inn. All references to "Red Lion" include references to the acts and omission of its predecessors for which it is liable.

21.     Sonesta International Hotels Corporation ("Sonesta") is a Maryland corporation with its principal place of business at 400 Centre Street, Newton, MA 02458 (Attn: Brad Maxwell, General Counsel). Sonesta and/or its predecessors in interest, as set forth herein, transacted business in Kentucky, derived substantial revenue from services rendered in Kentucky, and caused

a tortious injury in Kentucky that arose out of its doing business in Kentucky or out of its persistent course of conduct or derivation of substantial revenue within Kentucky. Sonesta may be served under KRS 454.210 through the Kentucky Secretary of State, Office of the Secretary of State, Summons Branch, 700 Capital Avenue, Suite 86, Frankfort, KY 40601, and Sonesta has filed public documents assenting to such service of process. On information and belief, Sonesta in 2021 acquired the brands and brand operations of Red Lion and VHGI, Inc. and its subsidiaries. This included all or substantially all of Red Lion's VHGI, Inc.'s operating assets, including the Americas Best Value brand, which Sonesta continued to operate at locations around the United States, including in Kentucky. Upon information and belief, Sonesta is a successor to the liability of Red Lion, VHGI, Inc. and its subsidiaries, including VHGI Franchising Inc., for acts and omissions related to the Paducah ABV Inn. All references to "Sonesta" include references to the acts and omission of its predecessors for which it is liable.

22.     VHGI, Inc., VHGI Franchising Inc., Red Lion (in its capacity as successor) and Sonesta (in its capacity as successor) will be referred to collectively as "the ABV Brand Defendants."

23.     Upon information and belief, the ABV Brand Defendants operated, controlled, and/or managed the America's Best Value Inn located at 5125 Old Cairo Road, Paducah, Kentucky 42001 ("Paducah ABV Inn") through the ABV Inn system. The Paducah ABV Inn may now be operating under a different assumed name.

24.     Mata Pita, Inc. d/b/a America's Best Value Inn ("Mata Pita") is a for-profit Kentucky corporation with its principal place of business in Paducah, Kentucky. Mata Pita, Inc. d/b/a America's Best Value Inn may be served through its registered agent for service: Champaklal Patel, 5125 Old Cairo Road, Paducah, Kentucky 42001. Upon information and belief, at relevant

times, it owned, operated, controlled, and/or managed Paducah ABV Inn through the ABV brand system.

25.     The Wyndham Brand Defendants and the ABV Brand Defendants are referred to collectively as "Franchisor Defendants."

26.     Ky Hotel and Mata Pita are referred to collectively as "Franchisee Defendants."

## JURISDICTION AND VENUE

27.      This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

28.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district.

## STATEMENT OF FACTS

**I.      Jane Doe (T.W.) was a victim of unlawful sex trafficking at hotels owned, operated, managed, and controlled by Defendants.**

29.     From approximately April 2011 through October 2014, Jane Doe (T.W.) was repeatedly trafficked, often for days at a time, at the Paducah Super 8 and the Paducah ABV Inn.

30.     Jane Doe (T.W.) met her trafficker, Bobby Ward, through Facebook. Ward manipulated her and promised her a job as a housekeeper. He then used force and threats to coerce her into sex trafficking. Jane Doe (T.W.) was raped and repeatedly sexually exploited for the financial benefit of her trafficker.

### A.  Jane Doe (T.W.)'s Trafficking at the Paducah Super 8

31.     Jane Doe (T.W.)'s sexual exploitation repeatedly and regularly occurred in rooms of the Paducah Super 8 and was facilitated by the Wyndham Brand Defendants and Ky Motel.

32.     Before and during the time she was at the Paducah Super 8, Jane Doe (T.W.)'s trafficking had profound effects on her, consistent with "red flags" of trafficking that are well-recognized in the hospitality industry. These effects were obvious to and observed by the staff and management of the Paducah Super 8, including effects on her appearance, demeanor, movements throughout the hotel, and her interactions with her trafficker, hotel staff, and others.

33.     Hotel staff and Ky Motel had a duty to report these signs to the Wyndham Brand Defendants. These signs would have provided a reasonable hotel defendant with notice that Jane Doe (T.W.) was being subjected to force, fraud, and coercion by her trafficker. At a minimum, these signs would have prompted a reasonable hotel defendant to take further steps to ascertain information rather than continuing to profit from Jane Doe (T.W.)'s sexual exploitation.

34.     Jane Doe (T.W.)'s trafficking, and the widespread trafficking of other victims, occurred at the Paducah Super 8 as a direct result of the policies and practices adopted by the Wyndham Brand Defendants. The Wyndham Brand Defendants knew or should have known that its policies and practices were facilitating widespread sex trafficking at the Paducah Super 8, including the trafficking of Jane Doe (T.W.) If the Wyndham Brand Defendants had exercised ordinary diligence, they would not have benefited from the sex trafficking at the Paducah Super 8, including the trafficking of Jane Doe (T.W.) Thus, constructive knowledge of the trafficking of Jane Doe (T.W.) is imputed to the Wyndham Brand Defendants.

**B.  Jane Doe (T.W.)'s Trafficking at the Paducah ABV Inn**

35.     Jane Doe (T.W.)'s sexual exploitation repeatedly and regularly occurred in rooms of the Paducah ABV Inn and was facilitated by the ABV Brand Defendants and Mata Pita.

36.     Hotel staff and Mata Pita had a duty to report these signs to the ABV Inn Brand Defendants. These signs would have provided a reasonable hotel defendant with notice that Jane

Doe (T.W.) was being subjected to force, fraud, and coercion by her trafficker. At a minimum, these signs would have prompted a reasonable hotel defendant to take further steps to ascertain information rather than continuing to profit from Jane Doe (T.W.)'s sexual exploitation.

37.     Jane Doe (T.W.)'s trafficking, and the widespread trafficking of other victims, occurred at the Paducah ABV Inn as a direct result of the policies and practices adopted by the ABV Inn Brand Defendants. The ABV Inn Brand Defendants knew or should have known that its policies and practices were facilitating widespread sex trafficking at the Paducah ABV Inn, including the trafficking of Jane Doe (T.W.) If the ABV Brand Defendants had exercised ordinary diligence, they would not have benefited from the sex trafficking at the Paducah ABV Inn, including the trafficking of Jane Doe (T.W.) Thus, constructive knowledge of the trafficking of Jane Doe (T.W.) is imputed to the ABV Inn Brand Defendants.

## II.     The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem

38.     The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what each of the Defendants knew or should have known regarding the trafficking at their hotel properties, including the trafficking of Jane Doe (T.W.)

39.     Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[2] This is no accident. For years, sex traffickers have been able to reap enormous profits with "little risk when attempting to operate within hotels."[3] In 2014, 92 percent of calls to

---

[2] "This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." Id
[3] See Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[4] Hotels have been found to account for over 90 percent of the commercial exploitation of children.[5]

40.      Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking. Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[6]

41.      Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, of which Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:

- Individuals showing signs of fear, anxiety, tension, submission, and/or nervousness;

- Individuals showing signs of physical abuse, restraint, and/or confinement;

- Individuals exhibiting evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

- Individuals showing signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

---

[4] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[5] Erika R. George & Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery*, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

[6] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

- Individuals lacking freedom of movement or are constantly monitored;

- Individuals avoiding eye contact and interaction with others;

- Individuals having no control over or possession of money or ID;

- Individuals dressing inappropriately for their age or have lower quality clothing compared to others in their party;

- Individuals having few or no personal items—such as no luggage or other bags;

- Individuals appearing to be with a significantly older "boyfriend" or in the company of older males;

- A group of girls appearing to be traveling with an older female or male;

- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

- Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

- Possession of bulk sexual paraphernalia such as condoms or lubricant;

- Possession or use of multiple cell phones; and

- Possession or use of large amounts of cash or pre-paid cards.[7]

42.     The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff.

43.     Other commonly recurring signs of sex trafficking at a hotel include use of cash or a prepaid card to pay for a room, refusal of housekeeping services for multiple days, requesting housekeeping services (such as new linens or sheets) but refusing hotel staff access to the room, frequent use of a "Do Not Disturb" sign, finding large amounts of cash or sex paraphernalia in a room, the smell of bodily fluids or musk, the same person reserving multiple rooms, unusual traffic patterns to and from a room, individuals loitering in hallways or common areas who appear to be



[7] *Id.*

monitoring the area, evidence of illegal drugs or excessive alcohol use, excessive use of hotel computers for adult-oriented websites, cars in parking lots are parked so license plate is not visible, presence of multiple cellphones or computers, and an extended stay booked without significant personal possessions in the hotel. Toolkits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking. From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

44.     The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion. It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

45.     The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[8]

46.     All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

---

[8] *Id.*

47.     The most effective weapon against sexual exploitation and human trafficking is education and training.[9] As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[10]

48.     This same conclusion is echoed by others who seek to eliminate or minimize sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[11] In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

49.     Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers *without* taking reasonable steps to identify and prevent trafficking in its hotels is a decision to financially benefit by supporting and facilitating unlawful sex trafficking.

50.     Defendants' public statements regarding trafficking confirm they are aware of the problem in the hospitality industry. Recognizing the unique vantage point that hotel owners and staff often have to identify potential human trafficking ventures and victims on their properties,

---

[9] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).

[10] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Caroline L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

[11] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

several major hotel chains, including franchisors, franchisees, and owner/operators, have told the public they have accepted the unique opportunity and responsibility to stop facilitating sex trafficking.

     **a.** For example, the Wyndham brand has recognized it has a "critical role in increasing awareness and prevention" of sex trafficking in its hotels.[12] It has publicly claimed to be taking steps to avoid facilitating sex trafficking in its hotels since at least 2011.[13] However, the Wyndham Brand Defendants have refused to publish reports to show the brand's progress on the EPCAT goals to combat sex trafficking in hotels.[14]

     **b.** The CEO of VHGI, Inc., then known as Vantage Hospitality Group, Inc., recognized the prevalence of sex trafficking in the hospitality industry and the corresponding responsibility that this places on hotels, noting, "As business owners, community members and fellow human beings, it is our job to put a stop to the horrific crime of sex trafficking. Hotel owners are uniquely situated to identify this crime and until there is no longer a need for The Code, we will encourage our members to become educated about this issue and work with their local law enforcement to put an end to this exploitation."[15]

51.    Each of the Defendants had a responsibility to adopt, implement, and enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

52.    Unfortunately for Jane Doe (T.W.), the promises made by Defendants have proven empty. Defendants have failed, at all levels, to take appropriate action in response to their knowledge of widespread and ongoing human trafficking in their hotels. Instead, they have continued financially benefiting by providing venues for the sexual exploitation of victims like Jane Doe (T.W.)

---

[12] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/
[13] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/
[14] https://thecode.my.salesforce-sites.com/apex/MemberProfilenew?id=0019000000GxgPrAAJ&year=2023
[15] https://eturbonews.com/top-10-hotel-company-signs-tourism-child-protection-code-conduct/

III.     **Sex Trafficking Has Long Been Prevalent at the Franchisor Defendants' Branded Properties, and They Have Known About It.**

53.     Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants has known, since well before Jane Doe (T.W.)'s trafficking, that sex trafficking was ongoing and widespread at its branded properties.

54.     Upon information and belief, each of the Franchisor Defendants monitored criminal activity occurring at its branded hotels and were aware of activity indicating commercial sex trafficking or related crimes occurring at those branded hotels, including but not limited to the specific hotel properties where Jane Doe (T.W.) was trafficked.

55.     Upon information and belief, each of the Franchisee Defendants monitored criminal activity occurring at the hotels they operated and other areas hotels and were aware of activity indicating commercial sex trafficking or related crimes.

**A.  The use of Wyndham-branded properties for sex trafficking is prevalent.**

56.     Upon information and belief, at all relevant times the Wyndham Brand Defendants have adopted a centralized approach to trafficking-related issues at all Wyndham-branded properties, including Super 8 properties. The Wyndham Brand Defendants' public statements confirm that that they retained control over the response of Wyndham-branded hotels to sex trafficking.

57.     Unfortunately, while the Wyndham Brand Defendants' statements reflect actual knowledge of the problem of sex trafficking, they reflect only a public relations strategy rather than a genuine commitment to stop facilitating trafficking. Emails among company executives

reflect a hesitance to commit to meaningful anti-trafficking measures and a desire to avoid negative publicity without any significant burden.[16]

58.     The problem of sex trafficking at Wyndham branded properties was sufficiently well known that, in 2011, there was a public petition with thousands of signatures to stop Wyndham hotel staff from supporting child sex.[17] Although the Wyndham Defendants publicly committed to take steps to stop facilitating trafficking, this promise proved empty; Wyndham has been named a "major contributor to sexual exploitation" and part of the "dirty dozen list" by the National Center on Sexual Exploitation.[18]

59.     In the past twenty years, Wyndham-branded properties have been mentioned in at least two hundred criminal trafficking cases filed by the federal government.[19]

60.     Information that has become public through news stories establishes the entrenched and pervasive nature of the Wyndham Brand Defendants' role in providing a venue where sex trafficking has continued unabated for years. For example:

- In 2010, a California man was arrested for trafficking a 16-year-old victim after being spotted by law enforcement with the minor at a Super 8 in California.[20]

- In November 2011, a man was sentenced for sex trafficking after he forced minor girls to engage in commercial sex for his financial benefit, including at a Super 8 Motel in Virginia.[21]

---

[16] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ ("Scott McLester, Wyndham's former general counsel and chief compliance officer, wrote in an e-mail to the company's then C.E.O., Stephen Holmes, 'Even though we have been hesitant to commit to everything the [EPCAT] Code was asking for, the issue is not going away and it's starting to impact commercial relationships.' McLester added that the organization's 'concern about being 'bullied' into signing the Code is outweighed by the relative harmlessness of the Code itself.'")

[17] https://www.change.org/p/stop-wyndham-hotel-staff-from-supporting-child-sex-trafficking-in-wyndham-hotels

[18] https://endsexualexploitation.org/wyndham/

[19] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/

[20] https://www.wired.com/2010/11/epps/

[21] Gang member sentenced for sex trafficking in Prince William, News & Messenger (Manassas, Virginia) (November 4, 2011) https://plus.lexis.com/api/permalink/562d85d9-e662-4e4f-8f7f-67b52fa537e8/?context=1530671

- In January 2011, a man was sentenced to life for child sex trafficking for requiring a minor to perform commercial sex services more than 50 times over a 14-day period at a Florida Super 8 Motel.[22]

- In June 2011, an MS-13 gang member was indicted for trafficking girls at a Super 8 Motel near Washington, D.C.[23]

- In 2012, four were indicted after forcing a 24-year-old woman to engage in commercial sex at Ohio hotels, including a Super 8.[24] In December 2012, a man was arrested for attempting to entice a 15-year-old girl to engage in prostitution at a Super 8 Motel in Oklahoma.[25]

- In April 2013, two were arrested for trafficking a juvenile girl at an Illinois Super 8.[26]

- In June 2013, a man was arrested on human trafficking charges after he forced a woman to engage in commercial sex at hotels, including a Louisiana Super 8 Motel.[27]

- A man was sentenced to 21 years in prison for sex trafficking his 16-year-old girlfriend starting in August 2013 at two hotels in Dallas, including a Super 8 Motel.[28]

- In 2013, a man was arrested at a Super 8 in Rhode Island and charged with trafficking a 17-year-old girl at the motel.[29]

- In September 2013, a Super 8 motel in Massachusetts was searched and a man was charged with sex trafficking of a 17-year-old developmentally disabled girl after staying with her at that hotel.[30]

- In November 2013, two pled guilty to sex trafficking charges after forcing a child to engage in commercial sex at Super 8 Motel in Texas.[31]

---

[22] https://www.fbi.gov/jacksonville/press-releases/2011/ja011011.htm

[23] https://www.thepublicdiscourse.com/2011/10/4034/

[24] https://www.10tv.com/article/news/crime/crime-tracker/four-indicted-first-human-trafficking-case-franklin-county/530-36f713e6-5488-4465-90c0-7eb99504a635

[25] Man faces new sex-trafficking charges, Tulsa World (Oklahoma ) (March 9, 2013) https://plus.lexis.com/api/permalink/a9062a1a-76b4-4811-89ab-5b0b3c877a88/?context=1530671

[26] https://www.channel3000.com/news/local-news/2-women-accused-of-human-trafficking-at-motel/article_98edf1d4-d231-5ea1-a6b9-e71c83f44750.html

[27] https://www.endslaverytn.org/news/tenn-man-booked-in-human-trafficking-newsarticle

[28] https://www.ice.gov/news/releases/dallas-gang-member-sentenced-21-years-federal-prison-child-sex-trafficking-conviction

[29] https://turnto10.com/archive/new-details-in-ardrey-sex-trafficing-investigation

[30] https://www.providencejournal.com/story/news/crime/2013/09/14/20130914-missouri-man-charged-with-sex-trafficking-in-mass-teens-disappearance-ece/35397014007/

[31] https://www.chron.com/news/article/two-plead-guilty-to-child-sex-trafficking-5000132.php

- In June 2014, two were charged with trafficking a 13-year-old girl at a Minnesota Super 8.[32]

61.     These articles are only representative examples. There are many similar articles about sex trafficking and other associated criminal activity at Super 8 properties and other Wyndham branded hotels. Moreover, on information and belief, the Wyndham Brand Defendants are aware of additional significant law enforcement activity related to trafficking at its hotels that was not reported in the media.

62.     Reviews of Super 8 branded properties, which upon information and belief each of the Wyndham Brand Defendants, monitored regularly, also show both the pervasiveness of sex trafficking at its branded properties and the Wyndham Brand Defendants' knowledge of the same. For example:

- An August 2008 review of a Super 8 property in Arizona stated: "Woke in middle of night (2:30am) with loud party on 2nd floor with bodies slamming into walls, and looked out window to see hooker and pimp making deal with another man in pickup in the parking lot."[33]

- A January 2010 review of a Super 8 property in Escondido, California stated: "This is a hooker hangout, doors slaming at 3:00 AM, You will hear pimps on their cellphones outside in the middle of the night. Ladies arriving at 4:00 AM, Management MUST be aware this is going on and condone this. I expected John Walsh to show up with a film crew."[34]

- A February 2010 review of a Super 8 property in Los Angeles, California stated: "This place lacks security and there were drug dealers trying to push their products inside of the hotel. This place is Scary. The neighborhood was frightening and there were also prostitutes and homeless/addicts all over the place and renting rooms in the hotel. The desk guy looked at my friends attire (faux fur coat) and assumed he was a pimp and that we were prostitutes and seemed surprised that we had made reservations for more than one night. He kept giving us this strange smile... icky. This place left me with a bad feeling. If you want to stay here to save a few bucks my advice is to utilize the buddy system whenever you leave your room to visit the

---

[32] https://www.grandforksherald.com/newsmd/moorhead-police-charge-two-with-sex-trafficking-13-year-old

[33] https://www.tripadvisor.co/Hotel_Review-g60950-d74409-Reviews-Super_8_by_Wyndham_Tucson_Downtown_Convention_Center-Tucson_Arizona.html

[34] https://www.tripadvisor.com/Hotel_Review-g32358-d235407-i132418454-Super_8_Escondido-Escondido_California.html

vending machines... after checking in for the night that is probably the only thing you will feel even moderately safe doing. eek. I can deal with scary hotels but this place is a disaster waiting to happen."[35]

- A June 2010 review of a Super 8 property in Virginia stated: "The location is in a very unsafe place. There were junkies and prostitutes using the premises of the hotel."[36]

- A July 2010 review of a Super 8 property in Texas stated: "After a night out parking lot full had to park under drive thur in front of hotel no other space. Number One reason to not stay here HOOKERS!!! walking the parking lot, walking the sidewalks and feeder road roads in front of Motel. All hours of the day."[37]

- An October 2011 review of a Super 8 property in Tennessee stated: "Don't stay here unless you want drugs or a prostitute....or both. There were drunks running up the halls all night and the maid offered to have sex with my husband for money. When he refused, she then offered to sell him pills."[38]

- A February 2012 review of a Super 8 property in Florida stated: "This hotel should not even be listed as a choice to stay in. Upon check, 3 rooms from me was a sexual battery crime scene. Prostitutes and drug deals were going on all over the property. The room was filthy, smelled horrible and I wouldn't even touch the bed! This hotel is a LIVE IN hotel for Prostitutes, drug dealers and gangs!!!!! DO NOT STAY HERE!!"[39]

- An April 2012 review of a Super 8 property in Virginia stated: "Just beware, there are "escorts" who are constantly on the lookout for fresh meet. A pimp will knock on your door asking to use your cell to call his girlfriend. From then on, she will do the work."[40]

- An April 2012 review of a Super 8 property in Texas stated: "We have stayed in hotels all over the world and I have never had as terrible and frightening an experience as I had at this hotel. The place was crawling with prostitutes and seedy looking guys looking for prostitutes. We tried to stay here anyway, but the night manager started threatening us! In the end we had to call the police in order to safely leave. The police were very sympathetic, and apparently they have frequent problems with this hotel. Stay Away."[41]

---

[35] https://www.tripadvisor.com/Hotel_Review-g32655-d235134-Reviews-Super_8_by_Wyndham_Hollywood_La_Area-Los_Angeles_California.html
[36] https://www.expedia.com/Norfolk-Hotels-Super-8-By-Wyndham-NorfolkChesapeake-Bay.h7202.Hotel-Reviews
[37] https://www.tripadvisor.com/Hotel_Review-g30196-d109015-Reviews-Super_8_by_Wyndham_Austin_North_University_Area-Austin_Texas.html
[38] https://www.tripadvisor.com/Hotel_Review-g55138-d97967-Reviews-or165-Super_8_by_Wyndham_Knoxville_Downtown_Area-Knoxville_Tennessee.html
[39] https://www.tripadvisor.com/Hotel_Review-g34378-d113362-Reviews-Super_8_by_Wyndham_Lantana_West_Palm_Beach-Lantana_Florida.html
[40] https://www.expedia.com/Manassas-Hotels-Super-8-By-Wyndham-Manassas.h12141.Hotel-Reviews
[41] https://www.tripadvisor.ca/Hotel_Review-g56003-d240483-Reviews-Super_8_by_Wyndham_Houston_Brookhollow_NW-Houston_Texas.html

- An October 2012 review of a Super 8 property in Florida stated: "the last time i stayed at this super 8, a hooker approached me in the parking lot and i informed you . this time there was a drug dealer in the next door room, cars coming and going all day & night a car would pull up and one person goes inside and 5 minutes later comes out. when i was checking out i told the desk clerk and the girl in the office says oh i know who that is. well if you knew about why was he still there. i will never stay there again, and i'm a loyal super 8 customer."[42]

- A March 2013 review of a Super 8 property in Louisiana stated: "There was a PROSTITUTE running her business from a room, with her pimp standing outside. She propositioned a co-worker as he was going to his room. Then in the middle of the night she and her clients were fighting very loudly over money and services issued!"[43]

- A March 2013 review of a Super 8 property in Ohio stated: "I've been solicited for drugs and by prostitutes here on several occassions. I told the hotel staff about it and they seem to turn a blind eye to the problem because these people are also buying rooms."[44]

- A February 2013 review of a Super 8 property in Minnesota stated: "This hotel was disgusting. Homeless man passed out in lobby, possible prostitute hanging out in hallway with pimp, cigarette smell, ridiculous noise level throughout night, etc. Dirty shoes in microwave, empty beer cans in fridge. I cannot express enough how terrible this place really is."[45]

- An April 2013 review of a Super 8 property in Georgia stated: "The hotel was filled with prostitutes and drug dealers and I was put in the back with my children which gave me no type of security. Super 8 needs to remove their name from this building."[46]

- A July 2013 review of a Super 8 property in California stated: "Our first night we were greeted by undercover police busting the prostitutes using the spare rooms to turn tricks. Maids make extra income unlocking vacant rooms. I would not recommend this place for children.Or anyone for that fact."[47]

---

[42] https://www.tripadvisor.com/Hotel_Review-g34378-d113362-Reviews-Super_8_by_Wyndham_Lantana_West_Palm_Beach-Lantana_Florida.html
[43] https://www.tripadvisor.ca/Hotel_Review-g40314-d120851-Reviews-FairBridge_Inn_Express_Metairie-Metairie_Louisiana.html
[44] https://www.tripadvisor.com/Hotel_Review-g50891-d226034-Reviews-Quality_Inn_Columbus_East-Reynoldsburg_Ohio.html
[45] https://www.tripadvisor.com/Hotel_Review-g43493-d247863-Reviews-Super_8_by_Wyndham_St_Cloud-Saint_Cloud_Minnesota.html
[46] https://www.tripadvisor.com/Hotel_Review-g34856-d217054-Reviews-Super_8_by_Wyndham_Atlanta_Hartsfield_Jackson_Airport-College_Park_Georgia.html
[47] https://www.tripadvisor.com/Hotel_Review-g32655-d252254-Reviews-or50-Super_8_by_Wyndham_Canoga_Park-Los_Angeles_California.html

- An August 2013 review of a Super 8 property in Ohio stated: "This hotel gives the Super 8 chain a bad reputation. The local restaurant management told us not to answer door due to prostitution issues."[48]

- An October 2013 review of a Super 8 property in Virginia stated: "We ended up wedging a pole in the door for safety reasons. After dark the place turned into, I do NOT exaggerate, a open hoer house. At lease 4 pimps were doing business with a dozen or so girls there. If not for the safety reasons it was a life experience seeing that side of society. We were surprised at a chain like Super 8 condoning this activity. . . . The big thing was the blatant open prostitution that was condoned by your chain was despicable. The car music blaring and loud laughing and yelling was just like out of a rap video. Shame on you Super 8 for condoning this kind of activity just to fill a room."[49]

63.    These reviews are examples. There are many similar online reviews for Super 8 properties and other Wyndham-branded hotels, and, on information and belief, there are additional similar reviews and other customer complaints from before 2013 that are not currently available on the internet but which the Wyndham Brand Defendants know about.

**B.  The use of ABV Inn properties for sex trafficking is prevalent.**

64.    The use of ABV Inn properties for sex trafficking was well known to the ABV Brand Defendants. Information that has become public through news stories establishes the entrenched and pervasive nature of ABV Brand Defendants' role in providing a venue where sex trafficking has continued unabated for years. For example:

- In 2012, 2 were arrested in a prostitution bust at an ABV Inn in North Dakota.[50]

- In 2012, a 13-year-old boy was shot at an ABV Inn in Texas, which was known as a property where prostitution and drugs were common.[51]

---

[48] https://www.tripadvisor.com/Hotel_Review-g50891-d226034-Reviews-Quality_Inn_Columbus_East-Reynoldsburg_Ohio.html
[49] https://www.tripadvisor.com/Hotel_Review-g58026-d110776-Reviews-or10-Super_8_by_Wyndham_Norfolk_Chesapeake_Bay-Norfolk_Virginia.html
[50] https://www.grandforksherald.com/newsmd/charged-with-prostitution-grand-forks-woman-says-shes-not-guilty
[51] *Boy dies in motel shooting*, The Dallas Morning News (November 14, 2012), https://plus.lexis.com/api/permalink/73f3eb54-d344-461d-b467-ff5d088b5ffa/?context=1530671

- In 2013, a woman was sentenced to more than 6 years in prison for trafficking a minor at hotels including an ABV Inn in Connecticut.[52]

- In 2013, 12 people were arrested on prostitution-related charges at an Ohio ABV Inn.[53]

- In 2013, a man faced charges for trafficking an adult woman at an ABV Inn in Georgia.[54]

- In 2013, 2 were arrested for trafficking a 14-year-old girl at an ABV Inn in Georgia.[55]

- In 2014, the City of Birmingham voted to revoke the business license of an ABV Inn property based on widespread criminal activity dating back to 2011.[56]

- In 2014, 2 were arrested for trafficking a teenage girl at an ABV Inn property in Ohio.[57]

- In 2014, 2 were arrested for trafficking 2 adult women at an ABV Inn property in Maryland.[58]

- In 2015, an ABV Inn in North Carolina was deemed a public nuisance for repeated reports of prostitution, drugs, and violence.[59]

- In 2015, a man was arrested for trafficking women at an ABV Inn in Georgia.[60]

- In 2015, arrests were made related to a prostitution ring operating out of hotels, including an ABV Inn in Texas.[61]

- In 2015, a man was arrested for trafficking women at hotels, including an ABV Inn in Pennsylvania.[62]

---

[52] *Norwich woman to serve 78 months for sex trafficking*, The Day (New London, Connecticut) (May 8, 2013).

[53] *Prostitution sting nets 12 offenders*, The Sentinel-Tribune (March 21, 2013), https://plus.lexis.com/api/permalink/c2d06a55-5a54-4ba2-b7ff-173d7a187b93/?context=1530671

[54] https://www.rockdalenewtoncitizen.com/news/man-faces-human-trafficking-charge/article_36fe2c8d-71d2-519a-bdcc-af6d21b18b2d.html

[55] https://www.wsbtv.com/news/local/teens-accused-pimping-exploiting-14-year-old/243073225/

[56] *The Hotel from Hotel: Homicide, Rapes, Drugs, City uses 500 pages of police records to deny business license renewal*, Birmingham News (Alabama) (May 23, 2014), https://plus.lexis.com/api/permalink/4fde894e-c41d-4eea-b108-dd7e05440ae0/?context=1530671

[57] https://www.cleveland19.com/story/26156528/human-trafficking-bust-in-independence-new-state-law-in-effect/

[58] https://www.usatoday.com/story/news/nation/2014/12/02/human-trafficking-charges-maryland/19789031/

[59] https://www.starnewsonline.com/story/news/crime/2016/10/01/update-clock-ticking-down-for-targeted-market-street-hotels/25275378007/

[60] https://www.valdostadailytimes.com/news/local_news/human-trafficking-charges-filed-two-women-rescued-from-local-motel/article_22361c02-0a43-11e5-9673-9fe0de11dff08.html

[61] https://www.beaumontenterprise.com/news/article/At-least-5-arrested-in-prostitution-sting-6323418.php

[62] https://www.lehighvalleylive.com/allentown/2015/05/allentown_mans_sex_trafficking.html

65.     These articles are only representative examples. There are many similar articles about sex trafficking and other associated criminal activity at ABV Inn branded hotels. Moreover, on information and belief, the ABV Brand Defendants are aware of additional significant law enforcement activity related to trafficking at ABV Inn brand hotels that was not reported in the media.

66.     Upon information and belief, each of the ABV Brand Defendants monitored criminal activity occurring at ABV Inn branded hotels and were aware of activity indicating commercial sex trafficking or related crimes occurring at those branded hotels, including the specific property where Jane Doe (T.W.) was trafficked.

67.     Reviews of ABV Inn properties, which upon information and belief each of the ABV Brand Defendants, monitored regularly, also show both the pervasiveness of sex trafficking at its branded properties and the ABV Brand Defendants' knowledge of the same. For example:

- A 2011 review for an ABV Inn property in California states "The hotel room was fine, but there were prostitutes out front and a drunk man in the lobby when we checked in, complaining."[63]

- A 2011 review for an ABV Inn property in Missouri notes "there is prostitution, drug sales and animals on the premises."[64]

- A 2012 review for an ABV Inn property in California states "Leaving the room at 7 pm, there were 5 police cars in the parking lot with a man in handcuffs. I was informed by a police officer this was a "hooker motel, and the man being arrested was a pimp, and we might want to find another hotel." When we arrived back at the motel at midnight it was quiet. At 2:00 AM were were awaken by a group in the room next door who partied very loudly until 3:30 AM,there was no attempt by management to quiet them down. In the morning when packing our vehicle to leave. It appeared that there had been 6 people staying in the room adjacent to us. I would not recommend this motel."[65]

---

[63] https://www.expedia.com/San-Jose-Hotels-Americas-Best-Value-Inn-San-Jose-Convention-Center.h26266.Hotel-Reviews

[64] https://www.tripadvisor.com/Hotel_Review-g44168-d243902-Reviews-Americas_Best_Value_Inn_Bridgeton_St_Louis_North-Bridgeton_Saint_Louis_Missouri.html

[65] https://www.tripadvisor.com/Hotel_Review-g33020-d1022963-Reviews-or10-Americas_Best_Value_Inn_San_Jose_Convention_Center-San_Jose_California.html

- A 2012 review for an ABV Inn property in Illinois states "DRUGS DRUGS DRUGS POLICE POLICE POLICE-- What a dump. Police showed up twice, people fighting, and lots of foot traffic all hours of the night."

- A 2013 review for an ABV Inn property in Ohio states "Just plain and simple. This hotel has prostitutes and drug dealers in it. The owner doesn't even care as long as the money comes in. If I was staying in cleveland, would not even consider this hotel. THUGS, YOUR CAR IS BROKEN INTO, HOOKERS."[66]

- A 2013 review for an ABV Inn in Missouri states "a total drug and prostitute infested dump. loud noise, kids running up and down the walkways, dogs barking all night. Eek they only have wifi on the front half of the building and half the time it did not work."[67]

- A 2013 review for an ABV Inn in California states "Small noisy room. Non smoking rooms wreak of cigarettes and for the week that we stayed there our neighbours consisted of what appeared to be: homeless people who had taken residence there and drug dealers who were smoking weed so strong that even our room began to smell like a Dutch oven. Judging from the state of the way management ran the hotel we didn't bother attempting the continental breakfast."[68]

- A 2014 review for an ABV Inn in Michigan states "But this was a pit of awful full of hookers, johns, drug dealers, and (8 swear words as a modifier) bed bugs. Take them off the list, process my return before my credit card cycle ends. Crimeny."[69]

- A 2014 review for an ABV Inn in Kentucky states "Need urgent supervision-- The worst place in the world .black mold in bathroom. Growth bathtub. The front door is full in people, selling drugs and full in cheap prostitutes sorry very bad impression."[70]

- A 2014 review for an ABV Inn in Oklahoma states "On top of all of that there were hookers all around and even a homeless woman slept on the floor of the guest

---

[66]https://www.google.com/travel/hotels/Americas%20Best%20Value%20Inn%20Cleveland%20Airport%20 14043%20Brookpark%20Rd,%20Brookpark,%20OH%2044142%20google/entity/CgoI6_ybvNuyp9M0EAE/review s?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4308226,4429192,4515404,4597 339,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4874726,4886082,4886480, 4893075,4902277,4905351,4906019,4926165,4926489,4930751,4930753,4931360,4934309,4936396,4937897,470 61553&hl=enVG&gl=vg&ssta=1&q=Americas+Best+Value+Inn+Cleveland+Airport+14043+Brookpark+Rd,+Broo kpark,+OH+44142+google&grf=EmQKLAgOEigSJnIkKiIKBwjnDxACGAwSBwjnDxACGA0gADAeQMoCSgcI 5w8QARgfCjQIDBIwEi6yASsSKQonCiUweDg4MzBlYzMwODcxNGYwMGQ6MHgzNGE2OWQ5NWI3ODZm ZTZi&rp=EOv8m7zbsqfTNBDr_Ju827Kn0zQ4AkAASAHAAQI&ictx=1&sa=X&ved=2ahUKEwjIz8vu0PH8AhV JkmoFHVIOA4EQ4gl6BAhlEAU

[67] https://www.yelp.com/biz/americas-best-value-inns-and-suites-bridgeton

[68] https://www.tripadvisor.com/Hotel_Review-g32655-d549431-Reviews-Americas_Best_Value_Inn_Hollywood_Los_Angeles_California.html

[69] https://www.tripadvisor.com/Hotel_Review-g30196-d108988-Reviews-Americas_Best_Value_Inn_Austin_University-Austin_Texas.html

[70] https://www.tripadvisor.com/Hotel_Review-g39604-d498178-Reviews-Americas_Best_Value_Inn_Louisville-Louisville_Kentucky.html

laundy room on Saturday night. Not to mention the parties and the Corona beer bottles laying around the parking lot both broken and whole."[71]

- A 2014 review for an ABV Inn in Washington states "BUYER BEWARE OF THIS MOTEL!!! The pictures must be from when it was new! We had to get a second motel. They would not refund our money for the room or even for the pet fee! Booking.com offered a $27 refund. What a joke We had to be given a second room key to try. The first room had a group of druggies smoking out. Not sure what but it wasn't cigs or pot. The guy in the next room was a pimping his ole lady. I saw ankle bracelets on more than one guy."[72]

- A 2014 review for an ABV Inn Texas states "If you like roaches and hookers, this is the place!--Hookers walk this place day and night."[73]

**C. The Franchisor Defendants' knowledge of widespread and ongoing sex trafficking at their branded hotels.**

68.     This sampling of news stories, reviews, and other public information establishes that, at the time Jane Doe (T.W.) was trafficked at their hotel properties, the Franchisor Defendants knew, at least, that:

> **a.**   There was widespread and ongoing sex trafficking occurring at their branded properties.
>
> **b.**   Sex trafficking was a brand-wide problem stemming from their top-level decisions.
>
> **c.**   Their franchisees and hotel staff were not taking reasonable steps to detect, deter, and disrupt known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties.
>
> **d.**   Their efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective.
>
> **e.**   They were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

---

[71] https://www.tripadvisor.com/Hotel_Review-g51560-d101858-Reviews-Americas_Best_Value_Inn_Oklahoma_City_I_35_South-Oklahoma_City_Oklahoma.html
[72] https://www.yelp.com/biz/americas-best-value-inn-lakewood-tacoma-s-lakewood
[73] https://www.tripadvisor.com/Hotel_Review-g30196-d108988-Reviews-Americas_Best_Value_Inn_Austin_University-Austin_Texas.html

69.     Despite the continually mounting evidence that sex trafficking at their properties was ongoing and growing, the Franchisor Defendants earned revenue by continuing conduct that they knew or should have known would continue to facilitate that trafficking.

IV.     **Sex Trafficking at the Paducah Super 8**

A.  **The Wyndham Brand Defendants and Ky Motel had actual and constructive knowledge of widespread and ongoing sex trafficking at the Paducah Super 8.**

70.     Sex trafficking was widespread and pervasive at the Paducah Super 8 specifically.

71.     Traffickers, including Jane Doe (T.W.)'s traffickers, repeatedly chose to use the Paducah Super 8 for their sex trafficking activity.

72.     Traffickers, including Jane Doe (T.W.)'s trafficker, operated with little regard for concealment, due to an implicit understanding between traffickers and the Wyndham Brand Defendants and Ky Motel. This understanding enabled the traffickers to operate openly, as they had found a venue where they could conduct their operations without disruption from the Wyndham Brand Defendants and Ky Motel.

73.     There were other victims being trafficked at the Paducah Super 8 at the same time as Jane Doe (T.W.), and there were obvious signs they were being trafficked.

74.     Upon information and belief, there were multiple trafficking victims exploited at the Paducah Super 8 prior to Jane Doe (T.W.)'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims'

27

interactions with their traffickers and others, all of which provided Defendants with notice that these victims were being subject to violence, coercion, control, and exploitation.

75.     All knowledge from the staff at the Paducah Super 8 is imputed to Ky Motel. Ky Motel knew about this widespread and ongoing trafficking at the Paducah Super 8, including the trafficking of Jane Doe (T.W.), through the direct observations of hotel staff, including management-level staff.

76.     Upon information and belief, in addition to available public sources of information about trafficking and knowledge imputed from the hotel staff and management, Ky Motel knew or should have known about the widespread trafficking at the Paducah Super 8 based on non-public sources of information including but not limited to:

a.  surveillance of the property;
b.  internal investigations;
c.  customer complaints;
d.  monitoring of customer feedback;
e.  information received from law enforcement; and
f.  other sources of non-public information available to Ky Motel.

77.     Ky Motel knew about or was willfully blind to the ongoing trafficking at the Paducah Super 8.

78.     At all material times, the Wyndham Brand Defendants had robust reporting requirements in place for franchisees, such as Ky Motel.

79.     The Wyndham Brand Defendants required franchisees, such as Ky Motel, to report all suspected instances of crime, including sex trafficking, at the Paducah Super 8.

80.     The Wyndham Brand Defendants regularly received reports from Ky Motel and others related to suspected instances of crime, including sex trafficking, at the Paducah Super 8.

81.     The Wyndham Brand Defendants required franchisees, such as Ky Motel, to allow the Wyndham Brand Defendants to regularly inspect Super 8 branded hotels, and the Wyndham Brand Defendants regularly inspected the Paducah Super 8. Upon information and belief, during these inspections the Wyndham Brand Defendants observed obvious signs of ongoing criminal activity, including red flags of sex trafficking activity.

82.     Upon information and belief, the Wyndham Brand Defendants knew or should have known about the widespread trafficking at the Paducah Super 8 based on:

a.  The obligation of hotel staff and Ky Motel to report suspected criminal activity, including sex trafficking, to the Wyndham Brand Defendants;

b.  The Wyndham Brand Defendants' regular monitoring of online reviews;

c.  The Wyndham Brand Defendants' collection and monitoring of customer surveys and complaints;

d.  The Wyndham Brand Defendants' requirement that Ky Motel submit regular and detailed reports to the Wyndham Brand Defendants about day-to-day hotel operations;

e.  The Wyndham Brand Defendants' collection and monitoring of data about guests at the Paducah Super 8, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data;

f.  The Wyndham Brand Defendants' supervision and control over day-to-day operations of the Paducah Super 8 through detailed information and extensive reports that it obtained through the property management system and other software systems it required Ky Motel to use and through which Ky Motel was obligated to allow the Wyndham Brand Defendants to obtain real-time data to allow it to monitor hotel operations on a day-to-day basis;

g.  The Wyndham Brand Defendants' regular inspections of the Paducah Super 8;

h.  The Wyndham Brand Defendants' employment of "field agents" to work with hotels on security issues, including trafficking issues;

i.  The Wyndham Brand Defendants' access to surveillance and security systems;

j.  Information provided to the Wyndham Brand Defendants by law enforcement; and

k.  Other sources of information available to the Wyndham Brand Defendants.

83. The Wyndham Brand Defendants and Ky Motel had constructive knowledge of the widespread and ongoing trafficking at the Paducah Super 8 because this trafficking resulted from their failure to exercise ordinary care operating the hotel.

84. Based on their knowledge of the problem of sex trafficking in the hotel industry, at Wyndham-branded hotels, and at the Paducah Super 8, the Wyndham Brand Defendants and Ky Motel each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the subject hotels and to make a reasonable investigation in response to signs of potential sex trafficking. If the Wyndham Brand Defendants and Ky Motel had used reasonable prudence, they would have been aware of the widespread and ongoing trafficking at the Paducah Super 8 and that they were benefiting from such trafficking.

**B. The activities of Jane Doe (T.W.)'s trafficker at Paducah Super 8 were apparent and obvious.**

85. During the 30-month period that Jane Doe (T.W.) was trafficked at the Paducah Super 8, there were obvious signs that her trafficker was engaged in sex trafficking.

    **a.** Rooms were paid for using cash or prepaid cards.

    **b.** There was constant and heavy foot traffic in and out of Jane Doe (T.W.)'s room involving men who were not hotel guests. Jane Doe (T.W.) had approximately 15 men per day sexually exploiting her at the Paducah Super 8.

    **c.** Men sexually exploiting Jane Doe (T.W.) entered and left her room at unusual times and stayed for brief periods.

    **d.** Men visiting to sexually exploit Jane Doe (T.W.) would enter and exit the hotel in a manner such that they would be captured by Defendants' surveillance cameras.

    **e.** Other traffickers were operating out of this hotel at the same time that Jane Doe (T.W.) was trafficked there.

    **f.** Jane Doe (T.W.)'s traffickers would decline room service for several consecutive days.

**g.** Jane Doe (T.W.) would request extra towels and linens, but housekeeping would be asked to leave them at the door.

**h.** Jane Doe (T.W.)'s trafficker would be present in common areas of the hotel, lingering there while Jane Doe (T.W.) was seeing johns.

**i.** Jane Doe (T.W.)'s trafficker would linger on the hotel property while Jane Doe (T.W.) was seeing johns.

**j.** Jane Doe (T.W.)'s trafficker sold drugs at the hotel property.

**k.** The front desk staff had a familiar relationship with Jane Doe (T.W.)'s traffickers.

**l.** Jane Doe (T.W.)'s movements around the hotel were restricted, and she was confined to her room for extended periods.

**m.** There were other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel, including but not limited to those described above.

86.     Ky Motel knew or was willfully blind to the fact that Jane Doe (T.W.) was being trafficked.

87.     Given these obvious signs, the Wyndham Brand Defendants knew or should have known about the trafficking of Jane Doe (T.W.) based on their policy or protocol under which hotel staff were required to report suspected trafficking to the Wyndham Brand Defendants.

88.     The Wyndham Brand Defendants and Ky Motel had constructive knowledge of the trafficking of Jane Doe (T.W.) at the Paducah Super 8 because that trafficking was the direct result of the Wyndham Brand Defendants and Ky Motel facilitating trafficking at the Paducah Super 8.

89.     Based on their knowledge of the problem of sex trafficking in the hotel industry, at Wyndham-branded hotels, and at the Paducah Super 8, the Wyndham Brand Defendants and Ky Motel each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the subject hotels and to make a reasonable investigation in response to signs of potential sex

trafficking. If the Wyndham Brand Defendants and Ky Motel had used reasonable prudence, they would have been aware of Jane Doe (T.W.)'s trafficking at the Paducah Super 8 and that they were benefiting from such trafficking.

**C. Ky Motel facilitated the trafficking activity at the Paducah Super 8, including the trafficking of Jane Doe (T.W.)**

90.     Ky Motel is responsible for the acts, omissions, and knowledge of all employees of the Paducah Super 8 when operating the hotel because these acts and omissions were committed in the scope and course of employment, because Ky Motel ratified these acts and omissions, and because Ky Motel failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Ky Motel, of human trafficking occurring in the subject Super 8.

91.     Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Paducah Super 8, Ky Motel continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

92.     Ky Motel knew or was willfully blind to the fact that Jane Doe (T.W.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (T.W.)'s sexual exploitation.

93.     Ky Motel also facilitated widespread trafficking at the Paducah Super 8, including the trafficking of Jane Doe (T.W.), in ways including:

        a.  Accommodating specific requests of the traffickers for room location.

        b.  Continuing to provide wi-fi services to traffickers even though it knew or should have known those services were being used for advertising victims for sexual exploitation.

  **c.** Implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

  **d.** Failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site.

94. Ky Motel's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Jane Doe (T.W.)

95. Ky Motel knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

**D. The Wyndham Brand Defendants facilitated the trafficking activity at the Paudcah Super 8, including the trafficking of Jane Doe (T.W.)**

96. The Wyndham Brand Defendants directly participated in and retained day-to-day control over renting rooms at the Paducah Super 8. Upon information and belief, the Wyndham Brand Defendants directly participated in and retained day-to-day control over renting rooms at the Paducah Super 8 by, among other things:

  **a.** controlling all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

  **b.** controlling and overseeing policies and procedures regarding check-in, payment, and identity verification procedures, including whether cash and prepaid cards could be used and who had to show identification.

  **c.** requiring Ky Motel to use the Wyndham centralized reservation system and preventing the Ky Motel from using any other system;

  **d.** reserving rooms and accepting payments without requiring Ky Motel approval or involvement;

  **e.** controlling and restricting the ability of Ky Motel and staff to refuse or cancel a reservation.

**f.**  requiring Ky Motel to use a software system operated and controlled by the franchisor for booking rooms and checking guests into rooms;

**g.**  requiring Ky Motel to use a software system operated and controlled by the Wyndham Brand Defendants to process payments;

**h.**  requiring Ky Motel to use a property-management system operated and controlled by the Wyndham Brand Defendants;

**i.**  requiring the Wyndham Brand Defendants to use a data-management system operated and controlled by the franchisor;

**j.**  ensuring that data related to each room reservation passes through systems owned, maintained, and managed by the franchisor;

**k.**  exercising control over the price of rooms;

**l.**  controlling all details of the customer loyalty program that the franchisee was required to implement;

**m.**  setting detailed policies for the check-in process, including requirements for identification and payment methods;

**n.**  collecting guest data, requiring franchisees to report guest data, and reviewing and analyzing guest data, including names, payment information, reservation history, internet browsing data, and other details associated with their stay;

**o.**  assuming sole ownership over all guest information;

**p.**  overseeing do not rent (DNR) lists for its branded properties.

97.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Paducah Super 8, the Wyndham Brand Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

98.    The Wyndham Brand Defendants knew or should have known that Jane Doe (T.W.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate Plaintiff Jane Doe (T.W.)' s sexual exploitation.

99.    The Wyndham Brand Defendants directly participated in and retained control over aspects of the operation of subject the Paducah Super 8 related to trafficking, including by:

**a.**  assuming joint responsibility with the franchisee for detecting and preventing human trafficking at the hotel property

     **b.**   assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols requiring hotel staff to report suspected criminal or trafficking activity to the franchisor

     **c.**   assuming or retaining control over and responsibility for training hotel staff on detecting and responding to human trafficking

     **d.**   assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to human trafficking

     **e.**   employing field-based associates who work with hotels on trafficking issues

     **f.**   assessing or auditing hotel properties, specifically, for the purpose of evaluating whether safety and security measures related to trafficking are in place.

     **g.**   establishing systems for guests to report security issues to the Wyndham Brand Defendants

     **h.**   requiring franchisees to provide Wi-Fi/internet access to guests

     **i.**   mandating the specific tools and systems that franchisees must use to provide Wi-Fi/internet access to guests

     **j.**   setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage

     **k.**   requiring franchisees to use a system to monitor and track housekeeping requests.

     **l.**   setting policies for when and how housekeeping services are provided.

     **m.**  collecting and monitoring data that shows patterns of use of housekeeping services

100.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Paducah Super 8, the Wyndham Brand Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

101.    The Wyndham Brand Defendants knew or should have known that Jane Doe (T.W.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate Jane Doe (T.W.)'s sexual exploitation.

102.    The Wyndham Brand Defendants knew or should have known that Jane Doe (T.W.) and other victims were being trafficked and, despite this, benefited from continued association

with criminal traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate sexual exploitation of victims, including Jane Doe (T.W.)

103.     Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Paducah Super 8, the Wyndham Brand Defendants continued operating Super 8 together with Ky Motel in a way that it knew or should have known would result in facilitating additional sex trafficking at the Paducah Super 8, including by:

       **a.** adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing traffickers, including Jane Doe (T.W.)'s traffickers, to secure rooms without providing their own identifying information;

       **b.** adopting, maintaining, and enforcing policies and practices regarding payment methods in a way that facilitated trafficking by allowing traffickers, including Jane Doe (T.W.)'s traffickers, to pay for rooms using non-traceable methods;

       **c.** adopting and enforcing training methods for the franchisee and hotel staff in a way that led to widespread and ongoing trafficking at the hotel property;

       **d.** adopting and enforcing policies and protocol regarding trafficking in a way that led to widespread and ongoing trafficking at the hotel property;

       **e.** providing traffickers continued access to Franchisor-maintained internet systems despite having or constructive knowledge this access was being used for advertising services related to their trafficking activities;

       **f.** adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of Franchisee and hotel staff related to human trafficking at Super 8;

       **g.** implicitly or explicitly encouraging franchisee to continue facilitating trafficking by continuing the same methods of operation at the hotel property despite obvious evidence that those methods were leading to widespread and ongoing sex trafficking.

104.     But for the Wyndham Brand Defendants' failure to exercise ordinary diligence when operating and controlling the Paducah Super 8, including when exercising control over staff training and response to suspected criminal activity on property, they would have known that Jane

36

Doe (T.W.) was being trafficked there. Thus, constructive knowledge of Jane Doe (T.W.)'s trafficking is imputed to the Wyndham Brand Defendants.

105.    If the Wyndham Brand Defendants had exercised reasonable diligence when operating the Paducah Super 8, the Wyndham Brand Defendants would have prevented this hotel from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (T.W.), and would not have benefited from that trafficking. Instead, the Wyndham Brand Defendants engaged in a course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (T.W.), resulting in financial benefit to the Wyndham Brand Defendants.

106.    The Wyndham Brand Defendants' acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Jane Doe (T.W.)

107.    The Wyndham Brand Defendants knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

**E.  Defendants' ventures at the Paducah Super 8.**

108.    Each of the Defendants knowingly received benefits from participating in the ventures that facilitated Jane Doe (T.W.)'s trafficking at the Paducah Super 8.

109.    Each Defendant directly benefited from facilitating trafficking at the Paducah Super 8. Each Defendant received monetary payment as the result of the rental of rooms at the Paducah Super 8, including the rooms Jane Doe (T.W.) was being trafficked.

110.    Each of the Wyndham Brand Defendants generated substantial income from operations of hotels such as the Paducah Super 8. In exchange for providing the services described

above, each of the Wyndham Brand Defendants received a share of the revenue from room rentals collected at the Paducah Super 8. The fees generated by the Wyndham Brand Defendants are primarily based on gross room rentals; therefore, the Wyndham Brand Defendants' profits increase with each room rental at the Paducah Super 8. Revenue generated from rooms rented at the Paducah Super 8 was distributed among the Wyndham Brand Defendants, with each benefiting from each rental of a hotel room.

111.    Ky Motel profited from every stay by every patron at the Paducah Super 8, both from room rentals and from other hotel services.

112.    By participating in a venture that facilitated sex trafficking, Defendants also benefitted by keeping operating costs low, maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade and by not acknowledging the pervasive nature of sex trafficking in their hotels generally and the Paducah Super 8 specifically.

113.    In ways described more fully above, the Wyndham Brand Defendants and Ky Motel knowingly received a financial benefit from participating in a venture, in the form of a continuous business relationship and implicit understanding, with sex traffickers at the Paducah Super 8 (hereinafter "Venture 1").

114.    The Wyndham Brand Defendants and Ky Motel formed this continuous business relationship and implicit understanding with the traffickers at the Paducah Super 8 by continuing to rent rooms to traffickers (including Jane Doe (T.W.)'s traffickers) after the Wyndham Brand Defendants and Ky Motel knew or should have known that the rooms were being used for unlawful trafficking.

115.    This implicit understanding developed because sex traffickers, including Jane Doe (T.W.)'s sex traffickers, frequently used the Paducah Super 8 for their trafficking knowing that

staff members would look the other way. This occurred because of the acts and omissions of the Wyndham Brand Defendants and Ky Motel that created a favorable environment for sex trafficking to flourish.

116.    Both the Wyndham Brand Defendants and Ky Motel participated in this venture by acting jointly to rent rooms to traffickers as further described throughout this pleading. Ky Motel provided "boots on the ground" for reservations, and the Wyndham Brand Defendants directly participated in renting rooms to guests, retained control over reservation systems, and developed and enforced applicable policies and guidelines as further described in this pleading. Each Defendant participated in the venture by continuing to rent rooms to traffickers after they knew or should have known that hotel rooms were being used for unlawful trafficking.

117.    Defendants did not only provide these traffickers with a physical space but also with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low risk of disruption. This was done pursuant to an implicit agreement with Defendants, which is evidenced as set forth immediately below, among other things:

118.    These traffickers were familiar to the staff at Paducah Super 8;

119.    These traffickers took few or no steps to conceal their activities from the staff at the Paducah Super 8 but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by that staff;

120.    Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties; and

121.    Defendants provided additional services to traffickers (including Jane Doe (T.W.)'s traffickers), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms.

122.    The criminal traffickers operating at the Paducah Super 8 as part of Venture 1 violated 18 U.S.C. §1591 as to victims trafficked at the hotel, including Jane Doe (T.W.)

123.    Jane Doe (T.W.)'s trafficking at the Paducah Super 8 was a result of each Defendant's participation in Venture 1 with criminal traffickers. If Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe (T.W.)'s trafficking at the Paducah Super 8.

124.    In ways described more fully above, the Wyndham Brand Defendants also knowingly received a financial benefit from participating in a commercial venture with Ky Motel operating the Paducah Super 8 (hereinafter "Venture 2").

125.    The Wyndham Brand Defendants and Ky Motel had a longstanding business relationship pursuant to which they jointly participated in operation of the Paducah Super 8 with a shared goal of maximizing revenue, including gross room revenue.

126.    Venture 2 violated the TVRPA through the widespread sex trafficking at Paducah Super 8, including the trafficking of Jane Doe (T.W.), and through the conduct of Ky Motel which violated the TVPRA as a perpetrator by harboring sex trafficking victims as defined by 18 U.S.C §1591(a)(1) and by participating in a criminal trafficking venture as defined by 18 U.S.C §1591(a)(2).

127.    Despite actual or constructive knowledge that Venture 2 was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), the Wyndham Brand Defendants participated in the venture by continuing to associate with Ky Motel to operate the Paducah Super 8 in a way that the

Wyndham Brand Defendants knew or should have known would lead to further violations of 18 U.S.C. §1591, including the trafficking of Jane Doe (T.W.) the Wyndham Brand Defendants continued providing Franchisees with operational support, use of its trademarks, marketing services, and other resources to operate the Paducah Super 8 in a way that the Wyndham Brand Defendants knew or should have known was engaging in violations of 18 U.S.C §1591(a).

**F.  Ky Motel and the staff at the Paducah Super 8 acted as actual agents of the Wyndham Brand Defendants.**

128.   The Wyndham Brand Defendants are vicariously liable for the acts, omissions, and knowledge of Ky Motel and staff at the Paducah Super 8, which are the Wyndham Brand Defendants' actual agents or subagents.

129.   The Wyndham Brand Defendants subjected Ky Motel to detailed standards and requirements regarding the operation of the Paducah Super 8 through the franchising agreement, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the Wyndham Brand Defendants. These written standards, protocols, and requirements:

> a.  did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Ky Motel used at the Paducah Super 8; and
>
> b.  covered virtually all aspects of hotel operations, including but not limited to personnel, building, grounds, furnishing, fixtures, decor, equipment, vehicles, supplies, foodstuffs, printed matters, and internal operating functions; and
>
> c.  dictated the specific manner in which Ky Motel and hotel staff must carry out most day-to-day functions at the Paducah Super 8; and
>
> d.  significantly exceeded what was necessary for the Wyndham Brand Defendants to protect their registered trademarks.

130.     In addition to the ways described above, upon information and belief, the Wyndham Brand Defendants exercised and reserved the right to exercise systemic and pervasive control over Ky Motel's day-to-day operation of the Paducah Super 8, including the following ways:

**a.**   requiring the franchisee and hotel staff to keep detailed records of the day-to-day operations of the hotel;

**b.**   requiring the franchisee and hotel staff to submit detailed reports on aspects of day-to-day operations;

**c.**   requiring the franchisee and hotel staff to implement a data system that gives Franchisor real-time information that it can monitor on a day-to-day basis;

**d.**   exercising or retaining control over vendors that franchisees can use to procure supplies for day-to-day operations;

**e.**   dictating the specific tools that franchisee and hotel staff must use to perform day-to-day operations of the hotel;

**f.**   requiring franchisees to use specific complaint resolution programs;

**g.**   dictating the response of franchisees to specific complaints;

**h.**   exercising or retaining control over the franchisee's day-to-day accounting and banking practices;

**i.**   requiring franchisees to participate in mandatory marketing and advertising programs;

**j.**   exercising sole control over a website for the hotel property and prohibiting franchisee from using any other website for the hotel property;

**k.**   restricting the franchisee's ability to contract out the work of operating the hotel and retaining control over the franchisee's ability to use a management company or other third-party contractor;

**l.**   exercising or retaining control over all aspects of building and facility design;

**m.**   reserving the right to order upgrades and improvements to facilities and operations at the hotel;

**n.**   retaining control over all in-room services, including whether and under what conditions adult movie should be offered;

**o.** retaining the right to use meeting rooms and other space at the hotel property to conduct meetings and other business;

**p.** publicly labeling hotel employees as "our staff" or "our hotel staff";

**q.** exercising or retaining control over human resources issues at the hotel property;

**r.** posting jobs for its branded properties;

**s.** providing benefits to staff of its branded properties;

**t.** setting parameters and guidelines for mandatory evaluations of hotel staff;

**u.** setting pay, pay parameters, or pay ranges for hotel staff;

**v.** setting job qualifications for hotel staff;

**w.** setting job descriptions for hotel staff;

**x.** adopting policies that specifically dictate which positions must perform which day-to-day functions;

**y.** dictating staffing levels required at hotels;

**z.** making or influencing hiring decisions for hotel staff;

**aa.** providing or controlling onboarding for hotel staff;

**bb.** exercising or retaining control over standardized training for hotel employees and management;

**cc.** controlling the time, manner, and location of training for franchisees and hotel staff;

**dd.** requiring all management personnel to attend franchisor led training;

**ee.** exercising or retaining control over training for front desk, housekeeping and operational staff;

**ff.** retaining sole discretion to determine whether franchisee and hotel staff have satisfactorily completed training;

**gg.** adopting policies that dictate specific disciplinary steps for specific infractions by hotel staff;

**hh.** maintaining employment records, including training records, for hotel staff

**ii.** establishing employee recognition programs for hotel staff;

**jj.** requiring that franchisee maintain specific levels of insurance and list the franchisor as an additional insured;

**kk.** retaining sole discretion to transfer the franchising agreement to any person or entity without notice but prohibiting franchisee from transferring the agreement without the franchisor's consent.

131.   The Wyndham Brand Defendants specifically retained control of the day-to-day operation of Ky Motel with regards to aspects of operation of the Paducah Super 8 that caused Jane Doe (T.W.)'s harm, including but not limited to reservation policies and procedures, staff training, security policies, and training, education policies, and procedure regarding human trafficking.

132.   Upon information and belief, the Wyndham Brand Defendants had the right to and did enforce its control over Ky Motel through various methods, including:

**a.** the right to conduct detailed inspections of the Paducah Super 8;

**b.** monitoring or auditing Ky Motel for compliance with policies and expectations;

**c.** directing Ky Motel to take specific steps to come into compliance with detailed and exacting standards regarding day-to-day operations;

**d.** mandating training and education for franchisees and/or hotel staff;

**e.** employing consultants or field agents to become involved in the day-to-day operations of franchised hotels;

**f.** the right to impose fines or penalties;

**g.** the right to impose additional conditions on franchisee or to restrict or limit its right to provide goods and services;

**h.** the right to terminate the franchise agreement for failure to comply with policies that govern the means and methods used for day-to-day operations.

133.    At all relevant times, Ky Motel acted as the actual agent of the Wyndham Brand Defendants when operating the Paducah Super 8.

134.    Upon information and belief, the Wyndham Brand Defendants and Ky Motel shared control of the terms and conditions of the employment of staff at the Paducah Super 8 and, therefore, Wyndham and Ky Motel are joint employers. Upon information and belief, the Wyndham Brand Defendants exercised control over the terms and conditions employment of staff at the Paducah Super 8 by advertising employment opportunities, making or influencing employment decisions, setting employee wages, and adopting standardized rules of operations that govern the day-to-day work of the employees.

## G. The Relationships among the Wyndham Brand Defendants.

135.    WHR is responsible, as a successor, for the acts and omissions of its predecessors (including Wyndham Worldwide Corporation and its subsidiaries) with respect to operation, franchising, and control of the Paducah Super 8.

136.    Prior to 2018, an entity known as Wyndham Hotels and Resorts was a private company (referred to herein as "predecessor WHR") that was a wholly owned subsidiary of Wyndham Worldwide Corporation. In 2018, Wyndham Worldwide Corporation approved a spin-off of its wholly owned subsidiary, predecessor WHR, to form a public company for the continued operation of the Wyndham hotel business that had previously been conducted by Wyndham Worldwide Corporation and/or its wholly owned subsidiaries. This business included the franchising, control, and operation of the Paducah Super 8. This public company that resulted from this spin-off was Defendant WHR.

137.     Defendant WHR and its wholly owned subsidiaries continued to operate all or substantially all the hotel business formerly operated by Wyndham Worldwide Corporation and its subsidiaries, including the franchising, control, and operation of the Paducah Super 8.

138.     Upon information and belief, WHR agreed to assume responsibility for liabilities of Wyndham Worldwide Corporation and its former subsidiaries regarding the franchising, control, and operation of the Paducah Super 8.

139.     Upon information and belief, the rights, and obligations with respect to the operation, franchising, and control of the Paducah Super 8 were shared and fulfilled jointly by the Wyndham Brand Defendants, with the Wyndham Brand Defendants jointly guaranteeing all promises made in Super 8 franchising agreements and reserving rights under those agreements.

140.     Upon information and belief, at all relevant times, the Wyndham Brand Defendants or the predecessor entities for which they are liable, shared a headquarters, corporate officers, employees, and other resources related to franchising, operation, and control of the Paducah Super 8.

141.     Upon information and belief, at all relevant times, the Wyndham Brand Defendants or the predecessor entities for which they are liable, acted jointly to adopt and enforce policies, procedures, and standards for the Paducah Super 8; to participate in and supervise day-to-day operations at that hotel property; and to rent rooms at that property.

142.     Upon information and belief, each of the Wyndham Brand Defendants shared in and benefited from revenue generated from franchising, operation, and control of the Paducah Super 8 and each of the Wyndham Brand Defendants received a direct benefit when a room was rented to a trafficker at this hotel property.

143.    Upon information and belief, each of the Wyndham Brand Defendants—through its individual acts and omissions and through its joint acts and omissions with other Wyndham Brand Defendants—knowingly benefited from participating a venture that it knew or should have known was engaged in a violation of the TVPRA.

144.    Moreover, upon information and belief, each of the Wyndham Brand Defendants participated in a joint venture regarding the operation, control, and franchising of the Paducah Super 8. The Wyndham Brand Defendants, who were corporate affiliates subject to common ownership and control, were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture with respect to the operation, franchising, and control of the Paducah Super 8.

## V.    Sex Trafficking at America's Best Value Inn

### A.    The ABV Brand Defendants and Mata Pita had actual and constructive knowledge of widespread and ongoing sex trafficking at the Paducah ABV Inn.

145.    Sex trafficking was widespread and pervasive at the Paducah ABV Inn specifically.

146.    Traffickers, including Jane Doe (T.W.)'s traffickers, repeatedly chose to use the Paducah ABV Inn for their sex trafficking activity.

147.    Traffickers, including Jane Doe (T.W.)'s trafficker, operated with little regard for concealment, due to an implicit understanding between traffickers and the ABV Brand Defendants and Mata Pita. This understanding enabled the traffickers to operate openly, as they had found a venue where they could conduct their operations without disruption from the ABV Brand Defendants and Mata Pita.

148.    Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the Paducah ABV Inn prior

to Jane Doe (T.W.)'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided Defendants with notice that these victims were being subject to violence, coercion, control, and exploitation.

149.    All knowledge from the staff at the Paducah ABV Inn is imputed to Mata Pita. Mata Pita knew about this widespread and ongoing trafficking at the Paducah ABV Inn, including the trafficking of Jane Doe (T.W.), through the direct observations of hotel staff, including management-level staff.

150.    Upon information and belief, in addition to available public sources of information about trafficking and knowledge imputed from the hotel staff and management, Mata Pita also knew or should have known about the widespread trafficking at the Paducah ABV Inn based on non-public sources of information including but not limited to:

        a.  surveillance of the property;
        b.  internal investigations;
        c.  customer complaints;
        d.  monitoring of customer feedback;
        e.  information received from law enforcement; and
        f.  other sources of non-public information available to Mata Pita.

151.    Mata Pita knew about or was willfully blind to the ongoing trafficking at the ABV Inn Paducah.

152.     At all material times, the ABV Brand Defendants had robust reporting requirements in place for members, such as Mata Pita.

153.     The ABV Brand Defendants required members, such as Mata Pita, to report all suspected instances of crime at the Paducah ABV Inn.

154.     The ABV Brand Defendants regularly received reports from Mata Pita and others related to suspected instances of crime at the Paducah ABV Inn.

155.     The ABV Brand Defendants required members, such as Mata Pita, to report all suspected instances of sex trafficking at ABV Inn branded properties, including the Paducah ABV Inn.

156.     The ABV Brand Defendants regularly received reports from Mata Pita and others related to suspected instances of sex trafficking and commercial sex activities at the Paducah ABV Inn.

157.     The ABV Brand Defendants required franchisees, such as Mata Pita, to allow the ABV Brand Defendants to regularly inspect ABV Inn branded hotels, and the ABV Brand Defendants regularly inspected the Paducah ABV Inn. Upon information and belief, during these inspections the ABV Brand Defendants observed obvious signs of ongoing criminal activity, including red flags of sex trafficking activity.

158.     Upon information and belief, the ABV Brand Defendants knew or should have known about the widespread trafficking at the Paducah ABV Inn based on:

   **a.**  The obligation of hotel staff and Mata Pita to report suspected criminal activity, including sex trafficking, to the ABV Brand Defendants;

   **b.**  The ABV Brand Defendants' regular monitoring of online reviews;

   **c.**  The ABV Brand Defendants' collection and monitoring of customer surveys and complaints;

   **d.**  The ABV Brand Defendants' requirement that Mata Pita submit regular and detailed reports to the ABV Brand Defendants about day-to-day hotel operations;

    **e.**  The ABV Brand Defendants' collection and monitoring of data about guests at the Paducah ABV Inn, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data;

    **f.**  The ABV Brand Defendants' supervision and control over day-to-day operations of the Paducah ABV Inn through detailed information and extensive reports that it obtained through the property management system and other software systems it required Mata Pita to use and through which Mata Pita was obligated to allow the ABV Brand Defendants to obtain real-time data to allow it to monitor hotel operations on a day-to-day basis;

    **g.**  The ABV Brand Defendants' regular inspections of the Paducah ABV Inn;

    **h.**  Information provided to the ABV Brand Defendants by law enforcement; and

    **i.**  Other sources of information available to the ABV Brand Defendants.

159.    The ABV Brand Defendants and Mata Pita had constructive knowledge of the widespread and ongoing trafficking at the Paducah ABV Inn because this trafficking resulted from their failure to exercise ordinary care operating the hotel.

160.    Based on their knowledge of the problem of sex trafficking in the hotel industry, at ABV-branded hotels, and at the Paducah ABV Inn, the ABV Brand Defendants and Mata Pita each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the subject hotels and to make a reasonable investigation in response to signs of potential sex trafficking. If the ABV Brand Defendants and Mata Pita had used reasonable prudence, they would have been aware of the widespread and ongoing trafficking at the Paducah ABV Inn and that they were benefiting from such trafficking.

**B.  The activities of Jane Doe (T.W.)'s trafficker at the Paducah ABV Inn were apparent and obvious.**

161.    During the 30-month period that Jane Doe (T.W.) was trafficked at the Paducah ABV Inn, there were obvious signs that her trafficker was engaged in sex trafficking.

    **a.**  Rooms were often paid for using cash or prepaid cards.

    **b.**  There was constant and heavy foot traffic in and out of Jane Doe (T.W.)'s room involving men who were not hotel guests. Jane Doe (T.W.) had

approximately 15 men per day sexually exploiting her at the Paducah ABV Inn.

   **c.**  Men sexually exploiting Jane Doe (T.W.) entered and left her room at unusual times and stayed for brief periods.

   **d.**  Men visiting to sexually exploit Jane Doe (T.W.) would enter and exit the hotel in a manner such that they would be captured by Defendants' surveillance cameras.

   **e.**  Jane Doe (T.W.)'s traffickers would decline room service for several consecutive days.

   **f.**  Jane Doe (T.W.) would request extra towels and linens, but housekeeping would be asked to leave them at the door.

   **g.**  Jane Doe (T.W.)'s trafficker would be present in common areas of the hotel, lingering there while Jane Doe (T.W.) was seeing johns.

   **h.**  The front desk staff had a relationship with Jane Doe (T.W.)'s traffickers and would provide discounts.

   **i.**  Jane Doe (T.W.)'s movements around the hotel were restricted, and she was confined to her room for extended periods.

   **j.**  There were other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel, including but not limited to those described above

162.   Mata Pita knew or was willfully blind to the fact that Jane Doe (T.W.) was being trafficked.

163.   Given these obvious signs, the ABV Brand Defendants knew or should have known about the trafficking of Jane Doe (T.W.) based on their policy or protocol under which hotel staff and members were required to report suspected trafficking to the ABV Brand Defendants.

164.   The ABV Brand Defendants and Mata Pita had constructive knowledge of the trafficking of Jane Doe (T.W.) at the Paducah ABV Inn because that trafficking was the direct result of the ABV Brand Defendants and Mata Pita facilitating trafficking at the Paducah ABV Inn.

165.    Based on their knowledge of the problem of sex trafficking in the hotel industry, at Wyndham-branded hotels, and at the Paducah ABV Inn, the ABV Brand Defendants and Mata Pita each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the subject hotels and to make a reasonable investigation in response to signs of potential sex trafficking. If the ABV Brand Defendants and Mata Pita had used reasonable prudence, they would have been aware of the trafficking of Jane Doe (T.W.) at the Paducah ABV Inn and that they were benefiting from such trafficking.

### C.  Mata Pita facilitated the trafficking activity at the Paducah ABV Inn, including the trafficking of Jane Doe (T.W.)

166.    Mata Pita is responsible for the acts, omissions, and knowledge of all employees of the Paducah ABV Inn when operating the hotel because these acts and omissions were committed in the scope and course of employment, because Mata Pita ratified these acts and omissions, and because Mata Pita failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Mata Pita of human trafficking occurring in the Paducah ABV Inn.

167.    Mata Pita is responsible for the acts, omissions, and knowledge of all employees of the Paducah ABV Inn when operating the hotel because these acts and omissions were committed in the scope and course of employment, because Mata Pita ratified these acts and omissions, and because Mata Pita failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Mata Pita, of human trafficking occurring in the Paducah ABV Inn.

168.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Paducah ABV Inn, Mata Pita continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

169.    Mata Pita knew or was willfully blind to the fact that Jane Doe (T.W.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (T.W.)'s sexual exploitation.

170.    Mata Pita also facilitated widespread trafficking at the Paducah ABV Inn, including the trafficking of Jane Doe (T.W.), in ways including:

  a.  Accommodating specific requests of the traffickers for room location.

  b.  Continuing to provide wi-fi services to traffickers even though it knew or should have known those services were being used for advertising victims for sexual exploitation.

  c.  Implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

  d.  Failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site.

171.    Mata Pita's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Jane Doe (T.W.)

172.    Mata Pita knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

## D.  The ABV Brand Defendants facilitated the trafficking activity at ABV Inn, including the trafficking of Jane Doe (T.W.)

173.    The ABV Brand Defendants directly participated in and retained day-to-day control over renting rooms at the Paducah ABV Inn. Upon information and belief, the ABV Brand

Defendants directly participated in and retained day-to-day control over renting rooms at the Paducah ABV Inn by, among other things:

  **a.** The ABV Brand Defendants controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes.

  **b.** The ABV Brand Defendants directly made reservations for rooms at the Paducah ABV Inn and accepted payment for those rooms through a central reservation system.

  **c.** The ABV Brand Defendants controlled room rates, required discounts, mandatory fees, and rewards programs.

  **d.** The ABV Brand Defendants controlled and oversaw policies and procedures regarding check-in, payment, and identity verification procedures.

  **e.** The ABV Brand Defendants collected, retained, monitored, and analyzed detailed data about every guest who stayed at the Paducah ABV Inn.

  **f.** The ABV Brand Defendants established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the Paducah ABV Inn until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in.

  **g.** The ABV Brand Defendants required Mata Pita to use a property management system, which was owned, maintained, controlled, and operated by the ABV Brand Defendants, for virtually all aspects of hotel operations regarding room reservations and payment.

174.   Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Paducah ABV Inn, the ABV Brand Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

175.     The ABV Brand Defendants knew or should have known that Jane Doe (T.W.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate Plaintiff Jane Doe (T.W.)' s sexual exploitation.

176.     The ABV Brand Defendants directly participated in and retained control over aspects of the operation of the Paducah ABV Inn related to trafficking, including by:

**a.**  The ABV Brand Defendants publicly assumed responsibility and control over the human trafficking response of all ABV Inn properties, including design and implementation of practices to prevent trafficking, safety and security procedures, employee and franchisee education, training, and response, partnership with external organizations, and advocacy.

**b.**  The ABV Brand Defendants retained control over when branded hotels would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in branded hotels.

**c.**  The ABV Brand Defendants retained control, at the brand-wide level, over security training, including how to detect and respond to criminal activity, including trafficking.

**d.**  The ABV Brand Defendants were responsible for adopting, enforcing, and monitoring policies and codes of conduct related to criminal activity, including human trafficking, at the Paducah ABV Inn.

**e.**  The ABV Brand Defendants retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the Paducah ABV Inn, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services.

177.     Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Paducah ABV Inn, the ABV Brand Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

178.     The ABV Brand Defendants knew or should have known that Jane Doe (T.W.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate Jane Doe (T.W.)'s sexual exploitation.

179. The ABV Brand Defendants knew or should have known that Jane Doe (T.W.) and other victims were being trafficked and, despite this, benefited from continued association with criminal traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate sexual exploitation of victims, including Jane Doe (T.W.)

180. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Paducah ABV Inn, the ABV Brand Defendants continued operating the Paducah ABV Inn together with Mata Pita in a way that it knew or should have known would result in facilitating additional sex trafficking at the Paducah ABV Inn, including by:

    a. adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing traffickers, including Jane Doe (T.W.)'s traffickers, to secure rooms without providing their own identifying information;

    b. adopting, maintaining, and enforcing policies and practices regarding payment methods in a way that facilitated trafficking by allowing traffickers, including Jane Doe (T.W.)'s traffickers, to pay for rooms using non-traceable methods;

    c. adopting and enforcing training methods for the franchisee/member and hotel staff in a way that led to widespread and ongoing trafficking at the hotel property;

    d. adopting and enforcing policies and protocol regarding trafficking in a way that led to widespread and ongoing trafficking at the hotel property;

    e. providing traffickers continued access to ABV-maintained internet systems despite having or constructive knowledge this access was being used for advertising services related to their trafficking activities;

    f. adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of franchisee/member and hotel staff related to human trafficking at the Paducah ABV Inn;

    g. implicitly or explicitly encouraging the franchisee/member to continue facilitating trafficking by continuing the same methods of operation at the hotel property despite obvious evidence that those methods were leading to widespread and ongoing sex trafficking.

181.    If The ABV Brand Defendants had exercised reasonable diligence when operating the Paducah ABV Inn and, in the areas, where it retained control, the ABV Brand Defendants would have prevented the Paducah ABV Inn from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (T.W.) Instead, the ABV Brand Defendants engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (T.W.)

182.    The ABV Brand Defendants' acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Jane Doe (T.W.)

183.    The ABV Brand Defendants knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

**E.  Defendants' ventures at the Paducah ABV Inn.**

184.    Each of the Defendants knowingly received benefits from participating in the ventures that facilitated Jane Doe (T.W.)'s trafficking at the Paducah ABV Inn.

185.     Each Defendant directly benefited from facilitating trafficking at the Paducah ABV Inn. Each Defendant received monetary payment as the result of the rental of rooms at the Paducah ABV Inn, including the rooms where Jane Doe (T.W.) was being trafficked.

186.    Each of the ABV Brand Defendants generated substantial income from operations of hotels such as the Paducah ABV Inn. In exchange for providing the services described above, each of the ABV Brand Defendants received a share of the revenue from room rentals collected at the Paducah ABV Inn. The fees generated by the ABV Brand Defendants are primarily based on gross room rentals; therefore, the ABV Brand Defendants' profits increase with each room rental

at the Paducah ABV Inn. Revenue generated from rooms rented at the Paducah ABV Inn was distributed among the ABV Brand Defendants, with each benefiting from each rental of a hotel room.

187.    Mata Pita profited from every stay by every patron at the Paducah ABV Inn, both from room rentals and from other hotel services.

188.    By participating in a venture that facilitated sex trafficking, Defendants also benefitted by keeping operating costs low, maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade and by not acknowledging the pervasive nature of sex trafficking in their hotels generally and the Paducah ABV Inn specifically.

189.    In ways described more fully above, the ABV Brand Defendants and Mata Pita knowingly received a financial benefit from participating in a venture, in the form of a continuous business relationship and implicit understanding, with sex traffickers at the Paducah ABV Inn (hereinafter "Venture 1").

190.    The ABV Brand Defendants and Mata Pita formed this continuous business relationship and implicit understanding with the traffickers at the Paducah ABV Inn by continuing to rent rooms to traffickers (including Jane Doe (T.W.)'s traffickers) after the ABV Brand Defendants and Mata Pita knew or should have known that the rooms were being used for unlawful trafficking.

191.    This implicit understanding developed because sex traffickers, including Jane Doe (T.W.)'s sex traffickers, frequently used the Paducah ABV Inn for their trafficking knowing that staff members would look the other way. This occurred because of the acts and omissions of the ABV Brand Defendants and Mata Pita that created a favorable environment for sex trafficking to flourish.

192. Both the ABV Brand Defendants and Mata Pita participated in this venture by acting jointly to rent rooms to traffickers as further described throughout this pleading. Mata Pita provided "boots on the ground" for reservations, and the ABV Brand Defendants directly participated in renting rooms to guests, retained control over reservation systems, and developed and enforced applicable policies and guidelines as further described in this pleading. Each Defendant participated in the venture by continuing to rent rooms to traffickers after they knew or should have known that hotel rooms were being used for unlawful trafficking.

193. Defendants did not only provide these traffickers with a physical space but also with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low risk of disruption. This was done pursuant to an implicit agreement with Defendants, which is evidenced by, among other things.

194. These traffickers were familiar to the staff at Paducah ABV Inn.

195. These traffickers took few or no steps to conceal their activities from the staff at the Paducah ABV Inn but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by that staff.

196. Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties; and

197. Defendants provided additional services to traffickers (including Jane Doe (T.W.)'s traffickers), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms.

198. The criminal traffickers operating at the Paducah ABV Inn as part of Venture 1 violated 18 U.S.C. §1591 as to victims trafficked at the hotel, including Jane Doe (T.W.)

199.     Jane Doe (T.W.)'s trafficking at the Paducah ABV Inn was a result of each Defendant's participation in Venture 1 with criminal traffickers. If Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe (T.W.)'s trafficking at the Paducah ABV Inn.

200.     In ways described more fully above, The ABV Brand Defendants also knowingly received a financial benefit from participating in a commercial venture with Mata Pita operating the Paducah ABV Inn (hereinafter "Venture 2").

201.     The ABV Brand Defendants and Mata Pita had a longstanding business relationship pursuant to which they jointly participated in operation of the Paducah ABV Inn with a shared goal of maximizing revenue, including gross room revenue.

202.     Venture 2 violated the TVRPA through the widespread sex trafficking at Paducah ABV Inn, including the trafficking of Jane Doe (T.W.), and through the conduct of Mata Pita who violated the TVPRA as a perpetrator by harboring sex trafficking victims as defined by 18 U.S.C §1591(a)(1) and by participating in a criminal trafficking venture as defined by 18 U.S.C §1591(a)(2).

203.     Despite actual or constructive knowledge that Venture 2 was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), The ABV Brand Defendants participated in the venture by continuing to associate with Mata Pita to operate the Paducah ABV Inn in a way that The ABV Brand Defendants knew or should have known would lead to further violations of 18 U.S.C. §1591, including the trafficking of Jane Doe (T.W.) The ABV Brand Defendants continued providing Franchisees with operational support, use of its trademarks, marketing services, and other resources to operate the Paducah ABV Inn in a way that The ABV Brand Defendants knew or should have known was engaging in violations of 18 U.S.C §1591(a).

**F. Mata Pita and the staff at the ABV Inn acted as actual agents of the ABV Brand Defendants.**

204.    The ABV Brand Defendants are vicariously liable for the acts, omissions, and knowledge of Mata Pita and the staff at Paducah ABV Inn, which acted as the ABV Brand Defendants' actual agents or subagents when operating the Paducah ABV Inn.

205.    The ABV Brand Defendants subjected Mata Pita to detailed standards and requirements regarding the operation of ABV Inn through the membership agreement, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the ABV Brand Defendants. These written standards, protocols, and requirements:

> a.  did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Mata Pita used at ABV Inn; and
>
> b.  covered virtually all aspects of hotel operations, including but not limited to personnel, building, grounds, furnishings, fixtures, decor, equipment, vehicles, supplies, foodstuffs, printed matters, and internal operating functions; and
>
> c.  dictated the specific manner in which Mata Pita and hotel staff must carry out most day-to-day functions at ABV Inn; and
>
> d.  significantly exceeded what was necessary for The ABV Brand Defendants to protect its registered trademarks.

206.    In addition to the ways described above, upon information and belief, The ABV Brand Defendants exercised and reserved the right to exercise systemic and pervasive control over Mata Pita's day-to-day operation of the ABV Inn, including the following ways:

> a.  requiring Mata Pita to participate in operational support programs;
>
> b.  requiring Mata Pita and hotel staff to keep detailed records of the day-to-day operations of the hotel;

**c.**  requiring Mata Pita and hotel staff to submit detailed reports on aspects of day-to-day operations;

**d.**  requiring Mata Pita and hotel staff to implement a data system that gives the ABV Brand Defendants real-time information that it can monitor on a day-to-day basis;

**e.**  exercising or retaining control over vendors that Mata Pita used to procure supplies for day-to-day operations;

**f.**  dictating the specific tools that Mata Pita and hotel staff used to perform day-to-day operations of the hotel;

**g.**  requiring Mata Pita to use specific complaint resolution programs;

**h.**  reserving the right to directly resolve guest complaints at Mata Pita's expense;

**i.**  requiring Mata Pita to participate in mandatory marketing and advertising programs;

**j.**  exercising sole control over a website for the hotel property and prohibiting franchisee from using any other website for the hotel property;

**k.**  restricting Mata Pita's ability to contract out the work of operating the hotel and retaining control over the franchisee's ability to use a management company or other third-party contractor;

**l.**  posting jobs for its branded properties;

**m.**  providing benefits to staff of its branded properties;

**n.**  setting parameters and guidelines for mandatory evaluations of hotel staff;

**o.**  setting pay, pay parameters, or pay ranges for hotel staff;

**p.**  setting job qualifications for hotel staff;

**q.**  setting job descriptions for hotel staff;

**r.**  exercising or retaining control over standardized training for hotel employees and management;

**s.**  controlling the time, manner, and location of training for franchisees and hotel staff;

    **t.** requiring all management personnel to attend training;

    **u.** exercising or retaining control over training for front desk, housekeeping and operational staff;

    **v.** retaining sole discretion to determine whether members and hotel staff have satisfactorily completed training;

    **w.** requiring that members maintain specific levels of insurance and list the franchisor as an additional insured;

    **x.** retaining sole discretion to transfer the membership agreement to any person or entity without notice but prohibiting franchisee from transferring the agreement without the franchisor's consent.

207.   The ABV Brand Defendants specifically retained control of the day-to-day operation of Mata Pita with regards to aspects of operation of the subject ABV Inn that caused Jane Doe (T.W.)'s harm, including but not limited to reservation policies and procedures, staff training, security policies, and training, education policies, and procedure regarding human trafficking.

208.   Upon information and belief, The ABV Brand Defendants had the right to and did enforce its control over Mata Pita through various methods, including:

    **a.** the right to conduct detailed inspections of the ABV Inn;

    **b.** monitoring or auditing the Mata Pita for compliance with policies and expectations;

    **c.** directing Mata Pita to take specific steps to come into compliance with detailed and exacting standards regarding day-to-day operations;

    **d.** mandating training and education for franchisees and/or hotel staff;

    **e.** employing consultants or field agents to become involved in the day-to-day operations of franchised hotels;

    **f.** the right to impose fines or penalties;

    **g.** the right to impose additional conditions on membersor to restrict or limit its right to provide goods and services;

    **h.** the right to terminate the franchise agreement for failure to comply with policies that govern the means and methods used for day-to-day operations.

209. At all relevant times, Mata Pita acted as the actual agent of The ABV Brand Defendants when operating the Paducah ABV Inn.

### G. Relationships among the ABV Brand Defendants.

210. Red Lion and Sonesta are responsible, as successors, for the acts and omissions of its predecessors, including VGHI, Inc. and VGHI Franchising, Inc., with respect to operation, franchising, and control of the Paducah ABV Inn.

211. Upon information and belief, in 2016, Red Lion acquired the brands and brand operations of VGHI, Inc., VGHI Franchising, Inc. and their subsidiaries, and in 2021 Sonesta acquired (or merged with) Red Lion. This included all or substantially all their operating assets, including the America's Best Value brand, which Red Lion and then Sonesta continued to operate at locations around the United States, including in Kentucky.

212. Upon information and belief, Red Lion agreed to assume responsibility for liabilities of VGHI, Inc., VGHI Franchising, Inc. and their subsidiaries regarding the franchising, control, and operation of the Paducah ABV Inn. Upon information and belief, Sonesta agreed to assume responsibility for liabilities of Red Lion, VGHI, Inc., VGHI Franchising, Inc. and their subsidiaries regarding the franchising, control, and operation of the Paducah ABV Inn.

213. Upon information and belief, the rights, and obligations with respect to the operation, franchising, and control of the Paducah ABV Inn were shared and fulfilled jointly by the ABV Brand Defendants. Upon information and belief, each of the ABV Brand Defendants shared revenue related to operation, franchising, and control of the Paducah ABV Inn and each of

the ABV Brand Defendants experienced a direct benefit from the rental of rooms to traffickers at the Paducah ABV Inn. Upon information and belief, each of the ABV Brand Defendants participated directly in the ventures franchising, controlling, operating, and renting rooms at the Paducah ABV Inn in the ways outlined more specifically above. Further, upon information and belief, each of the ABV Brand Defendants knew or should have known that these ventures were engaged in facilitation of sex trafficking.

214.    Upon information and belief, each of the ABV Brand Defendants participated in a joint venture regarding the operation, control, and franchising of the Paducah ABV Inn. The ABV Brand Defendants, who were corporate affiliates subject to common ownership and control, and were alter-egos and/or were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture with respect to the operation, franchising, and control of the Paducah ABV Inn.

**VI.    Defendants are Jointly and Severally Liable for Jane Doe (T.W.)'s Damages.**

215.    The venture or ventures in which each Defendant participated were proximate causes of the injuries and damages to Jane Doe (T.W.) and were direct causes and/or substantial factors in causing those injuries and damages.

216.    Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Jane Doe (T.W.) for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

## CAUSES OF ACTION

I.   **Cause of Action 1: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a) (Franchisee Defendants)**

217.   Jane Doe (T.W.) is a victim of sex trafficking within the meaning of 18 U.S.C §1591 and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

218.   Each of the Franchisee Defendants is a perpetrator within the meaning of 18 U.S.C §1595(a) because each of the Franchisee Defendants:

   **a.**   violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, it harbored individuals (including Jane Doe (T.W.)) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at its respective hotel property.

   **b.**   violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, it knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at its respective hotel property.

II.   **Cause of Action 2: Beneficiary Liability under §1595 (a) of the TVPRA (all Defendants)**

219.   Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C §1591 and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

220.   All Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, in ways further described above, each Defendant knowingly benefitted, by receiving additional revenue and other benefits, from its participation in a venture the Defendant knew or should have known was engaged in a violation of the TVPRA.

221.   **Venture 1:** Through acts and omissions more fully described throughout this pleading, each Defendant received a financial benefit from participating in ongoing commercial

relationship venture, referred to herein as Venture 1, with sex traffickers, including JANE DOE

(T.W.)'s traffickers, operating at their respective subject hotels. Each Defendant violated the

TVPRA through its participation, as a beneficiary, in Venture 1 as follows:

    a. Venture 1 resulted when Defendants developed and maintained a continuous business relationship and implicit understanding with sex traffickers at the subject hotels by renting them hotel rooms and providing them related services despite the fact that each Defendant knew or should have known these traffickers were using the Paducah Super 8 and the Paducah ABV Inn to engage in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2), including the trafficking of Jane Doe (T.W.)

    b. This venture violated the TVPRA through the conduct of the traffickers who repeatedly exploited victims, including Jane Doe (T.W.), in the rooms of the subject hotels.

    c. Each Defendant knew or should have known Venture 1 engaged in violations of the TVPRA.

    d. Each member of Venture 1 pursued the purpose of generating revenue through this continuous business relationship. Traffickers (including Jane Doe (T.W.)'s trafficker) rented rooms to earn profits by exploiting trafficking victims (including Jane Doe (T.W.)). Each Defendant received a financial benefit every time a trafficker rented a room.

    e. Each Defendant participated in the venture by continually renting rooms to traffickers, creating a favorable environment for trafficking, and providing a venture where traffickers could continue to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of trafficking (including Jane Doe (T.W.)'s trafficking).

    222. **Venture 2**: Through acts and omissions more fully described throughout this

Complaint, each of the Franchisor Defendants received a financial benefit from participating in

commercial venture, referred to herein as Venture 2, with its respective Franchisee Defendant

operating its respective hotel. Each of the Franchisor Defendants violated the TVPRA through

participation, as beneficiaries, in this venture as follows:

    a. This is a commercial venture that resulted from the business relationship between the Franchisor Defendants and their respective franchisees to operate the subject hotels with a common objective of maximizing revenue at the hotels, including gross room revenue.

    b. The venture violated the TVPRA through the widespread sex trafficking that occurred at each of the subject hotels, including the trafficking of JANE DOE

(T.W.) This venture also violated the TVPRA through the conduct of the respective franchisee who violated 18 U.S.C §1591(a) as a perpetrator as alleged above.

    c.    The Franchisor Defendants knew or should have known Venture 2 was engaged in violations of the TVPRA.

    d.    The Franchisor Defendants knowingly benefited from this venture through the management fees, royalty fees, reservation fees, marketing fees, and other ancillary fees from the operation of their respective subject hotel, which increased every time a room was rented to a trafficker.

    e.    The Franchisor Defendants participated in this venture by (1) continuing the ongoing business relationship with their respective franchisee despite actual or constructive knowledge the hotel was facilitating sex trafficking; (2) directly involving themselves in and supporting aspects of hotel operations that they knew or should have known were facilitating trafficking at the hotel; and (3) continuing to lend the perceived legitimacy of their brand and provide marketing services for the hotel after they knew or should have known the venture was engaged in violations of the TVPRA.

223.    The ventures in which each Defendant participated were a direct, producing, and proximate cause of the injuries and damages to Jane Doe (T.W.)

### III.    Cause of Action 3: Vicarious Liability for TVPRA Violations (Franchisor Defendants)

224.    Each of the Franchisee Defendants acted as the actual agent of its respective Franchisor Defendant when operating its respective hotel property.

225.    In ways further described above, each of the Franchisor Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its franchisee to operate its respective hotel property.

226.    Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agent and its subagents.

227.    Each of the Franchisor Defendants is vicariously liable for the TVPRA violations of its franchisee and the subagents of that franchisee.

228.    As alleged above, Ky Motel is directly liable to Jane Doe (T.W.) for violations of the TVPRA, both as a perpetrator under 18 U.S.C §1591(a) and as a beneficiary under 18 U.S.C

§1595(a). The Wyndham Brand Defendants are vicariously liable to Jane Doe (T.W.) for those same violations.

229.     As alleged above, Mata Pita is directly liable to Jane Doe (T.W.) for violations of the TVPRA, both as a perpetrator under 18 U.S.C §1591(a) and as a beneficiary under 18 U.S.C §1595(a). The ABV Brand Defendants are vicariously liable to Jane Doe (T.W.) for those same violations.

230.     Each of the Wyndham Brand Defendants is liable for the acts and omissions of each of the other Wyndham Brand Defendants with respect to the operation and franchising of the Paducah Super 8. On information and belief, the Wyndham Brand Defendants, who were corporate affiliates subject to common ownership and control, operated as a joint venture engaged in profit sharing and subject to mutual control regarding the operation of the Paducah Super 8. They operated as a single integrated enterprise and as alter-egos and/or agents of one another with respect to operation of the Paducah Super 8.

231.     Each of the ABV Brand Defendants is liable for the acts and omissions of each of the other ABV Brand Defendants with respect to the operation and control of the Paducah ABV Inn. On information and belief, the ABV Brand Defendants, who were corporate affiliates subject to common ownership and control, operated as a joint venture engaged in profit sharing and subject to mutual control regarding the operation of the Paducah ABV Inn. They operated as a single integrated enterprise and as alter-egos and/or agents of one another with respect to operation of the Paducah ABV Inn.

IV.     **Cause of Action 4: Franchisor Defendants' Vicarious Liability for Franchisee's Violations of the TVPRA as Joint Employer of the Staff at the Subject Hotels.**

232.    At all relevant times, the Wyndham Brand Defendants and Ky Motel were joint employers of the staff of the Paducah Super 8 because they exercised joint control over the terms and conditions of employment, and the economic realities reflect joint employment.

233.    Under the TVPRA and the federal common law, the Wyndham Brand Defendants, as a joint employer of the staff of the Paducah Super 8, are vicariously liable for the acts and omissions of the staff of the Paducah Super 8.

234.    As alleged above, the staff of the subject Paducah Super 8 engaged in conduct that violated 18 U.S.C §1591(a) and §1595(a). The Wyndham Brand Defendants are vicariously liable for these TVPRA violations.

235.    At all relevant times, the ABV Brand Defendants and Mata Pita were joint employers of the staff of the Paducah ABV Inn because they exercised joint control over the terms and conditions of employment, and the economic realities reflect joint employment.

236.    Under the TVPRA and the federal common law, the ABV Brand Defendants, as a joint employer of the staff of the Paducah ABV Inn, are vicariously liable for the acts and omissions of the staff of the Paducah ABV Inn.

237.    As alleged above, the staff of the Paducah ABV Inn engaged in conduct that violated 18 U.S.C §1591(a) and §1595(a). The ABV Brand Defendants are vicariously liable for these TVPRA violations.

## TOLLING OF LIMITATIONS

238.    To the extent Defendants assert an affirmative defense of limitations, Jane Doe (T.W.) invokes the discovery rule. At the time she was harmed and through at least October 2014, Jane Doe (T.W.) was under coercion and control of traffickers who abused and manipulated her.

Thus, Jane Doe (T.W.) did not discover and could not reasonably have discovered the legal cause of her injury more than ten years before she filed this lawsuit. While she was under the control of her trafficker, Jane Doe (T.W.) —through no fault of her own—lacked the information to bring a claim because she did not know both her injury and the cause of her injury. This lack of information was due to no fault on the part of Jane Doe (T.W.) but rather was a direct result of Jane Doe (T.W.) being kept under the control of her traffickers, which Defendants facilitated.

239.   At the time Jane Doe (T.W.) was harmed, she did not know that she was the victim of human trafficking as that term is defined by law, that her injury arose from being trafficked at Defendants' hotel or that she was a person trafficked, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in a position to discover the legal cause of her injury, more than ten years before suit was filed.

240.   To the extent Defendants assert an affirmative defense of limitations, Jane Doe (T.W.) invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking, Jane Doe (T.W.) faced extraordinary circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit, and those circumstances did not end more than 10 years before Jane Doe (T.W.) filed this lawsuit.

241.   To the extent Defendants assert an affirmative defense of limitations, Jane Doe (T.W.) also invokes the continuing tort doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct. Jane Doe (T.W.) was subject to continuous trafficking at Defendants' hotels through at least October 2014, which is not more than 10 years before Jane Doe (T.W.) filed this lawsuit. This continuous trafficking resulted from Defendants' continuous facilitating of trafficking and Defendants' ongoing venture with one another and with criminal traffickers at the subject hotels.

**DAMAGES**

242.    Jane Doe (T.W.) seeks the following damages, joint and severally, in an amount to be determined, from all Defendants:

      a.   Actual damages;

      b.   Direct damages;

      c.   Incidental and consequential damages;

      d.   Mental anguish and emotional distress damages (until trial and in the future)

      e.   Lost earnings and lost earning capacity;

      f.   Loss of self-esteem and self-worth;

      g.   Necessary medical expenses;

      h.   Physical pain and suffering;

      i.   Physical impairment;

      j.   Emotional impairment;

      k.   Unjust enrichment;

      l.   Exemplary/Punitive damages;

      m.   Attorneys' fees;

      n.   Costs of this action; and

      o.   Pre- and post-judgment interest at the maximum legal rates.

243.    A constructive trust should be imposed on all Defendants and the Court should sequester any benefits or money wrongfully received by Defendants for the benefit of Plaintiff.

**JURY DEMAND**

244.    Jane Doe (T.W.) requests a trial by jury.

**REQUEST FOR RELIEF**

WHEREFORE, Jane Doe (T.W.) requests that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (T.W.) against all Defendants jointly and severally for such actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe (T.W.) may be justly entitled.

Respectfully submitted,

*/s/ E. Douglas Richards*
**E. Douglas Richards**
401 Lewis Hargett Circle, Suite 210
Lexington, KY 40503
859.229.5851
edr@richardslawky.com

Michael Hamilton (BPR # 010720)
**PROVOST★UMPHREY LAW FIRM LLP**
4205 Hillsboro Pike, Suite 303
Nashville, Tennessee 37215
615.297.1932
mhamilton@pulf.com

Guy G. Fisher
**PROVOST★UMPHREY LAW FIRM LLP**
350 Pine Street, Ste. 1100
Beaumont, Texas 77701
409.835.6000
gfisher@pulf.com

**ANNIE MCADAMS, PC**
ANNIE MCADAMS
1150 Bissonnet Street
Houston, TX 77005
713.785.6262
annie@mcadamspc.com
*Attorneys for Plaintiff, Jane Doe (T.W.)*