UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION

| | |
|---|---|
| JANE DOE (T.W.), AN INDIVIDUAL, <br><br> Plaintiff, <br><br> v. <br><br> WYNDHAM HOTELS AND RESORTS, INC.; WYNDHAM HOTEL GROUP, LLC; SUPER 8 WORLDWIDE, INC.; VIDHI, LLC; RED LION HOTELS CORPORATION; MATA PITA, INC. D/B/A AMERICA'S BEST VALUE INN; VHGI FRANCHISING, INC.; and VHGI, INC. <br><br> Defendants. | CIVIL ACTION NO: 5:24-cv-00008-BJB-LLK |

**FIRST AMENDED COMPLAINT**

Plaintiff Jane Doe (T.W.) files this First Amended Complaint and respectfully shows the Court as follows:

**PARTIES**

1.  Plaintiff Jane Doe (T.W.) is a resident of Casselberry, Florida.

2.  T.W. is a a victim of sex trafficking under 18 U.S.C. §1591(a) who is entitled to bring a civil lawsuit under §1595(a) of the Trafficking Victims Protection Reauthorization Act (TVPRA).

3.  Defendant Wyndham Hotels & Resorts, Inc., ("WHR") is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey. It was served and has appeared in this lawsuit.

4.  WHR is responsible, as successor, for all liabilities of Wyndham Worldwide Corporation and its predecessor subsidiaries. All references to WHR include the acts and omissions

1

of predecessor entities for which WHR is responsible, including Wyndham Worldwide Corporation and its former subsidiaries.

5.    Wyndham Hotel Group, LLC ("WHG") is a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. It was served and has appeared in this lawsuit.

6.    Upon information and belief, WHG is a wholly owned subsidiary of WHR and a former subsidiary of Wyndham Worldwide Corporation.

7.    Super 8 Worldwide, Inc. ("S8W") is a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. It was served and has appeared in this lawsuit.

8.    Upon information and belief, S8W is a direct subsidiary of WHG, an indirect subsidiary of WHR, and a former subsidiary of Wyndham Worldwide Corporation.

9.    WHR, WHG, and S8W are referred to collectively as the "Wyndham Brand Defendants."

10.    VIDHI, LLC, is a for-profit Kentucky limited liability company with its principal place of business in Paducah, Kentucky. It can be served through its registered agent, James Konis, 907 Paris Road, Mayfield KY 42066.

11.    VHGI, Inc., formerly known as Vantage Hospitality Group, Inc., is a Florida corporation with its principal place of business in Coral Springs, Florida. It was served through the Kentucky Secretary of State.

12.    VHGI Franchising, Inc., f/k/a Vantage Franchising, Inc., is a Florida corporation with its principal place of business in Coral Springs, Florida. It was served through the Kentucky Secretary of State.

13.   On information and belief, during the time that T.W. was being trafficked, VHGI, Inc., and VHGI Franchising, Inc., owned the America's Best Value Inn (ABV Inn) brand and licensed it to entities—referred to as "members"—that owned hotels, which were then operated under the ABV Inn brand system. When VHGI, Inc. (then known as Vantage Hospitality Group) first started operating, it was structured as a membership organization that subjected the members to brand standards. However, over time, Vantage Hospitality began providing more services and exercising more control over its members such that it has referred to the fact that it became an "accidental franchisor." By the time of Jane Doe T.W.'s trafficking, VHGI, Inc., and VHGI Franchising, Inc. exercised significant control over and had significant involvement in operations of ABV Inn properties.

14.   Red Lion Hotels Corporation ("Red Lion") is a Maryland corporation with its principal place of business Baltimore, Maryland. It was served and has appeared in this lawsuit.

15.   Red Lion is sued in its capacity as a successor. In 2016, Red Lion acquired the brands and brand operations of VHGI, Inc. and its subsidiaries. This included all or substantially all VHGI, Inc.'s operating assets, including the Americas Best Value brand, which Red Lion continued to operate at locations around the United States, including in Kentucky. Upon information and belief, Red Lion is a successor to the liability of VHGI, Inc. and its subsidiaries, including VHGI Franchising Inc., for acts and omissions relevant to this lawsuit. All references to "Red Lion" include references to the acts and omission of its predecessors for which it is liable.

16.   Sonesta International Hotels Corporation ("Sonesta") is a Maryland corporation with its principal place of business at 400 Centre Street, Newton, MA 02458 (Attn: Brad Maxwell, General Counsel). Sonesta and/or its predecessors in interest, as set forth herein, transacted business in Kentucky, derived substantial revenue from services rendered in Kentucky, and caused

a tortious injury in Kentucky that arose out of its doing business in Kentucky or out of its persistent course of conduct or derivation of substantial revenue within Kentucky. It was served and has appeared in this lawsuit.

17.  Sonesta is sued in its capacity as a successor. On information and belief, in 2021 Sonesta acquired the brands and brand operations of Red Lion and VHGI, Inc. and its subsidiaries. This included all or substantially all of Red Lion's VHGI, Inc.'s operating assets, including the Americas Best Value brand, which Sonesta continued to operate at locations around the United States, including in Kentucky. Upon information and belief, Sonesta is a successor to the liability of Red Lion, VHGI, Inc. and its subsidiaries, including VHGI Franchising Inc., for acts and omissions relevant to this lawsuit. All references to "Sonesta" include references to the acts and omission of its predecessors for which it is liable.

18.  VHGI, Inc., VHGI Franchising Inc., Red Lion (in its capacity as successor), and Sonesta (in it capacity as successor) will be referred to collectively as "the ABV Brand Defendants."

19.  Mata Pita, Inc. d/b/a America's Best Value Inn ("Mata Pita") is a for-profit Kentucky corporation with its principal place of business in Paducah, Kentucky. It has been served and has appeared in this lawsuit.

## JURISDICTION AND VENUE

20.  This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

21.  Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district.

## STATEMENT OF FACTS

**I.        T.W. is a victim of sex trafficking.**

22.   T.W. is a survivor of sex trafficking that started in 2011 when she was a minor and continued through October 2014. During this period, she was regularly and repeatedly trafficked at hotels in Paducah, Kentucky owned and operated by Defendants.

23.   T.W.'s trafficker first contacted her through social media. He developed a rapport with her and then told her about a potential job opportunity that would allow her to work cleaning hotel rooms even though she was still a minor. However, when T.W. showed up for what she thought was a job interview, she was trapped in a room with a man who raped her and then paid her. When she left the room, her trafficker grabbed her, started beating her, and demanded she hand over the money. He told her this is how things were going to work moving forward, and he threatened to harm her family if she told anyone.

24.   After this first time, T.W.'s trafficker told her it was too late to turn back. He persisted in using threats to harm T.W. and her family and physical violence to get T.W. to comply with his demands. He would grab her, slap her, and beat her with a belt. He would threaten to harm her elderly grandmother.

25.   T.W.'s trafficker forced her to take illicit drugs to make her more compliant.

26.   T.W.'s trafficker kept all money that she collected, making her completely dependent on him financially.

27.   T.W.'s trafficker cut T.W. off from her friends and family. He would not allow her to have unsupervised access to a phone. He used extreme isolation to increase his control over her.

28.   While under the control of her trafficker, T.W. had no permanent residence. Instead, her trafficker moved her around between different hotels.

29. T.W.'s trafficker chose hotels carefully, finding locations that he preferred and then consistently returning to those same locations. He made it known to T.W. that he preferred locations where it was easy to attract business and where the environment at the hotel made it easier for him to operate without risk of interference by the hotel staff and with minimal risk of traceability.

30. T.W.'s trafficker followed standard, routine practices at the hotels where he trafficked T.W. He also imposed strict rules controlling T.W.'s behavior. Thus, the signs of his trafficking activity followed patterns and were consistent across the hotels where he trafficked T.W.

31. T.W. observed that her trafficker liked to brag about the control he had over her and the money he made selling her. He did not hide the fact that she was under his control. He would advertise himself as a "pimp" through social media.

32. T.W. remained under the control of her trafficker through October 2014 when she was able to escape. T.W.'s trafficker accidentally left a phone behind, and T.W. used it to call her father who came to rescue her.

## II.    Facts specific to the Paducah Super 8.

### A. Trafficking at the Paducah Super 8.

33. Between 2011 and October 2014, T.W. was repeatedly and regularly trafficked at the Super 8 located at 5001 Hinkleville Rd., Paducah, Kentucky 42001 ("Paducah Super 8").

34. The Paducah Super 8 was one of the hotels that T.W.'s trafficker brought her to most frequently.

35. The Paducah Super 8 was one of the first hotels that T.W.'s trafficker brought her to as a minor. He continued taking her to this hotel on a repeated and regular basis for years until she escaped his control in 2014.

6

36.   T.W. cannot say exactly how many times her trafficker brought her to Paducah Super 8 over the years, but she estimates that the number is easily in the dozens.

37.   T.W.'s trafficker would keep her at the Paducah Super 8 as long as business remained steady. They would sometimes stay for several days or even a week at a time before moving on to the next hotel.

38.   The first several times that T.W. was trafficked at the Paducah Super 8, she was still a minor.

39.   T.W. was repeatedly observed by hotel staff in the presence of her trafficker while she was still a minor.

40.   T.W.'s trafficker was a much older man who had a daughter near her age.

41.   T.W.'s trafficker frequently interacted with hotel staff at the Paducah Super 8.

42.   T.W.'s trafficker was always the one who checked in and paid for the room.

43.   T.W.'s trafficker always required her to stay within his eyesight when she was in public.

44.   When T.W.'s trafficker checked in at the front office of the Paducah Super 8, she was required to remain where he could see her. As a result, she was always close enough that the hotel staff could see her nearby.

45.   T.W.'s trafficker kept prepaid gift cards around to pay to advertise T.W. online, and T.W. observed that he would sometimes use them to pay for hotel rooms at the Paducah Super 8.

46.   Most often, T.W.'s trafficker paid for rooms at the Paducah Super 8 with cash, which he preferred because it did not create a trail.

47.   Even when T.W. and her trafficker would stay at the Paducah Super 8 for days or weeks at a time, he typically paid for the room on a day-to-day basis using the cash he collected each day.

Each day, he would go to the front desk and interact with the staff, extending the room rental and paying with cash.

48.    When she was at the Paducah Super 8, T.W. was never allowed to go anywhere without her trafficker escorting and monitoring her.

49.    T.W. repeatedly was in the presence of hotel staff at the Paducah Super 8 while her trafficker was escorting and monitoring her.

50.    The dynamic between T.W. and her trafficker was abnormal and noticeable. It was apparent that her trafficker was guarding her, restricting her freedom, and demeaning her. This was a pattern of behavior that continued whether they were in public or in private. It was on display at the Paducah Super 8, and this pattern of behavior occurred in the presence of hotel staff.

51.    Because her trafficker forced her to take illegal drugs to make her more compliant, T.W. was often obviously impaired while in the presence of hotel staff.

52.    Because her trafficker imposed strict rules on her behavior while she was at the Paducah Super 8, T.W. engaged in a consistent pattern of noticeable behavior such as avoiding eye contact, looking at the floor, and showing her trafficker extreme deference.

53.    T.W. routinely arrived at the Paducah Super 8, even for extended stays, with few personal possessions and was often forced to carry the possessions she did have in a garbage bag.

54.    T.W.'s trafficking took an extraordinary physical and emotional toll on her. She recalls vividly how she became a shell of herself during this period. While being trafficked at the Paducah Super 8, T.W. was terrified and extremely emotional. When she looks back on pictures and videos from this time, she sees a teenager (and in the later years of her trafficking a young woman) who was in obvious distress and in obvious need of help. Staff who repeatedly encountered her would have seen these same signs.

55.  T.W.'s trafficker would often use the internet at the Super 8 Paducah to post advertisements for T.W. online and then would arrange for johns to come to the hotel.

56.  There was a heavy flow of johns to and from T.W.'s hotel room throughout the day and night. This involved both vehicle traffic and foot traffic that staff performing ordinary duties would have observed.

57.  T.W. was often forced to see around 20 or sometimes even 30 johns in a single day at the Paducah Super 8.

58.  The johns were not registered hotel guests and arrived in vehicles that were not registered with the hotel. They arrived with no luggage and would come and go from T.W.'s room at all hours of the day and night after staying for only a brief period.

59.  When T.W. was with johns, her trafficker would remain on site at the Paducah Super 8 and would be in the parking lot, in the hallway, or in other common areas of the hotel. T.W. knows this because her trafficker would often remind her that he would be there watching her and because she feared him and thus attempted to keep tabs on where he was.

60.  T.W.'s trafficker would sometimes tell her about how he had spoken to members of the hotel staff while she was with johns.  He bragged about this in a way that caused her to believe that the hotel staff liked him and would protect him.

61.  T.W.'s trafficker would not allow staff to enter the hotel room to perform housekeeping services or other services while he and T.W. were staying there, even when they stayed for extended periods.

62.  T.W.'s trafficker constantly used the "do not disturb" sign.

63.    When housekeeping would come to the door, T.W.'s trafficker would refuse to allow them to enter. He would require T.W. to hand them trash from the room and would request that linens and towels be provided at the door.

64.    T.W. often needed extra towels and linens to clean up between johns. Her trafficker would repeatedly go to the front office to request more towels and linens.

65.    After each john left T.W.'s room at the Paducah Super 8, her trafficker would immediately return to the room and collect all the money from T.W. This means that her trafficker would go back and forth to and from the room many times each day.

66.    On a few occasions, T.W. attempted to hide portions of the money that she collected from johns at the Paducah Super 8 so that she could have some resources to attempt an escape. When her trafficker found out, loud altercations ensued. Based on the volume and intensity of these altercations, they would have been heard by other hotel guests and by staff performing their normal duties.

67.    While at the Paducah Super 8, T.W.'s trafficker would beat her, and she would scream and cry. T.W.'s trafficker frequently engaged in screaming matches with T.W. at the Paducah Super 8, which were of such volume and frequency that they would have been heard by other guests and by hotel staff performing their ordinary duties.

68.    T.W. observed her trafficker selling illegal drugs at the Paducah Super 8 on a routine basis. He kept drugs in the room. He would leave the room with drugs and come back with cash. He talked to T.W. about the money he made selling drugs in the hotel parking lot. T.W. observed that her trafficker did not feel the need to take steps to conceal this activity but did it brazenly in the open.

69. T.W.'s trafficker preferred for their room to be in a particular area at the Super 8 Paducah because it made it easier to operate. He was regularly given rooms in this area of the hotel.

70. When they were ready to leave the hotel, T.W.'s trafficker did not allow for time to clean up the room thoroughly. Thus, they would often leave sex paraphernalia—including an excessive amount of condom wrappers—visible in the room when checking out of the Super 8 Paducah.

71. The above-described events related to T.W.'s trafficking at the Super 8 Paducah are not things that occurred only once or twice. They occurred repeatedly and consistently over the dozens of times she was trafficked at this hotel over a three-year period.

72. The activity associated with T.W.'s trafficking was so frequent and obvious that, on information and belief, guests at the hotel made complaints about the activity to the hotel staff and/or through online or telephone customer feedback systems.

73. It appeared to T.W. that members of the hotel staff were familiar with her trafficker given how often they were at the Paducah Super 8 and how comfortable her trafficker seemed with those staff members.

74. T.W. recalls seeing surveillance cameras at the Paducah Super 8. They were in areas that would have captured the extremely heavy volume of vehicle traffic, the foot traffic in and out of T.W.'s room, and T.W.'s trafficker loitering in common areas of the hotel selling drugs and monitoring T.W.

75. Though she was showing obvious signs of distress, none of the hotel staff at the Paducah Super 8 ever inquired about T.W.'s wellbeing or offered her any assistance.

76.  T.W.'s trafficker talked about the Paducah Super 8 as a venue where he believed he could operate without any interference.

77.  There was only one reason that T.W.'s trafficker continued to pay to rent rooms at the Paducah Super 8: to use the hotel as a venue to traffic T.W.

78.  The operational model of T.W.'s trafficker depended on the use of hotels like the Paducah Super 8.

### B.  The Role of VIDHI, LLC at the Paducah Super 8.

79.  Property records show that Ky Motel owned the property where the Paducah Super 8 was located. However, VIDHI, LLC was the Wyndham franchisee for the Paducah Super 8 during the time when T.W. was trafficked at the hotel. During T.W.'s trafficking period, Ky Motel leased the Paducah Super 8 to VIDHI, LLC.

80.  On information and belief, VIDHI, LLC, ran on-the-ground operations at the Paducah Super 8.

81.  On information and belief, VIDHI, LLC, employed the hotel staff and management at the Paducah Super 8.

82.  On information and belief, one of the members of VIDHI, LLC, who managed the Paducah Super 8 lived at the hotel and was frequently present on site when the activity associated with T.W.'s trafficking was occurring.

83.  The hotel staff and management repeatedly observed T.W., her trafficker, the johns, and the activity associated with T.W.'s trafficking while performing ordinary functions of hotel operation, such as working at the front desk, providing housekeeping services, and maintaining and monitoring common areas of the hotel.

84. Through its on-the-ground staff and management, VIDHI, LLC, observed the frequent and repetitive activity associated with T.W.'s trafficking.

85. On information and belief, through its on-the-ground role at the Paducah Super 8, VIDHI, LLC, would receive feedback and complaints from hotel guests about the activity associated with T.W.'s trafficking—including the loud altercations, the heavy foot and vehicle traffic at all hours of the day and night, the suspicious loitering of her trafficker, and the obvious signs of her trafficker dealing drugs on site.

86. On information and belief, VIDHI, LLC,'s visible surveillance cameras captured and monitored surveillance footage that showed signs of the activity associated with T.W.'s trafficking and her trafficker dealing drugs on site.

87. T.W. observed as her trafficker directly paid VIDHI, LLC's hotel staff to rent the rooms that were used to traffic her.

88. VIDHI, LLC, continued renting rooms to T.W.'s trafficker on an ongoing basis even after repeatedly observing the red flags associated with T.W.'s trafficking.

89. Upon information and belief, VIDHI, LLC, provided T.W.'s trafficker with rooms in his preferred locations and accommodated his specific requests.

90. It became clear to T.W., as she was brought back to the Paducah Super 8 time after time, that VIDHI, LLC had notice of what her trafficker was doing but kept accepting money in exchange for allowing her trafficker to use the hotel.

91. Upon information and belief—and based on T.W.'s observation of the interactions and of how her trafficker spoke about and acted at the hotel—VIDHI, LLC, developed a familiar relationship with T.W.'s trafficker and operated the Paducah Super 8 in ways that created an

implicit understanding her trafficker could continue operating there without risk of interference or disruption by VIDHI, LLC.

92. VIDHI, LLC, had a continuous business relationship with T.W.'s trafficker. T.W. witnessed this continuous business relationship as she saw her trafficker continue to rent rooms at the Paducah Super 8 day after day, continue to use the hotel internet to advertise her for commercial sex, and continue to return to the Paducah Super 8 and operate brazenly because he understood it was a venue where staff would not interfere with or disrupt his operations.

93. This continuous business relationship with VIDHI, LLC, facilitated T.W.'s trafficker in harboring, maintaining, advertising, and providing T.W. for the purpose of causing her to engage in commercial sex at the Paducah Super 8 while she was a minor and through the use of force, fraud, and coercion.

### C.  The Role of the Wyndham Brand Defendants at the Paducah Super 8

94. Wyndham is a large umbrella hotel brand with approximately 9,000 hotels worldwide. Super 8 is one of Wyndham's brands, and the Paducah Super 8 was a Wyndham hotel.

95. Through their role as franchisor for the Paducah Super 8, the Wyndham Brand Defendants oversaw, controlled, and participated in aspects of hotel operations that facilitated sex trafficking at the hotel, including T.W.'s trafficking.

    i.   The Wyndham Brand Defendants' monitoring and oversight of the Paducah Super 8.

96. Upon information and belief, Wyndham Brand Defendants required hotel staff and franchisees, such as VIDHI, LLC, to report all suspected instances of crime, including prostitution and sex trafficking, at the Paducah Super 8 to the Wyndham Brand Defendants.

97.  Upon information and belief, because the signs of T.W.'s trafficking were so obvious and persistent over a period of several years, the Wyndham Brand Defendants would have received reports regarding the activity associated with her sex trafficking.

98.  The Wyndham Brand Defendants controlled, oversaw, and monitored systems for collecting feedback from guests at the Paducah Super 8.

99.  The Wyndham Brand Defendants established systems through which guests could report safety and security concerns at the Paducah Super 8, including concerns about suspected sex trafficking, prostitution, and other criminal activity, directly to the Wyndham Brand Defendants.

100. Upon information and belief, because the signs of T.W.'s trafficking and her trafficker dealing drugs were so obvious and persistent over several years, guests would have complained about this activity through the channels established, maintained, controlled, and monitored by the Wyndham Brand Defendants.

101. The Wyndham Brand Defendants required VIDHI, LLC, to keep detailed records of daily operations and then to report this information to the Wyndham Brand Defendants and/or to document such information in the Wyndham Brand Defendants' property management system, which gave the Wyndham Brand Defendants direct and real-time access to such information.

102. Upon information and belief, this data gave the Wyndham Brand Defendants access to information that showed the payment method (i.e., cash) used for each room, the identifying information of the individual checking into the room, the use (or refusal) of housekeeping services, reports of towel/linen usage, and other documented information about the stay of each guest.

103. Upon information and belief, the guest and operational data that the Wyndham Brand Defendants had access to regarding the Paducah Super 8 would have revealed signs of the

persistent activity associated with T.W.'s trafficking over several years, including use of cash or prepaid cards, a pattern of refusing housekeeping services, excessive use of towels and linens, room condition upon departure, staff observations and reporting, and guest complaints associated with the stays.

104. Upon information and belief, the Wyndham Brand Defendants collected and monitored data regarding guest internet usage at the Paducah Super 8, and this data provided the Wyndham Brand Defendants with notice that T.W.'s trafficker was using the hotel internet to advertise T.W. for commercial sex.

105. The Wyndham Brand Defendants regularly inspected the Paducah Super 8. Upon information and belief, the Wyndham Brand Defendants also employed individuals who spent time on the ground at franchised hotels, including the Paducah Super 8, including while addressing training and security issues.

106. Upon information and belief, through this on-site presence at the Paducah Super 8, the Wyndham Brand Defendants would have observed the activity associated with T.W.'s trafficking because this activity was obvious, frequent, and persisted over several years.

107. Exactly what information regarding trafficking at the Paducah Super 8 was made available to the Wyndham Brand Defendants is a subject that is within the Wyndham Brand Defendants' control.

ii.   The role of the Wyndham Brand Defendants' in the continuous business relationship between the Super 8 Paducah and traffickers operating there.

108. The Wyndham Brand Defendants participated in the continuous business relationship between traffickers, including T.W.'s trafficker, and the Paducah Super 8 through their central role in the rental of rooms at this hotel. The Wyndham Brand Defendants' role in the rental of rooms at the Paducah Super 8 included:

a.  controlling all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for guest reservation, check-in, and payment processes;

b.  controlling, overseeing and enforcing policies and procedures regarding check-in, payment, and identity verification procedures, including whether cash and prepaid cards could be used and who had to show identification.

c.  requiring the franchisee to use the franchisor's centralized reservation system and preventing the franchisee from using any other system;

d.  reserving rooms and accept payments without requiring franchisee approval or involvement;

e.  controlling and restricting the ability of franchisee and staff to refuse or cancel a reservation.

f.  requiring the franchisee to use a software system operated and controlled by the franchisor for booking rooms and checking guests into rooms;

g.  requiring the franchisee to use a software system operated and controlled by the franchisor to process payments;

h.  requiring the franchisee to use a property-management system operated and controlled by the franchisor;

i.  requiring the franchisee to use a data-management system operated and controlled by the franchisor;

j.  ensuring that data related to each room reservation passes through systems owned, maintained, and managed by the franchisor;

k.  exercising control over the price of rooms;

l.  controlling all details of the customer loyalty program that the franchisee was required to implement;

m.  setting detailed policies for the check-in process, including requirements for identification and payment methods;

n.  collecting guest data, requiring franchisees to report guest data, and reviewing and analyzing guest data, including names, payment information, reservation history, internet browsing data, and other details associated with their stay;

o.  assuming sole ownership over all guest information;

p.  overseeing do not rent (DNR) lists for its branded properties.

17

109. The knowledge of hotel staff is attributed to the Wyndham Brand Defendants based on the existence of an agency relationship as described below.

110. Despite having at least constructive knowledge of the activity associated with T.W.'s trafficking, the Wyndham Brand Defendants continued renting rooms to her trafficker.

111. The Wyndham Brand Defendants also participated in the continuous business relationship between the Paducah Super 8 and traffickers because they exercised pervasive control over and were directly involved in providing internet services to traffickers who operated at the Paducah Super 8, including T.W.'s trafficker. T.W.'s trafficker used those internet services to advertise T.W. for commercial sex.

112. At all relevant times, the Wyndam Brand Defendants participated in aspects of operations at the Paducah Super 8 related to the detection of, response to, and facilitation of sex trafficking.

113. The Wyndham Brand Defendants adopted a centralized, brand-wide response to the issue of sex trafficking in its hotels. Public statements confirm that the Wyndham Brand Defendants knew sex trafficking was a problem at Wyndham branded hotels and that they retained control over the response of Wyndham branded hotels to sex trafficking. Wyndham has recognized its "critical role in increasing awareness and prevention" of sex trafficking in their hotels.[1] The Wyndham brand has publicly claimed to be taking steps to avoid facilitating sex trafficking in its hotels since at least 2011.[2]

114. The Wyndham Brand Defendants retained control over training of hotel staff and management and franchisees regarding sex trafficking. By using this retained control to provide

---

[1] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/
[2] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/

18

untimely, incomplete, and insufficient training, they created an environment more favorable for sex trafficking.

115. The Wyndham Brand Defendants retained control over adopting, monitoring, and enforcing policies and protocol related to how hotel staff should respond to and/or report suspected sex trafficking at the Paducah Super 8. By adopting untimely, incomplete, and insufficient policies and failing to adequately enforce them, they created an environment far more favorable for sex trafficking.

116. The Wyndham Brand Defendants retained control over guest, visitor, and vehicle identification policies that influenced how easy it was for traffickers to operate and that affected the risk of traceability for traffickers and johns. They adopted policies that attracted business from traffickers, like T.W.'s trafficker, and made it easier for them to operate.

117. The Wyndham Brand Defendants retained control over what payment methods were accepted at the Paducah Super 8. Policies regarding the use of cash and pre-paid cards influenced how easy it was for traffickers to operate and affected the risk of traceability.

118. The Wyndham Brand Defendants retained control and enforcement over the identifying information required at check-in and for visitors to hotel which also influenced how easy it was for traffickers to operate at the Paducah Super 8.

119. The Wyndham Brand Defendants retained control over issues related to use of hotel internet including by establishing policies on monitoring internet usage and establishing blocked sites. This affected how easy it was for traffickers to use the internet to advertise victims.

120. The Wyndham Brand Defendants retained control over relevant aspects of housekeeping services, including, on information and belief, requiring franchisee to track housekeeping requests, housekeeping services, and room conditions and setting policies for how

housekeeping services are provided and how frequently guest rooms should be entered. This affected how easy it was for traffickers to use the hotel without interference or disruption.

121. The decisions that the Wyndham Brand Defendants made in exercising this retained control created an environment that T.W.'s trafficker used time and time again to traffic T.W.

122. The Wyndham Brand Defendants participated in operating the Paducah Super 8 in ways that they knew, or at least should have known, would result in more sex trafficking at that hotel.

       iii.    <u>The revenue the Wyndham Brand Defendants generated from trafficking at the Paducah Super 8.</u>

123. The Wyndham Brand Defendants directly benefited when traffickers, including T.W.'s trafficker, used the Paducah Super 8 for sex trafficking.

124. In exchange for providing the services described above, each of the Wyndham Brand Defendants received a share of the revenue from room rentals collected at the Paducah Super 8. The fees generated by the Wyndham Brand Defendants from the Paducah Super 8 were primarily based on gross room revenue; therefore, the Wyndham Brand Defendants' revenue increased with each room rental at the Paducah Super 8. Revenue generated from rooms rented at the Paducah Super 8 was distributed among the Wyndham Brand Defendants, with each benefiting from each rental of a hotel room.

125. When T.W.'s trafficker paid for a room at the Paducah Super 8, this resulted in increased gross room revenue and thus increased revenue received by the Wyndham Brand Defendants.

126. The Wyndham Brand Defendants also benefited when traffickers rented rooms at the Paducah Super 8 because this increased the hotel's occupancy rate. For the Wyndham Brand

Defendants, having high hotel occupancy rates was important. For example, they used their occupancy rates to attract new franchises and to attract potential investors.

> iv.    The Wyndham Brand Defendants' pervasive control over Super 8 Franchisee and the Paducah Super 8.

127. The Wyndham Brand Defendants are vicariously liable for the acts, omissions, and knowledge of VIDHI, LLC and the staff at Paducah Super 8, which are the Wyndham Brand Defendants' actual agents or subagents.

128. The Wyndham Brand Defendants subjected VIDHI, LLC to detailed standards and requirements regarding the operation of the Paducah Super 8 through the franchising agreement, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the Wyndham Brand Defendants.

129. The Wyndham Brand Defendants treat their manuals and policies as proprietary and confidential such that full information about the control they exercised is peculiarly within their own knowledge.

130. In addition to the ways described above, upon information and belief, the Wyndham Brand Defendants exercised and reserved the right to exercise systemic and pervasive control over VIDHI, LLC's day-to-day operation of the Paducah Super 8, including the following ways:

a. requiring VIDHI, LLC and hotel staff to keep detailed records of the day-to-day operations of the hotel;

b. requiring VIDHI, LLC and hotel staff to submit detailed reports on aspects of day-to-day operations;

c. requiring VIDHI, LLC and hotel staff to implement a data system that gives Franchisor real-time information that it can monitor on a day-to-day basis;

d. exercising or retaining control over vendors that VIDHI, LLC can use to procure supplies for day-to-day operations;

e. dictating the specific tools that VIDHI, LLC and hotel staff must use to perform day-to-day operations of the hotel;

f.  requiring VIDHI, LLC to use specific complaint resolution programs;

g.  dictating the response of VIDHI, LLC to specific complaints;

h.  exercising or retaining control over VIDHI, LLC's day-to-day accounting and banking practices;

i.  requiring VIDHI, LLC to participate in mandatory marketing and advertising programs;

j.  exercising sole control over a website for the hotel property and prohibiting VIDHI, LLC from using any other website for the hotel property;

k.  restricting the VIDHI, LLC's ability to contract out the work of operating the hotel and retaining control over the franchisee's ability to use a management company or other third-party contractor;

l.  exercising or retaining control over all aspects of building and facility design;

m.  reserving the right to order upgrades and improvements to facilities and operations at the hotel;

n.  retaining control over all in-room services, including whether and under what conditions adult movie should be offered;

o.  retaining the right to use meeting rooms and other space at the hotel property to conduct meetings and other business;

p.  publicly labeling hotel employees as "our staff" or "our hotel staff";

q.  exercising or retaining control over human resources issues at the hotel property;

r.  posting jobs for its branded properties;

s.  providing benefits to staff of its branded properties;

t.  setting parameters and guidelines for mandatory evaluations of hotel staff;

u.  setting pay, pay parameters, or pay ranges for hotel staff;

v.  setting job qualifications for hotel staff;

w.  setting job descriptions for hotel staff;

x.  adopting policies that specifically dictate which positions must perform which day-to-day functions;

y.  dictating staffing levels required at hotels;

z.  influencing hiring decisions for hotel staff;

aa.  controlling onboarding for hotel staff;

bb.  exercising or retaining control over standardized training for hotel employees and management;

cc. controlling the time, manner, and location of training for franchisees and hotel staff;

dd. requiring all management personnel to attend training;

ee. exercising or retaining control over training for front desk, housekeeping and operational staff;

ff. retaining sole discretion to determine whether franchisee and hotel staff have satisfactorily completed training;

gg. adopting policies that dictate specific disciplinary steps for specific infractions by hotel staff;

hh. maintaining employment records, including training records, for hotel staff

ii. requiring that VIDHI, LLC, maintain specific levels of insurance and list the franchisor as an additional insured;

jj. retaining sole discretion to transfer the franchising agreement to any person or entity without notice but prohibiting franchisee from transferring the agreement without the franchisor's consent.

131. Wyndham specifically retained control of the day-to-day operation of VIDHI, LLC with regards to aspects of operation of the Paducah Super 8 that caused T.W.'s harm, including but not limited to reservation policies and procedures, staff training, security policies, and training, education policies, and procedure regarding human trafficking.

     v.   The relationships between the Wyndham Brand Defendants regarding the Paducah Super 8.

132. Upon information and belief, the rights, and obligations with respect to the operation, franchising, and control of the Paducah Super 8 were shared and fulfilled jointly by the Wyndham Brand Defendants, with the Wyndham Brand Defendants jointly guaranteeing all promises made in Super 8 franchising agreements and reserving rights under those agreements.

133. Upon information and belief, at all relevant times, the Wyndham Brand Defendants shared a headquarters, corporate officers, employees, and other resources related to franchising, operation, and control of the Paducah Super 8.

134. Upon information and belief, at all relevant times, the Wyndham Brand Defendants acted jointly to adopt and enforce policies, procedures, and standards for the Paducah Super 8; to

participate in and supervise day-to-day operations at that hotel property; and to rent rooms at that property.

135. Upon information and belief, each of the Wyndham Brand Defendants shared in and benefited from revenue generated from franchising, operation, and control of the Paducah Super 8 and each of the Wyndham Brand Defendants received a direct benefit when a room was rented to a trafficker, including T.W.'s trafficker, at this hotel property.

136. Each of the Wyndham Brand Defendants participated in a joint venture with one another regarding the operation, control, and franchising of the Paducah Super 8. The Wyndham Brand Defendants, who were corporate affiliates subject to common ownership and control, were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture with respect to the operation, franchising, and control of the Paducah Super 8.

### III. Facts Specific to the Paducah ABV Inn.

#### A. Trafficking at the Paducah ABV Inn.

137. Between 2011 and October 2014, T.W. was repeatedly and regularly trafficked at the America's Best Value Inn located at 5125 Old Cairo Road, Paducah, Kentucky 42001 ("Paducah ABV Inn").

138. The Paducah ABV Inn was one of the hotels that T.W.'s trafficker used regularly to sell her to "johns" for commercial sex.

139. T.W.'s trafficker used this hotel on a regular basis throughout the entire time that he trafficked T.W.

140. T.W.'s trafficker made it known to T.W. that the reasons that they kept returning to the Paducah ABV Inn were because it was easy to attract johns to the location and the staff was not going to interfere with illegal activity at the hotel.

141. All these years later, T.W. cannot say how many times her trafficker brought her to Paducah ABV Inn. However, it was multiple times each year that she was trafficked.

142. The first times that T.W. was trafficked at the Paducah ABV Inn, she was still a minor. She was repeatedly observed by hotel staff in the presence of her trafficker while she was still a minor.

143. T.W.'s trafficker would keep her at the Paducah ABV Inn as long as business remained steady. They would sometimes stay for several days or a week before moving on to the next hotel.

144. T.W.'s trafficker would always be the one to check into the room and pay. As a result, he repeatedly interacted with hotel staff.

145. T.W.'s trafficker always required her to stay within his eyesight when they were in public. As a result, while her trafficker checked in at this hotel, T.W. was required to be nearby and was visible to hotel staff.

146. T.W.'s trafficker often paid for rooms at the ABV Inn with prepaid gift cards. T.W. observed that her trafficker always attempted to have these cards on hand because he used them to pay to advertise her online for commercial sex. He also sometimes used them to pay for rooms at the Paducah ABV Inn.

147. T.W.'s trafficker also kept cash on hand. T.W. frequently observed her trafficker pay for rooms at the Paducah ABV Inn in cash.

148. Even when T.W. and her trafficker would stay at the Paducah ABV Inn for days or weeks at a time, her trafficker often paid for the rooms on a daily basis with cash collected from

johns the previous day. Each day, T.W.'s trafficker would interact with hotel staff as he renewed rental of the room where T.W. was being trafficked.

149. When she was at the Paducah ABV Inn, T.W. was never allowed to go anywhere without her trafficker escorting her. While T.W. was being escorted and monitored by her trafficker, they repeatedly encountered the same members of the hotel staff.

150. Because her trafficker required her to take illicit drugs to make her more compliant, T.W. would be obviously impaired while in common areas of the Paducah ABV Inn.

151. Because her trafficker imposed strict rules on her behavior while she was at the Paducah ABV Inn, T.W. would avoid eye contact, look at the floor, and defer to her trafficker to respond on her behalf.

152. T.W. routinely arrived at the Paducah ABV Inn, even for extended stays, with few personal possessions. What T.W. did have she was usually required to carry in a garbage bag.

153. While being trafficked at the Paducah ABV Inn, T.W. was terrified and extremely emotional. When T.W. looks at pictures of herself from that time, she sees obvious signs of this. She was exhibiting those same signs when in the presence of hotel staff at the Paducah ABV Inn.

154. T.W.'s trafficker would often use the internet at the Paducah ABV Inn to post advertisements for T.W. online and then would arrange for johns to come to the hotel.

155. There was a heavy flow of johns to and from T.W.'s hotel room throughout the day and night. This involved both vehicle traffic and foot traffic that staff performing ordinary duties would have observed.

156. T.W. was often forced to see around 20 or sometimes even 30 johns in a single day at the Paducah ABV Inn.

157. The johns were not registered hotel guests and arrived in vehicles that were not registered with the hotel. They arrived with no luggage and would come and go from T.W.'s room at all hours of the day and night after staying for only a brief period.

158. When T.W. was with johns, her trafficker would remain on site at the Paducah ABV Inn and would be in the parking lot, in the hallway, or in other common areas of the hotel. T.W. knows this because her trafficker would often remind her that he would be there watching her and because she feared him and thus attempted to keep tabs on where he was.

159. T.W.'s trafficker would not allow hotel staff to enter the room to provide housekeeping or other services while he and T.W. stayed at the Paducah ABV Inn, even when they stayed for extended periods.

160. T.W.'s trafficker constantly used the "do not disturb" sign.

161. When housekeeping would come to the door, T.W.'s trafficker would sometimes require T.W. to hand them trash and would request that linens and towels be provided at the door.

162. T.W. often required extra towels and linens. Her trafficker would repeatedly go to the front office to request more towels and linens.

163. After each john left T.W.'s room at the Paducah ABV Inn, her trafficker would immediately return to the room and collect all the money from T.W.

164. While at the Paducah ABV Inn, T.W.'s trafficker would beat her, and she would scream and cry. T.W. and her trafficker had several loud altercations at the Paducah ABV Inn. Based on the volume and intensity of the altercation, these altercations would have been heard by other hotel guests and by staff performing their normal duties.

165. T.W. observed her trafficker regularly selling illegal drugs out of the Paducah ABV Inn. He kept drugs in the room. He would leave the room with drugs and come back with cash. He talked to T.W. about the money he made selling drugs in the hotel parking lot.

166. When they were ready to leave the Paducah ABV Inn, T.W.'s trafficker did not allow for time to clean up the room thoroughly. They would often leave sex paraphernalia—including an excessive amount of condom wrappers—visible in the room when checking out of the Paducah ABV Inn.

167. The above-described occurrences related to T.W.'s trafficking at the Paducah ABV Inn are not things that occurred only once or twice. They occurred repeatedly during the many times she was trafficked at this hotel over a three-year period.

168. The activity associated with T.W.'s trafficking was so frequent and obvious that, on information and belief, guests at the hotel made complaints about the activity.

169. It appeared to T.W. that members of the hotel staff were familiar with her and her trafficker given how often they were at the Paducah ABV Inn, the relatively small size of the hotel, how often they encountered the same staff members, and how those staff members interacted with her trafficker.

170. T.W.'s trafficker talked about the Paducah ABV Inn as a venue where he believed he could operate without any interference.

171. There was only one reason that T.W.'s trafficker continued to pay to rent rooms at the Paducah ABV Inn: to use the hotel as a venue to traffic T.W.

### B.  The Role of Mata Pita at the Paducah ABV Inn.

172. Mata Pita was the franchisee for the Paducah ABV Inn.

173. On information and belief, Mata Pita ran on-the-ground operations at the Paducah ABV Inn.

174. On information and belief, Mata Pita employed the hotel staff and management at the Paducah ABV Inn.

175. The hotel staff and management repeatedly observed T.W., her trafficker, the johns, and the activity associated with T.W.'s trafficking while performing ordinary functions of hotel operation, such as working at the front desk, providing housekeeping services, and maintaining and monitoring common areas of the hotel.

176. Through its on-the-ground staff and management, Mata Pita observed the frequent and repetitive activity associated with T.W.'s trafficking.

177. On information and belief, the Paducah ABV Inn only had approximately 41 hotel rooms such that the significant volume of traffic in and out of T.W.'s room was particularly noticeable.

178. Through its on-the-ground role at the Paducah ABV Inn, Mata Pita would receive feedback and complaints from hotel guests.

179. On information and belief and based on the persistence and obviousness of the activity, Mata Pita, received complaints about the activity associated with T.W.'s sex trafficking, including the loud altercations, the heavy foot and vehicle traffic at all hours of the day and night, the suspicious loitering of her trafficker, and the obvious signs of her trafficker dealing drugs on site.

180. Sex trafficking results in "red flags" that follow well-established patterns. As a result, there would have been similar signs associated with other sex trafficking activity occurring at the ABV Inn.

181. T.W.'s observed her trafficker directly pay Mata Pita's hotel staff to rent the rooms that were used to traffic her.

182. Mata Pita continued renting rooms to T.W.'s trafficker on an ongoing basis even after repeatedly observing the signs of T.W.'s trafficking.

183. Upon information and belief, Mata Pita provided T.W.'s trafficker with rooms in his preferred locations and accommodated his specific requests.

184. Upon information and belief and based on T.W.'s observation of the interactions and of how her trafficker spoke about and acted at the hotel, Mata Pita, through its hotel staff, developed a familiar relationship with T.W.'s trafficker and operated the hotel in ways that gave him the impression that he could continue operating there without risk of interference or disruption by Mata Pita.

185. Mata Pita had a continuous business relationship with T.W.'s trafficker through ongoing rental of rooms, providing internet, and providing a venue where T.W.'s trafficker understood that he could operate free from disruption or interference.

186. T.W. witnessed this continuous business relationship as she saw her trafficker continue to rent rooms day after day.

187. T.W. witnessed this continuous business relationship as she observed her trafficker repeatedly chose to return to the Paducah ABV Inn and operate brazenly and openly because he understood it was a venue where staff would not interfere with or disrupt his operations.

188. This continuous business relationship with Mata Pita facilitated T.W.'s trafficker in harboring, maintaining, advertising, and providing T.W. for the purpose of causing her to engage in commercial sex at the Paducah ABV Inn.

*C.  The Role of the ABV Brand Defendants at the Paducah ABV Inn*

i.  The ABV Brand Defendants monitoring and oversight of the Paducah ABV Inn.

189. Upon information and belief, the ABV Brand Defendants required hotel staff and Mata Pita to report all suspected instances of crime, including prostitution and sex trafficking, at the Paducah ABV Inn to the ABV Brand Defendants.

190. Upon information and belief, because the signs of T.W.'s trafficking were so obvious and persistent over several years, the ABV Brand Defendants would have received reports regarding the activity associated with her sex trafficking and her trafficker dealing illegal drugs on site.

191. The ABV Brand Defendants controlled, oversaw, and monitored systems for collecting feedback from guests at the Paducah ABV Inn.

192. The ABV Brand Defendants established systems through which guests could report safety and security concerns at the Paducah ABV Inn, including concerns about suspected sex trafficking, prostitution, and other criminal activities, directly to the ABV Brand Defendants.

193. Upon information and belief, because the signs of T.W.'s trafficking were so obvious and persistent over several years, guests would have complained about this activity to the ABV Brand Defendants.

194. The ABV Brand Defendants required Mata Pita to keep detailed records of daily operations and then to report this information to the ABV Brand Defendants.

195. The ABV Brand Defendants also required Mata Pita to use an approved property management system for all aspects of hotel operations, including check-in and check-out, managing room rates and inventory, collecting guest history, automating front desk and operational

accounting and record keeping and to give the ABV Brand Defendants an unlimited and independent right to access and use all information in the system.

196. Upon information and belief, this data gave the ABV Brand Defendants access to information that showed the payment method (cash) used for each room, the identifying information of the individual checking into the room, the use (or refusal) of housekeeping services, reports of towel/linen usage, and other documented information about the stay of each guest.

197. Upon information and belief, the data that the ABV Brand Defendants had access to regarding the Paducah ABV Inn would have revealed signs of the persistent activity associated with T.W.'s trafficking over several years, including use of cash or prepaid cards, a pattern of refusing housekeeping services, excessive use of towels and linens, room condition upon departure, and guest complaints associated with the stay.

198. The ABV Brand Defendants regularly inspected the Paducah ABV Inn. These inspections were conducted on site and involved assessment of safety and security issues. Upon information and belief, the ABV Brand Defendants also employed individuals who spent time on the ground at the Paducah ABV Inn, including addressing training and security issues.

199. Upon information and belief, through this on-site presence at the Paducah ABV Inn, the ABV Brand Defendants would have observed the activity associated with T.W.'s trafficking because this activity was obvious, frequent, and persisted over several years.

200. Exactly what information regarding trafficking at the Paducah ABV Inn was made available to the ABV Brand Defendants is a subject that is within the ABV Brand Defendants' control.

201. Because the signs of T.W.'s sex trafficking at the Paducah ABV Inn were obvious and persisted over dozens of stay across several years and involved repeated loud altercations, there is

is reason to believe that guests would have raised concerns or complaints about this activity. Whether such reports were made is information peculiarly within Defendants' control.

> ii.  The role of the ABV Brand Defendants' in the continuous business relationship between the Paducah ABV Inn and traffickers operating there.

202. The ABV Brand Defendants participated in the continuous business relationship between traffickers, including T.W.'s trafficker, and the Paducah ABV Inn through their central role in the rental of rooms at this hotel. The ABV Brand Defendants' role in the rental of rooms at the Paducah ABV Inn included:

a.  The ABV Brand Defendants controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes.

b.  The ABV Brand Defendants required Mata Pita to participate in a mandatory revenue management program that used data to predict demand, optimize pricing, and manage inventory to maximize revenue and profitability.

c.  The ABV Brand Defendants required that all reservations be booked through the mandatory central reservation system it required Mata Pita to use.

d.  The ABV Brand Defendants directly made reservations for rooms at the Paducah ABV Inn and accepted payment for those rooms through a central reservation system.

e.  The ABV Brand Defendants controlled room rates, required discounts, mandatory fees, and rewards programs.

f.  The ABV Brand Defendants dictated whether guests were entitled to late checkout and room upgrades.

g.  The ABV Brand Defendants controlled and oversaw policies and procedures regarding check-in, payment, and identity verification procedures.

h.  The ABV Brand Defendants collected, retained, monitored, and analyzed detailed data about every guest who stayed at the Paducah ABV Inn.

i.  The ABV Brand Defendants established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the Paducah ABV Inn until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected

for each guest, what questions hotel staff should and should not ask, and other matters related to check-in.

j.   The ABV Brand Defendants required Mata Pita to use a property management system for virtually all aspects of hotel operations regarding room reservations and payment and to give the ABV Brand Defendants an unlimited and independent right to access and use all information in that system.

203. Despite having at least constructive knowledge of the activity associated with T.W.'s trafficking, the ABV Brand Defendants continued renting rooms to her trafficker.

204. At all relevant times, the ABV Inn Defendants participated in aspects of operations at the Paducah ABV Inn related to the detection of, response to, and facilitation of sex trafficking.

205. Leadership for the ABV Inn Defendants publicly acknowledged the problem of sex trafficking and their responsibility in the response, stating "As business owners, community members and fellow human beings, it is our job to put a stop to the horrific crime of sex trafficking. Hotel owners are uniquely situated to identify this crime."[3]

206. The ABV Inn Brand Defendants retained control over training of franchisees and hotel staff and management regarding sex trafficking. By using this retained control to provide untimely, incomplete, and insufficient training, they created an environment more favorable for sex trafficking.

207. The ABV Brand Defendants retained control over adopting, monitoring, and enforcing policies and protocol related to how hotel staff should respond to and/or report suspected criminal activity at the Paducah ABV Inn. By adopting untimely, incomplete, and insufficient policies and failing to adequately enforce them, they created an environment for more favorable for sex trafficking.

---

[3] http://www.sbwire.com/press-releases/amp/release-568621.htm

208. The ABV Brand Defendants retained control over guest, visitor, and vehicle identification policies that influenced how easy it was for traffickers to operate and that affected the risk of traceability for traffickers and johns.

209. The ABV Brand Defendants retained control over what payment methods were accepted at the Paducah ABV Inn. Policies regarding the use of cash and pre-paid cards influenced how easy it was for traffickers to operate and affected the risk of traceability.

210. The ABV Brand Defendants retained control over relevant aspects of housekeeping services, including, on information and belief, requiring franchisee to track housekeeping requests, housekeeping services, and room conditions and setting policies for how housekeeping services are provided and how frequently guest rooms should be entered. This affected how easy it was for traffickers to use the hotel without interference or disruption.

211. The ABV Brand Defendants participated in operating the Paducah ABV Inn in ways that they at least should have known would result in more sex trafficking at that hotel.

       iii.   <u>The ABV Brand Defendants benefited from use of the Paducah ABV Inn for sex trafficking.</u>

212. The ABV Brand Defendants directly benefited when traffickers, including T.W.'s trafficker, used the Paducah ABV Inn for sex trafficking.

213. In exchange for providing the services described above, the ABV Brand Defendants received a share of the revenue from room rentals collected at the Paducah ABV Inn. The fees generated by the ABV Brand Defendants are primarily based on gross room rentals; therefore, the ABV Brand Defendants' revenue increased with each room rental at the Paducah ABV Inn.

214. When T.W.'s trafficker paid for a room at the Paducah ABV Inn, this resulted in increased gross room revenue and, therefore, increased revenue to the ABV Brand Defendants.

iv.    The ABV Brand Defendants' pervasive control over Mata Pita and the Paducah ABV Inn.

215. The ABV Brand Defendants are vicariously liable for the acts, omissions, and knowledge of Mata Pita and the staff at Paducah ABV Inn, which acted as the ABV Brand Defendants' actual agents or subagents when operating the Paducah ABV Inn.

216. The ABV Brand Defendants subjected Mata Pita to detailed standards and requirements regarding the operation of ABV Inn through the membership agreement, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the ABV Brand Defendants. These written standards, protocols, and requirements:

a.    did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Mata Pita used at ABV Inn; and

b.    covered virtually all aspects of hotel operations, including but not limited to personnel, building, grounds, furnishings, fixtures, decor, equipment, vehicles, supplies, foodstuffs, printed matters, and internal operating functions; and

c.    dictated the specific manner in which Mata Pita and hotel staff must carry out most day-to-day functions at ABV Inn; and

d.    significantly exceeded what was necessary for The ABV Brand Defendants to protect its registered trademarks.

217. In addition to the ways described above, upon information and belief, The ABV Brand Defendants exercised and reserved the right to exercise systemic and pervasive control over Mata Pita's day-to-day operation of the ABV Inn, including the following ways:

a.    requiring Mata Pita to participate in mandatory operational support programs;

b.    requiring Mata Pita to participate in a mandatory revenue management program;

c.    requiring Mata Pita and hotel staff to keep detailed records of the day-to-day operations of the hotel;

d.    requiring Mata Pita and hotel staff to submit detailed reports on aspects of day-to-day operations;

e.  requiring Mata Pita and hotel staff to implement a data system that gives the ABV Brand Defendants real-time information that it can monitor on a day-to-day basis;

f.  exercising or retaining control over vendors that Mata Pita used to procure supplies for day-to-day operations;

g.  dictating the specific tools that Mata Pita and hotel staff used to perform day-to-day operations of the hotel;

h.  requiring Mata Pita to enter and comply with all terms of agreements with third-party vendors;

i.  requiring that Mata Pita submit all marketing materials for prior review and approval;

j.  requiring Mata Pita to use specific complaint resolution programs;

k.  reserving the right to directly resolve guest complaints at Mata Pita's expense;

l.  requiring Mata Pita to participate in mandatory marketing and advertising programs;

m.  exercising sole control over a website for the hotel property and prohibiting franchisee from using any other website for the hotel property;

n.  restricting Mata Pita's ability to contract out the work of operating the hotel and retaining control over the franchisee's ability to use a management company or other third-party contractor;

o.  prohibiting Mata Pita from selling any guest service or product unless explicitly authorized in writing;

p.  posting jobs for its branded properties;

q.  providing benefits to staff of its branded properties;

r.  setting job descriptions for hotel staff;

s.  exercising or retaining control over standardized training for hotel employees and management;

t.  retaining virtually unlimited authority to add or change operational requirements;

218. The ABV Brand Defendants specifically retained control of the day-to-day operation of Mata Pita with regards to aspects of operation of the subject ABV Inn that caused T.W.'s harm, including but not limited to reservation policies and procedures, staff training, security policies, and training, education policies, and procedure regarding human trafficking.

v.    The relationships between the ABV Brand Defendants.

219. Upon information and belief, Vantage Franchising, Inc., was the party to the franchising agreement with Mata Pata, but that agreements expressly provided that VGHI, Inc. would fulfill some of obligations under the agreement.

220. Upon information and belief, at all relevant times, VGHI, Inc. and Vantage Franchising, Inc., (collectively "ABV Predecessors") and/or their affiliates, shared the rights, and obligations with respect to the operation, franchising, and control of the Paducah ABV Inn, with the ABV Predecessors jointly guaranteeing all promises made in ABV Inn franchising agreements and reserving rights under those agreements.

221. Upon information and belief, at all relevant times, the ABV Predecessors shared a headquarters, corporate officers, employees, and other resources related to franchising, operation, and control of the Paducah ABV Inn.

222. Upon information and belief, at all relevant times, the ABV Predecessors acted jointly to adopt and enforce policies, procedures, and standards for the Paducah ABV Inn; to participate in and supervise day-to-day operations at that hotel property; and to rent rooms at that property.

223. Upon information and belief, each of the ABV Predecessors shared in and benefited from revenue generated from franchising, operation, and control of the Paducah ABV Inn and each of the ABV Predecessors received a direct benefit when a room was rented to a trafficker at this hotel property.

224. Each of the ABV Predecessors participated in a joint venture with one another regarding the operation, control, and franchising of the Paducah ABV Inn. The ABV Brand Defendants, who were corporate affiliates subject to common ownership and control, were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations

of the other participants in the joint venture with respect to the operation, franchising, and control of the Paducah ABV Inn.

225. Upon information and belief, in 2016, Red Lion acquired the brands and brand operations of ABV Predecessors.

226. This purchase included all or substantially all the operating assets of ABV Predecessors, including the America's Best Value brand, which Red Lion continued to operate at locations around the United States, including in Kentucky.

227. The Asset Purchase Agreement stated: "Buyer wishes to purchase and assume from the Sellers, substantially all the assets, and certified specified liabilities, of the Business, subject to the terms and conditions set forth herein."

228. There was continuity of both management and ownership between Red Lion and the ABV Predecessors.

229. Bernard Moyle and Roger Bloss, who were officers for ABV Predecessors, signed separate agreements regarding both employment and voting rights with Red Lion.

230. The Asset Purchase Agreement reflects that a significant portion of the consideration given for the transaction was the transfer of stock (690,00 shares), which suggests a continuity of shareholders.

231. Further suggesting continuity of operations are provisions in the Asset Purchase Agreement that required ABV Brand Predecessors to immediately terminate all employees and independent contractors and contemplated that Red Lion would hire key employees and independent contractors.

232. Red Lion Hotel Corporation's own 2016 press release[4] contains characterizations of the transaction that **are** consistent with a *de facto* merger. The release itself is entitled "Red Lion Hotels Corporation enters into definitive agreement to **acquire substantially all of Vantage Hospitality Group**."[5]

233. This release also suggest continuity of operations and management, stating: "Vantage's current leadership and staff in Coral Springs will become the hub for all RLHC select service brand operations. . . . RLHC and the Vantage team are a winning combination."[6]

234. In 2021, Sonesta acquired the brands and brand operations of Red Lion, including the ABV Inn brand and brand operations. This included all or substantially all operating assets, including the Americas Best Value brand, which Sonesta continued to operate at locations around the United States, including in Kentucky.

235. Upon information and belief, this transaction was a merger or de facto merger that resulted in successor liability on Sonesta.

236. Upon information and belief, Sonesta assumed liability for operation of the ABV Inn brand, including the Paducah ABV Inn.

## IV.    Defendants' knowledge of the problem of sex trafficking.

237. The facilitation of trafficking described above occurred despite Defendants' knowledge that sex trafficking was a significant problem in the hospitality industry and throughout their own operations.

### A.  Defendants knew about the problem of sex trafficking in hotels and how to identify "red flags" of sex trafficking in their hotels.

---

[4] A copy of this release is publicly available online from the archives of the Securities and Exchange Commission, at https://www.sec.gov/Archives/edgar/data/1052595/000119312516708837/d260330dex991.htm.
[5] https://www.sec.gov/Archives/edgar/data/1052595/000119312516708837/d260330dex991.htm (emphasis added)
[6] https://www.sec.gov/Archives/edgar/data/1052595/000119312516708837/d260330dex991.htm

238. The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what each of the Defendants knew or should have known regarding the trafficking at their hotel properties, including the trafficking of T.W.

239. Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[7] This is no accident. For years, sex traffickers have been able to reap enormous profits with "little risk when attempting to operate within hotels."[8] In 2014, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[9] Hotels have been found to account for over 90 of the commercial exploitation of children.[10]

240. Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking. Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[11]

---

[7] "This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." Id

[8] See Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

[9] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[10] Erika R. George & Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery*, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

[11] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

241. This resulted in the development of "red flags" of sex trafficking. Law enforcement agencies and other organizations with subject-matter expertise identified specific indicators of the presence of sex trafficking at a hotel. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel. These recurring indicators are known as "red flags" of sex trafficking.

242. Recognized "red flags" of sex trafficking that are considered general indicators of trafficking that can be observed by staff throughout a hotel[12] include:

- individuals who appear to be with a significantly older "boyfriend" or in the company of much older males;
- a group of girls who appears to be traveling with an older female or male;
- a group with similar tattoos, which can indicate "branding" by a trafficker;
- individuals showing fear, anxiety, tension, submissiveness and/or nervousness;
- individuals who seem disoriented;
- individuals showing signs of physical abuse;
- individuals showing signs of restrain or confinement;
- individuals showing signs of malnourishment, poor hygiene, fatigue, or sleep deprivation;
- individuals with signs of untreated illness or injuries;
- individuals who appear to lack freedom of movement;
- individuals who are being constantly monitored and/or escorted around the hotel;
- individuals who avoid eye contact;
- individuals who avoid interactions with others;
- individuals who are not in possessions of their own identification;
- individuals who have few or no personal possessions;
- individuals who dress provocatively;
- a high volume of men who are not registered guests entering and exiting a room; and
- individuals who wait in common areas while other men frequent the room.

---

[12] *See id.*

243. Recognized "red flags" of sex trafficking that can be detected by front-desk staff and hotel security[13] include:

- patrons appeared distressed at check-in;
- the same person reserving multiple rooms;
- rooms paid for with cash or prepaid cards;
- rooms are paid for one day at a time;
- requests for isolated rooms or rooms close to an exit;
- use of hotel computers for adult oriented or sexually explicit websites;
- patrons not forthcoming about identifying information when registering;
- individuals checking in but then leaving a room only infrequently, not at all, or at odd hours;
- individuals lack identification;
- car in the parking lot is parked so license plate is not visible;
- individual present who avoids eye contact, does not communicate, and is accompanied by someone else who appears to speak for them; and
- individual appears to be giving scripted responses.

244. Recognized "red flags" of sex trafficking that can be detected by housekeeping, maintenance, and room service staff[14] include:

- constant use of the "Do Not Disturb" sign;
- requests for housekeeping services (towels, linens, etc.) but denying staff entry into the room;
- refusal of cleaning services for multiple days;
- excessive amounts of cash in a room;
- presence of multiple computers, cell phones, pagers, or other technology;
- the same person reserving multiple rooms;
- individuals leaving the room infrequently, not at all, or at unusual hours;
- individuals loitering in hallways or appearing to monitor a room;
- excessive alcohol in a room;
- illegal drugs in a room;
- evidence of pornography;
- excessive number of people staying in a room;
- guests with few or no personal possessions in room;
- provocative clothing and shoes.

---

[13] *See id.*
[14] *See id.*

245. The organizations who developed these "red flags," then educated and trained the hotel industry about them.

246. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Tool kits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[15] From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

247. Before T.W.'s trafficking at their hotels, Defendants had been educated and trained on these "red flags" of sex trafficking. The organizations that developed these "red flags" identified them as indicators specific to sex trafficking in a hotel environment. At all relevant times, Defendants acknowledged and recognized these "red flags" specifically as signs of sex trafficking.

248. There is a well-known link between commercial sex in a hotel environment and sex trafficking. The United States Department of Justice and other agencies and organizations have recognized that most individuals involved in commercial sex are subject to force, fraud, or coercion.[16] As a result, these women are victims of sex trafficking. Most federal sex trafficking prosecutions involve individual traffickers acting as "pimps" who are operating without direction from or connection to a larger criminal network.[17] It is well known that the "traffickers in

---

[15] Department of Homeland Security, *Blue Campaign Toolkit*, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

[16] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.

[17] Human Trafficking Institute, 2020 Federal Human Trafficking Report 28 (2021), https://traffickinginstitute.org/wp-content/uploads/2022/01/2020-Federal-Human-Trafficking-Report-Low-Res.pdf.

hotel/motel based commercial sex situations are often individual controllers, more commonly known as 'pimps.'"[18]

249. State, local, federal, and international governments and law enforcement agencies have long recognized the link between commercial sex and sex trafficking. For example:

- "The U.S. Government adopted a strong position against legalized prostitution in a December 2002 National Security Presidential Directive based on evidence that prostitution . . . . fuels trafficking in persons, a form of modern-day slavery."[19]

- In 2006 the United Nations Commission on Human Rights, Special Rapporteur or Trafficking in Persons recognized that "[f]or the most part, prostitution, as actually practiced in the world, usually does satisfy the elements of trafficking."[20]

- By 2008, a report of the Illinois Criminal Justice Information Authority concluded "young women in the sex trade who are controlled by a pimp should not be regarded as girls in prostitution, but as victims of violence who need assistance in safely exiting prostitution."[21]

- In 2010, the Anaheim Police Department (APD) recognized that a significant portion of those involved in prostitution who it came into contact with were likely trafficking victims and adopted a new approach that focused on rescuing women from their pimps and redirecting their lives.[22]

- In 2013, the New York State Court System launched the Human Trafficking Intervention Initiative recognizing that many individuals who end up in criminal courts are on prostitution charges "are recruited into the commercial sex industry by force, fraud, and/or coercion."[23]

---

[18] National Human Trafficking Hotline, *Hotel-Motel Based*, https://humantraffickinghotline.org/en/sex-trafficking-venuesindustries/hotelmotel.

[19] United States Department of State, *The Link Between Prostitution and Sex Trafficking* https://2001-2009.state.gov/r/pa/ei/rls/38790

[20] U.N. Escor, Comm'n on Human Rights, *13 Integration of the Human Rights of Women and a Gender Perspective, Report of the Special Rapporteur on the Human Rights Aspects of the Victims of Trafficking in Persons, Especially Women and Children, ¶ 42 U.N. Doc. E/CN.4/2006/62 (Feb. 20, 2006) (Sigma Huda)

[21] https://humantraffickinghotline.org/sites/default/files/Domstic%20Sex%20Trafficking%20Chicago%20-%20ICJIA.pdf

[22] Steve Marcin, *Prostitution and Human Trafficking: A Paradigm Shift*, Law Enforcement Bulletin, https://leb.fbi.gov/articles/featured-articles/prostitution-and-human-trafficking-a-paradigm-shift#:~:text=After%20close%20analysis%20of%20prostitutes,tactic%20in%20addressing%20the%20problem.

[23] Center for State Court Innovation, *State Court Snapshot: New York State's Human Trafficking Intervention* Courts, https://cjinvolvedwomen.org/wp-content/uploads/2016/12/HTIC-1pager.pdf

250. It is, and has at all relevant times, been well established that signs of commercial sex in a hotel environment are "red flags" for the presence of sex trafficking. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[24]

251. All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

252. There were also well-established practices for hotels to avoid the facilitation of sex trafficking. For example, End Child Prostitution and Trafficking ("ECPAT-USA") has identified hotel-specific best practices for preventing sex trafficking, such as (1) not permitting cash payments; (2) requiring vehicle information and photo id at check-in; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly and blocking websites frequently used to advertise commercial sex on hotel Wi-Fi; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number; and (8) developing a protocol for response to indicia of trafficking activity.[25]

---

[24] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.
[25] https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/5cd329e8a4222f20baf5378b/1557342696892/ECPAT-USA_AntiTraffickingHotelChecklist.pdf

253. The most effective weapon against sexual exploitation and human trafficking is education and training.[26] As ECPAT concluded:

254. The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[27]

255. This same conclusion is echoed by others who seek to eliminate or minimize sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[28] In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

256. The activity associated with T.W.'s trafficking, as outlined above, manifested in numerous, prevalent, frequent, and obvious signs consistent with these "red flags" that Defendants were educated on and accepted as indicators of sex trafficking.

257. The Paducah Super 8 and Paducah ABV Inn were located in an area that was a known hotspot for prostitution and sex trafficking before, during, and after T.W.'s trafficking period. On information and belief, there was other trafficking activity that occurred at the Paducah Super 8

---

[26] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).
[27] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Caroline L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.
[28] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

and Paducah ABV Inn at and around this same time, which followed the same patterns and also resulted in numerous, prevalent, frequent, and obvious signs consistent with these "red flags.

> ### B.  The Wyndham Brand Defendants knew about a brand-wide problem in their operations.

258. The Wyndham Brand Defendants' public statements confirm that that they knew about the problem of sex trafficking in their hotels and retained control over the response of Wyndham-branded hotels to sex trafficking. Unfortunately, while the Wyndham Brand Defendants' statements reflect actual knowledge of the problem of sex trafficking, they reflect only a public relations strategy rather than a genuine commitment to stop facilitating trafficking. Emails among company executives reflect a hesitance to commit to meaningful anti-trafficking measures and a desire to avoid negative publicity without any significant burden.[29]

259. The problem of sex trafficking at Wyndham branded properties was sufficiently well known that, in 2011, there was a public petition with thousands of signatures to stop Wyndham hotel staff from supporting child sex.[30] Although the Wyndham Brand Defendants publicly committed to take steps to stop facilitating trafficking, this promise proved empty; Wyndham has been named a "major contributor to sexual exploitation" and part of the "dirty dozen list" by the National Center on Sexual Exploitation.[31]

---

[29] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ ("Scott McLester, Wyndham's former general counsel and chief compliance officer, wrote in an e-mail to the company's then C.E.O., Stephen Holmes, 'Even though we have been hesitant to commit to everything the [EPCAT] Code was asking for, the issue is not going away and it's starting to impact commercial relationships.' McLester added that the organization's 'concern about being 'bullied' into signing the Code is outweighed by the relative harmlessness of the Code itself.'")

[30] https://www.change.org/p/stop-wyndham-hotel-staff-from-supporting-child-sex-trafficking-in-wyndham-hotels

[31] https://endsexualexploitation.org/wyndham/

260. Wyndham monitors law enforcement activity at its branded properties, and, in the past twenty years, Wyndham-branded properties have been mentioned in at least two hundred criminal trafficking cases filed by the federal government.[32]

261. Information that has become public through news stories establishes the entrenched and pervasive nature of the Wyndham Brand Defendants' role in providing a venue where sex trafficking has continued unabated for years. For example:

- In 2010, a California man was arrested for trafficking a 16-year-old victim after being spotted by law enforcement with the minor at a Super 8 in California.[33]

- In November 2011, a man was sentenced for sex trafficking after he forced minor girls to engage in commercial sex for his financial benefit, including at a Super 8 Motel in Virginia.[34]

- In January 2011, a man was sentenced to life for child sex trafficking for requiring a minor to perform commercial sex services more than 50 times over a 14-day period at a Florida Super 8 Motel.[35]

- In June 2011, an MS-13 gang member was indicted for trafficking girls at a Super 8 Motel near Washington, D.C.[36]

- In 2012, four were indicted after forcing a 24-year-old woman to engage in commercial sex at Ohio hotels, including a Super 8.[37] In December 2012, a man was arrested for attempting to entice a 15-year-old girl to engage in prostitution at a Super 8 Motel in Oklahoma.[38]

- In April 2013, two were arrested for trafficking a juvenile girl at an Illinois Super 8.[39]

---

[32] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/
[33] https://www.wired.com/2010/11/epps/
[34] Gang member sentenced for sex trafficking in Prince William, News & Messenger (Manassas, Virginia) (November 4, 2011) https://plus.lexis.com/api/permalink/562d85d9-e662-4e4f-8f7f-67b52fa537e8/?context=1530671
[35] https://www.fbi.gov/jacksonville/press-releases/2011/ja011011.htm
[36] https://www.thepublicdiscourse.com/2011/10/4034/
[37] https://www.10tv.com/article/news/crime/crime-tracker/four-indicted-first-human-trafficking-case-franklin-county/530-36f713e6-5488-4465-90c0-7eb99504a635
[38] Man faces new sex-trafficking charges, Tulsa World (Oklahoma ) (March 9, 2013) https://plus.lexis.com/api/permalink/a9062a1a-76b4-4811-89ab-5b0b3c877a88/?context=1530671
[39] https://www.channel3000.com/news/local-news/2-women-accused-of-human-trafficking-at-motel/article_98edf1d4-d231-5ea1-a6b9-e71c83f44750.html

- In June 2013, a man was arrested on human trafficking charges after he forced a woman to engage in commercial sex at hotels, including a Louisiana Super 8 Motel.[40]

- A man was sentenced to 21 years in prison for sex trafficking his 16-year-old girlfriend starting in August 2013 at two hotels in Dallas, including a Super 8 Motel.[41]

- In 2013, a man was arrested at a Super 8 in Rhode Island and charged with trafficking a 17-year-old girl at the motel.[42]

- In September 2013, a Super 8 motel in Massachusetts was searched and a man was charged with sex trafficking of a 17-year-old developmentally disabled girl after staying with her at that hotel.[43]

- In November 2013, two pled guilty to sex trafficking charges after forcing a child to engage in commercial sex at Super 8 Motel in Texas.[44]

- In June 2014, two were charged with trafficking a 13-year-old girl at a Minnesota Super 8.[45]

262. These articles are only representative examples. There are many similar articles about sex trafficking and other associated criminal activity at Super 8 properties and other Wyndham branded hotels. Moreover, on information and belief, the Wyndham Brand Defendants are aware of additional significant law enforcement activity related to trafficking at its hotels that was not reported in the media.

263. Reviews of Super 8 branded properties, which upon information and belief each of the Wyndham Brand Defendants, monitored regularly, also show both the pervasiveness of sex trafficking at its branded properties and the Wyndham Brand Defendants' knowledge of the same. For example:

---

[40] https://www.endslaverytn.org/news/tenn-man-booked-in-human-trafficking-newsarticle
[41] https://www.ice.gov/news/releases/dallas-gang-member-sentenced-21-years-federal-prison-child-sex-trafficking-conviction
[42] https://turnto10.com/archive/new-details-in-ardrey-sex-trafficking-investigation
[43] https://www.providencejournal.com/story/news/crime/2013/09/14/20130914-missouri-man-charged-with-sex-trafficking-in-mass-teens-disappearance-ece/35397014007/
[44] https://www.chron.com/news/article/two-plead-guilty-to-child-sex-trafficking-5000132.php
[45] https://www.grandforksherald.com/newsmd/moorhead-police-charge-two-with-sex-trafficking-13-year-old

- An August 2008 review of a Super 8 property in Arizona stated: "Woke in middle of night (2:30am) with loud party on 2nd floor with bodies slamming into walls, and looked out window to see hooker and pimp making deal with another man in pickup in the parking lot."[46]

- A January 2010 review of a Super 8 property in Escondido, California stated: "This is a hooker hangout, doors slaming at 3:00 AM, You will hear pimps on their cellphones outside in the middle of the night. Ladies arriving at 4:00 AM, Management MUST be aware this is going on and condone this. I expected John Walsh to show up with a film crew."[47]

- A February 2010 review of a Super 8 property in Los Angeles, California stated: "This place lacks security and there were drug dealers trying to push their products inside of the hotel. This place is Scary. The neighborhood was frightening and there were also prostitutes and homeless/addicts all over the place and renting rooms in the hotel. The desk guy looked at my friends attire (faux fur coat) and assumed he was a pimp and that we were prostitutes and seemed surprised that we had made reservations for more than one night. He kept giving us this strange smile... icky. This place left me with a bad feeling. If you want to stay here to save a few bucks my advice is to utilize the buddy system whenever you leave your room to visit the vending machines... after checking in for the night that is probably the only thing you will feel even moderately safe doing. eek. I can deal with scary hotels but this place is a disaster waiting to happen."[48]

- A June 2010 review of a Super 8 property in Virginia stated: "The location is in a very unsafe place. There were junkies and prostitutes using the premises of the hotel."[49]

- A July 2010 review of a Super 8 property in Texas stated: "After a night out parking lot full had to park under drive thur in front of hotel no other space. Number One reason to not stay here HOOKERS!!! walking the parking lot, walking the sidewalks and feeder road roads in front of Motel. All hours of the day."[50]

- An October 2011 review of a Super 8 property in Tennessee stated: "Don't stay here unless you want drugs or a prostitute....or both. There were drunks running up the halls all night and the maid offered to have sex with my husband for money. When he refused, she then offered to sell him pills."[51]

---

[46] https://www.tripadvisor.co/Hotel_Review-g60950-d74409-Reviews-Super_8_by_Wyndham_Tucson_Downtown_Center-Tucson_Arizona.html
[47] https://www.tripadvisor.com/Hotel_Review-g32358-d235407-i132418454-Super_8_Escondido-Escondido_California.html
[48] https://www.tripadvisor.com/Hotel_Review-g32655-d235134-Reviews-Super_8_by_Wyndham_Hollywood_La_Area-Los_Angeles_California.html
[49] https://www.expedia.com/Norfolk-Hotels-Super-8-By-Wyndham-NorfolkChesapeake-Bay.h7202.Hotel-Reviews
[50] https://www.tripadvisor.com/Hotel_Review-g30196-d109015-Reviews-Super_8_by_Wyndham_Austin_North_University_Area-Austin_Texas.html
[51] https://www.tripadvisor.com/Hotel_Review-g55138-d97967-Reviews-or165-Super_8_by_Wyndham_Knoxville_Downtown_Area-Knoxville_Tennessee.html

- A February 2012 review of a Super 8 property in Florida stated: "This hotel should not even be listed as a choice to stay in. Upon check, 3 rooms from me was a sexual battery crime scene. Prostitutes and drug deals were going on all over the property. The room was filthy, smelled horrible and I wouldn't even touch the bed! This hotel is a LIVE IN hotel for Prostitutes, drug dealers and gangs!!!!! DO NOT STAY HERE!!"[52]

- An April 2012 review of a Super 8 property in Virginia stated: "Just beware, there are "escorts" who are constantly on the lookout for fresh meet. A pimp will knock on your door asking to use your cell to call his girlfriend. From then on, she will do the work."[53]

- An April 2012 review of a Super 8 property in Texas stated: "We have stayed in hotels all over the world and I have never had as terrible and frightening an experience as I had at this hotel. The place was crawling with prostitutes and seedy looking guys looking for prostitutes. We tried to stay here anyway, but the night manager started threatening us! In the end we had to call the police in order to safely leave. The police were very sympathetic, and apparently they have frequent problems with this hotel. Stay Away."[54]

- An October 2012 review of a Super 8 property in Florida stated: "the last time i stayed at this super 8, a hooker approached me in the parking lot and i informed you . this time there was a drug dealer in the next door room, cars coming and going all day & night a car would pull up and one person goes inside and 5 minutes later comes out. when i was checking out i told the desk clerk and the girl in the office says oh i know who that is. well if you knew about why was he still there. i will never stay there again, and i'm a loyal super 8 customer."[55]

- A March 2013 review of a Super 8 property in Louisiana stated: "There was a PROSTITUTE running her business from a room, with her pimp standing outside. She propositioned a co-worker as he was going to his room. Then in the middle of the night she and her clients were fighting very loudly over money and services issued!"[56]

- A March 2013 review of a Super 8 property in Ohio stated: "I've been solicited for drugs and by prostitutes here on several occassions. I told the hotel staff about it

---

[52] https://www.tripadvisor.com/Hotel_Review-g34378-d113362-Reviews-Super_8_by_Wyndham_Lantana_West_Palm_Beach-Lantana_Florida.html
[53] https://www.expedia.com/Manassas-Hotels-Super-8-By-Wyndham-Manassas.h12141.Hotel-Reviews
[54] https://www.tripadvisor.ca/Hotel_Review-g56003-d240483-Reviews-Super_8_by_Wyndham_Houston_Brookhollow_NW-Houston_Texas.html
[55] https://www.tripadvisor.com/Hotel_Review-g34378-d113362-Reviews-Super_8_by_Wyndham_Lantana_West_Palm_Beach-Lantana_Florida.html
[56] https://www.tripadvisor.ca/Hotel_Review-g40314-d120851-Reviews-FairBridge_Inn_Express_Metairie-Metairie_Louisiana.html

and they seem to turn a blind eye to the problem because these people are also buying rooms."[57]

- A February 2013 review of a Super 8 property in Minnesota stated: "This hotel was disgusting. Homeless man passed out in lobby, possible prostitute hanging out in hallway with pimp, cigarette smell, ridiculous noise level throughout night, etc. Dirty shoes in microwave, empty beer cans in fridge. I cannot express enough how terrible this place really is."[58]

- An April 2013 review of a Super 8 property in Georgia stated: "The hotel was filled with prostitutes and drug dealers and I was put in the back with my children which gave me no type of security. Super 8 needs to remove their name from this building."[59]

- A July 2013 review of a Super 8 property in California stated: "Our first night we were greeted by undercover police busting the prostitutes using the spare rooms to turn tricks. Maids make extra income unlocking vacant rooms. I would not recommend this place for children. Or anyone for that fact."[60]

- An August 2013 review of a Super 8 property in Ohio stated: "This hotel gives the Super 8 chain a bad reputation. The local restaurant management told us not to answer door due to prostitution issues."[61]

- An October 2013 review of a Super 8 property in Virginia stated: "We ended up wedging a pole in the door for safety reasons. After dark the place turned into, I do NOT exaggerate, a open hoer house. At lease 4 pimps were doing business with a dozen or so girls there. If not for the safety reasons it was a life experience seeing that side of society. We were surprised at a chain like Super 8 condoning this activity. . . . The big thing was the blatant open prostitution that was condoned by your chain was despicable. The car music blaring and loud laughing and yelling was just like out of a rap video. Shame on you Super 8 for condoning this kind of activity just to fill a room."[62]

264. These reviews are examples. There are many similar online reviews for Super 8 properties and other Wyndham-branded hotels.

---

[57] https://www.tripadvisor.com/Hotel_Review-g50891-d226034-Reviews-Quality_Inn_Columbus_East-Reynoldsburg_Ohio.html

[58] https://www.tripadvisor.com/Hotel_Review-g43493-d247863-Reviews-Super_8_by_Wyndham_St_Cloud-Saint_Cloud_Minnesota.html

[59] https://www.tripadvisor.com/Hotel_Review-g34856-d217054-Reviews-Super_8_by_Wyndham_Atlanta_Hartsfield_Jackson_Airport-College_Park_Georgia.html

[60] https://www.tripadvisor.com/Hotel_Review-g32655-d252254-Reviews-or50-Super_8_by_Wyndham_Canoga_Park-Los_Angeles_California.html

[61] https://www.tripadvisor.com/Hotel_Review-g50891-d226034-Reviews-Quality_Inn_Columbus_East-Reynoldsburg_Ohio.html

[62] https://www.tripadvisor.com/Hotel_Review-g58026-d110776-Reviews-or10-Super_8_by_Wyndham_Norfolk_Chesapeake_Bay-Norfolk_Virginia.html

265. On information and belief, the Wyndham Brand Defendants also knew or at least should have known that there a problem with sex trafficking at the Paducah Super 8 specifically.

266. On information and belief, the Wyndham Brand Defendants performed risk assessments of their franchised hotels and knew or should have known that there was a heightened risk for sex trafficking at the Paducah Super 8.

267. On information and belief, the Wyndham Brand Defendants knew that law enforcement data showed that McCracken County, Kentucky has an elevated level of prostitution, sex trafficking, and related criminal activity.

268. On information and belief, the Paducah Super 8 was in a group of hotels off an interstate exit that were known to be a hotspot for prostitution, sex trafficking, and related criminal activity.

269. The above sampling of news stories, reviews, and other public information establishes that, at the time T.W. was trafficked at their hotel properties, the Wyndham Brand Defendants knew, at least, that:

    a.  There was widespread and ongoing sex trafficking occurring at their branded properties.

    b.  Sex trafficking was a brand-wide problem stemming from their top-level decisions.

    c.  Their franchisees and hotel staff were not taking reasonable steps to detect, deter, and disrupt known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties.

    d.  Their efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective.

    e.  They were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

    C.  *The ABV Brand Defendants knew about a brand-wide problem in their operations.*

270. The use of ABV Inn properties for sex trafficking was well known to the ABV Brand Defendants. Information that has become public through news stories establishes the entrenched

and pervasive nature of ABV Brand Defendants' role in providing a venue where sex trafficking

has continued unabated for years. For example:

- In 2012, 2 were arrested in a prostitution bust at an ABV Inn in North Dakota.[63]

- In 2012, a 13-year-old boy was shot at an ABV Inn in Texas, which was known as a property where prostitution and drugs were common.[64]

- In 2013, a woman was sentenced to more than 6 years in prison for trafficking a minor at hotels including an ABV Inn in Connecticut.[65]

- In 2013, 12 people were arrested on prostitution-related charges at an Ohio ABV Inn.[66]

- In 2013, a man faced charges for trafficking an adult woman at an ABV Inn in Georgia.[67]

- In 2013, 2 were arrested for trafficking a 14-year-old girl at an ABV Inn in Georgia.[68]

- In 2014, the City of Birmingham voted to revoke the business license of an ABV Inn property based on widespread criminal activity dating back to 2011.[69]

- In 2014, 2 were arrested for trafficking a teenage girl at an ABV Inn property in Ohio.[70]

- In 2014, 2 were arrested for trafficking 2 adult women at an ABV Inn property in Maryland.[71]

- In 2015, an ABV Inn in North Carolina was deemed a public nuisance for repeated reports of prostitution, drugs, and violence.[72]

---

[63] https://www.grandforksherald.com/newsmd/charged-with-prostitution-grand-forks-woman-says-shes-not-guilty

[64] *Boy dies in motel shooting*, The Dallas Morning News (November 14, 2012), https://plus.lexis.com/api/permalink/73f3eb54-d344-461d-b467-ff5d088b5ffa/?context=1530671

[65] *Norwich woman to serve 78 months for sex trafficking*, The Day (New London, Connecticut) (May 8, 2013).

[66] *Prostitution sting nets 12 offenders*, The Sentinel-Tribune (March 21, 2013), https://plus.lexis.com/api/permalink/c2d06a55-5a54-4ba2-b7ff-173d7a187b93/?context=1530671

[67] https://www.rockdalenewtoncitizen.com/news/man-faces-human-trafficking-charge/article_36fe2c8d-71d2-519a-bdcc-af6d21b18b2d.html

[68] https://www.wsbtv.com/news/local/teens-accused-pimping-exploiting-14-year-old/243073225/

[69] *The Hotel from Hotel: Homicide, Rapes, Drugs, City uses 500 pages of police records to deny business license renewal*, Birmingham News (Alabama) (May 23, 2014), https://plus.lexis.com/api/permalink/4fde894e-c41d-4eea-b108-dd7e05440ae0/?context=1530671

[70] https://www.cleveland19.com/story/26156528/human-trafficking-bust-in-independence-new-state-law-in-effect/

[71] https://www.usatoday.com/story/news/nation/2014/12/02/human-trafficking-charges-maryland/19789031/

[72] https://www.starnewsonline.com/story/news/crime/2016/10/01/update-clock-ticking-down-for-targeted-market-street-hotels/25275378007/

- In 2015, a man was arrested for trafficking women at an ABV Inn in Georgia.[73]

- In 2015, arrests were made related to a prostitution ring operating out of hotels, including an ABV Inn in Texas.[74]

- In 2015, a man was arrested for trafficking women at hotels, including an ABV Inn in Pennsylvania.[75]

271. These articles are only representative examples. There are many similar articles about sex trafficking and other associated criminal activity at ABV Inn branded hotels. Moreover, on information and belief, the ABV Brand Defendants are aware of additional significant law enforcement activity related to trafficking at ABV Inn brand hotels that was not reported in the media.

272. Upon information and belief, each of the ABV Brand Defendants monitored criminal activity occurring at ABV Inn branded hotels and were aware of activity indicating commercial sex trafficking or related crimes occurring at those branded hotels, including the specific property where T.W. was trafficked.

273. Reviews of ABV Inn properties, which upon information and belief each of the ABV Brand Defendants, monitored regularly, also show both the pervasiveness of sex trafficking at its branded properties and the ABV Brand Defendants' knowledge of the same. For example:

- A 2011 review for an ABV Inn property in California states "The hotel room was fine, but there were prostitutes out front and a drunk man in the lobby when we checked in, complaining."[76]

- A 2011 review for an ABV Inn property in Missouri notes "there is prostitution, drug sales and animals on the premises."[77]

- A 2012 review for an ABV Inn property in California states "Leaving the room at 7 pm, there were 5 police cars in the parking lot with a man in handcuffs. I was

---

[73] https://www.valdostadailytimes.com/news/local_news/human-trafficking-charges-filed-two-women-rescued-from-local-motel/article_22361c02-0a43-11e5-9673-9fe0de11df08.html
[74] https://www.beaumontenterprise.com/news/article/At-least-5-arrested-in-prostitution-sting-6323418.php
[75] https://www.lehighvalleylive.com/allentown/2015/05/allentown_mans_sex_trafficking.html
[76] https://www.expedia.com/San-Jose-Hotels-Americas-Best-Value-Inn-San-Jose-Convention-Center.h26266.Hotel-Reviews
[77] https://www.tripadvisor.com/Hotel_Review-g44168-d243902-Reviews-Americas_Best_Value_Inn_Bridgeton_St_Louis_North-Bridgeton_Saint_Louis_Missouri.html

informed by a police officer this was a "hooker motel, and the man being arrested was a pimp, and we might want to find another hotel." When we arrived back at the motel at midnight it was quiet. At 2:00 AM were were awaken by a group in the room next door who partied very loudly until 3:30 AM, there was no attempt by management to quiet them down. In the morning when packing our vehicle to leave. It appeared that there had been 6 people staying in the room adjacent to us. I would not recommend this motel."[78]

- A 2012 review for an ABV Inn property in Illinois states "DRUGS DRUGS DRUGS POLICE POLICE POLICE-- What a dump. Police showed up twice, people fighting, and lots of foot traffic all hours of the night."

- A 2013 review for an ABV Inn property in Ohio states "Just plain and simple. This hotel has prostitutes and drug dealers in it. The owner doesn't even care as long as the money comes in. If I was staying in cleveland, would not even consider this hotel. THUGS, YOUR CAR IS BROKEN INTO, HOOKERS."[79]

- A 2013 review for an ABV Inn in Missouri states "a total drug and prostitute infested dump. loud noise, kids running up and down the walkways, dogs barking all night. Eek they only have wifi on the front half of the building and half the time it did not work."[80]

- A 2013 review for an ABV Inn in California states "Small noisy room. Non smoking rooms wreak of cigarettes and for the week that we stayed there our neighbours consisted of what appeared to be: homeless people who had taken residence there and drug dealers who were smoking weed so strong that even our room began to smell like a Dutch oven. Judging from the state of the way management ran the hotel we didn't bother attempting the continental breakfast."[81]

- A 2014 review for an ABV Inn in Michigan states "But this was a pit of awful full of hookers, johns, drug dealers, and (8 swear words as a modifier) bed bugs. Take them off the list, process my return before my credit card cycle ends. Crimeny."[82]

---

[78] https://www.tripadvisor.com/Hotel_Review-g33020-d1022963-Reviews-or10-Americas_Best_Value_Inn_San_Jose_Convention_Center-San_Jose_California.html

[79] https://www.google.com/travel/hotels/Americas%20Best%20Value%20Inn%20Cleveland%20Airport%2014043%20Brookpark%20Rd,%20Brookpark,%20OH%2044142%20google/entity/CgoI6_ybvNuyp9M0EAE/reviews?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4308226,4429192,4515404,4597339,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4874726,4886082,4886480,4893075,4902277,4905351,4906019,4926165,4926489,4930751,4930753,4931360,4934309,4936396,4937897,4761553&hl=enVG&gl=vg&ssta=1&q=Americas+Best+Value+Inn+Cleveland+Airport+14043+Brookpark+Rd,+Brookpark,+OH+44142+google&grf=EmQKLAgOEigSJnIkKiIKBwjnDxACGAwSBwjnDxACGA0gADAeQMoCSgcI5w8QARgfCjQIDBIwEi6yASsSKQonCiUweDg4MzBlYzMwODcxNGYwMGQ6MHgzNGE2OWQ5NWI3ODZmZTZi&rp=EOv8m7zbsqfTNBDr_Ju827Kn0zQ4AkAASAHAAQI&ictx=1&sa=X&ved=2ahUKEwjIz8vu0PH8AhVJkmoFHVIOA4EQ4gl6BAhlEAU

[80] https://www.yelp.com/biz/americas-best-value-inns-and-suites-bridgeton

[81] https://www.tripadvisor.com/Hotel_Review-g32655-d549431-Reviews-Americas_Best_Value_Inn_Hollywood_Los_Angeles-Los_Angeles_California.html

[82] https://www.tripadvisor.com/Hotel_Review-g30196-d108988-Reviews-Americas_Best_Value_Inn_Austin_University-Austin_Texas.html

- A 2014 review for an ABV Inn in Kentucky states "Need urgent supervision-- The worst place in the world .black mold in bathroom. Growth bathtub. The front door is full in people, selling drugs and full in cheap prostitutes sorry very bad impression."[83]

- A 2014 review for an ABV Inn in Oklahoma states "On top of all of that there were hookers all around and even a homeless woman slept on the floor of the guest laundy room on Saturday night. Not to mention the parties and the Corona beer bottles laying around the parking lot both broken and whole."[84]

- A 2014 review for an ABV Inn in Washington states "BUYER BEWARE OF THIS MOTEL!!! The pictures must be from when it was new! We had to get a second motel. They would not refund our money for the room or even for the pet fee! Booking.com offered a $27 refund. What a joke We had to be given a second room key to try. The first room had a group of druggies smoking out. Not sure what but it wasn't cigs or pot. The guy in the next room was a pimping his ole lady. I saw ankle bracelets on more than one guy."[85]

- A 2014 review for an ABV Inn Texas states "If you like roaches and hookers, this is the place!--Hookers walk this place day and night."[86]

274. On information and belief, the ABV Brand Defendants also knew or at least should have known that there a problem with sex trafficking at the Paducah ABV Inn specifically.

275. On information and belief, the ABV Brand Defendants knew that law enforcement data showed that McCracken County, Kentucky has an elevated level of prostitution, sex trafficking, and related criminal activity.

276. On information and belief, the Paducah ABV Inn is known as a hotspot for prostitution, sex trafficking, and other related criminal activity such that law enforcement has conducted sting operations at the hotel.

---

[83] https://www.tripadvisor.com/Hotel_Review-g39604-d498178-Reviews-Americas_Best_Value_Inn_Louisville-Louisville_Kentucky.html
[84] https://www.tripadvisor.com/Hotel_Review-g51560-d101858-Reviews-Americas_Best_Value_Inn_Oklahoma_City_I_35_South-Oklahoma_City_Oklahoma.html
[85] https://www.yelp.com/biz/americas-best-value-inn-lakewood-tacoma-s-lakewood
[86] https://www.tripadvisor.com/Hotel_Review-g30196-d108988-Reviews-Americas_Best_Value_Inn_Austin_University-Austin_Texas.html

277. The above sampling of news stories, reviews, and other public information establishes that, at the time T.W. was trafficked at their hotel properties, the ABV Brand Defendants knew, at least, that:

    a.  There was widespread and ongoing sex trafficking occurring at their branded properties.

    b.  Sex trafficking was a brand-wide problem stemming from their top-level decisions.

    c.  Their franchisees and hotel staff were not taking reasonable steps to detect, deter, and disrupt known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties.

    d.  Their efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective.

    e.  They were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

**V.      Defendants' response to the known problem of sex trafficking.**

278. While Defendants knew that sex trafficking was a problem in the hotel industry and in their own operations, each Defendant's response to this known problem reflected a lack of reasonable care or diligence.

279. Each Defendant continued operating in ways that it knew or at least should have known would result in continuing to generate revenue from the sex trafficking at its hotel(s).

280. Although they knew what practices would minimize the prevalence of sex trafficking at their hotels, the Wyndham Brand Defendants and ABV Brand Defendants each made operational choices that resulted in *more* sex trafficking at their hotels (including the Paducah Super 8 and Paducah ABV Inn) and, therefore, more revenue from facilitating sex trafficking.

281. While the Wyndham Brand Defendants often made public statements regarding trafficking, their actions did not match their words. They have refused to publish reports to show

its progress, or lack thereof, on the EPCAT goals to combat sex trafficking in its hotels.[87] Emails among company executives of the Wyndham Brand Defendants reflect a hesitance to commit to meaningful anti-trafficking measures and a desire to avoid negative publicity without any significant burden.[88] They continued collecting revenue from trafficking occurring at their hotels, including the Paducah Super 8.

282. If the Wyndham Brand Defendants had exercised reasonable prudence in areas of operations over which they retained control or in which they directly participated, they would have detected and stopped benefiting from the illegal activities of traffickers at the Paducah Super 8, including T.W.'s trafficker. However, they failed to do so.

283. If the ABV Brand Defendants had exercised ordinary prudence in areas of operations over which they retained control or in which they directly participated, they would have detected and stopped benefiting from the illegal activities of traffickers at the Paducah ABV Inn, including T.W.'s trafficker. However, they failed to do so.

## CAUSES OF ACTION

### I.  Perpetrator liability (VIDHI, LLC)

284. T.W. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591 because her trafficker caused her to engage in commercial sex (1) while she was a minor; and (2) through the use of force, fraud, and coercion.  Thus. T.W. is entitled to bring a civil action under 18 U.S.C. §1595(a) against VIDHI, LLC, as a "perpetrator."

---

[87] https://thecode.my.salesforce-sites.com/apex/MemberProfilenew?id=0019000000GxgPrAAJ&year=2023
[88] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ ("Scott McLester, Wyndham's former general counsel and chief compliance officer, wrote in an e-mail to the company's then C.E.O., Stephen Holmes, 'Even though we have been hesitant to commit to everything the [EPCAT] Code was asking for, the issue is not going away and it's starting to impact commercial relationships.' McLester added that the organization's 'concern about being 'bullied' into signing the Code is outweighed by the relative harmlessness of the Code itself.'")

285. VIDHI, LLC, knew or recklessly disregarded the fact that T.W.'s trafficker was causing her to engage in commercial sex at the Paducah Super 8, both while she was a minor and through use of force, fraud, and coercion because, as further described above:

    a. through its on-the-ground role of its hotel staff, it directly observed the obvious signs associated with T.W.'s trafficking at the Paducah Super 8 and had frequent and familiar interactions with her trafficker.

    b. through the on-the-ground role of its hotel staff, it had repeated opportunities to observe T.W. while she was a minor.

286. VIDHI, LLC, is a "perpetrator" under 18 U.S.C. §1591(a)(1) because it harbored T.W. by continually renting hotel rooms to her trafficker knowing or in reckless disregard of the fact that she would be caused to engage in commercial sex while she was a minor and knowing or in reckless disregard of the fact that she would be caused to engage in commercial sex through the use of force, fraud, and coercion.

287. VIDHI, LLC, is a "perpetrator" under 18 U.S.C §1591(a)(2) because it knowingly benefited from facilitating, assisting, or supporting her trafficker by:

    a. renting him rooms on an ongoing basis that he used to cause T.W. to engage in commercial sex;

    b. providing him with his preferred rooms and accommodating his requests to make it easier for him to operate;

    c. creating an understanding he could operate openly without concern for interference or disruption by hotel staff.

## II.    Beneficiary liability (Vidhi, LLC, and the Wyndham Brand Defendants)

288. Because T.W. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591, she is entitled to bring a claim against VIDHI, LLC, and the Wyndham Brand Defendants as "beneficiaries" under §1595(a).

289. VIDHI, LLC, and the Wyndham Brand Defendants are liable as beneficiaries because they knowingly benefited from participating in a venture that they knew or should have known

was engaged in sex trafficking through their participation in the continuous business relationship between the Super 8 Paducah and the traffickers operating there, including T.W.'s trafficker, ("Venture 1").

290. VIDHI, LLC, knowingly benefited from participation in this continuous business because it directly received revenue every time this business relationship was renewed through continued rental of rooms to sex traffickers, including T.W.'s trafficker.

291. The Wyndham Brand Defendants knowingly benefited from participation in this continuous business relationship because they received increased revenue every time a room at the Paducah Super 8 was rented to a trafficker, including T.W.'s trafficker, as a result of the payments they received under their franchising agreement with VIDHI, LLC, which were primarily dependent on gross room revenue.

292. VIDHI, LLC, participated in this continuous business relationship through its on-the-ground role at the Paducah Super 8.

293. The Wyndham Brand Defendants participated in this continuous business relationship through their central role in renting rooms at the Paducah Super 8 and through their oversight of, control over, and participation in aspects of hotel operations that related to the detection of and response to sex trafficking at the Paducah Super 8.

294. This continuous business relationship facilitated the illegal activities of traffickers at this hotel, and specifically facilitated the trafficking of T.W.

295. VIDHI, LLC, knew or should have known that this continuous business relationship was facilitating sex trafficking at the Paducah Super 8 because, as further described above:

    a. Through its on-the-ground role of its hotel staff, it directly observed the obvious signs associated with T.W.'s trafficking at the Paducah Super 8 and had frequent and familiar interactions with her trafficker.

b. Through the on-the-ground role of its hotel staff, it had repeated opportunities to observe T.W. while she was a minor.

c. Through the on-the-ground role of its hotel staff, it received notice of the "red flags" of sex trafficking through guest complaints, monitoring of surveillance footage, on-site law enforcement activity, and other tools it used to monitor the Paducah Super

296. VIDHI, LLC also had constructive knowledge that this venture was facilitating sex trafficking at the Paducah Super 8 because, as further described above, it failed to respond with reasonable diligence to the known problem of sex trafficking in hotels and at its hotel specifically and because it failed to act with reasonable diligence in response to the obvious "red flags" of sex trafficking at the Paducah Super 8, including the "red flags" of T.W.'s own trafficking.

297. The Wyndham Brand Defendants knew or should have known that this continuous business relationship was facilitating sex trafficking at the Paducah Super 8 because, as further described above:

a. There were obvious signs associated with the trafficking at the Paducah Super 8, including T.W.'s trafficking, that were readily observable and that matched known "red flags" of sex trafficking in hotels.

b. The Wyndam Brand Defendants closely oversaw, monitored, and supervised the Paducah Super 8.

c. Based on the tools the Wyndham Brand Defendants used to oversee, monitor, and supervise this hotel, they were on notice of these obvious red flags of trafficking at the Paducah Super 8, including the activity associated with T.W.'s trafficking.

d. The knowledge of the hotel staff is also imputed to the Wyndham Brand Defendants because of an agency relationship that formed as a result of the control the Wyndham Brand Defendants exercised at the Paducah ABV Inn.

298. The Wyndham Brand Defendants also had at least constructive knowledge that this venture was facilitating sex trafficking because, as further described above:

a. They retained control over relevant aspects of operations at the Paducah Super 8.

b. They failed to respond with reasonable prudence to the problem of sex trafficking in their operations.

c. They failed to respond with ordinary prudence to "red flags" of sex trafficking at the Paducah Super 8, including T.W.'s trafficking.

d.  They operated in ways in that they knew or at least should have known were attracting business from traffickers, including T.W.'s trafficker, and leading to sex trafficking at their hotels.

e.  The signs of T.W.'s trafficking were sufficiently numerous, obvious, prevalent, and frequent that they would have been detected by a hotel operated using reasonable prudence.

299. The signs associated with T.W.'s trafficking at the Paducah Super 8, as further described above, were sufficiently numerous, obvious, prevalent, and frequent that a hotel exercising ordinary diligence would have known it was benefiting by facilitating her trafficking.

300. The Wyndham Brand Defendants and VIDHI, LLC, also participated in a commercial hotel-operating venture with one another that facilitated sex trafficking at the Paducah Super 8 ("Venture 2").

301. The Wyndham Brand Defendants and VIDHI, LLC, had a longstanding business relationship pursuant to which they jointly participated in operation of the Paducah Super 8 with a shared goal of maximizing revenue, including gross room revenue.

302. This hotel-operating venture was engaged in violations of the TVRPA because victims—including T.W.—were harbored, maintained, provided, and exploited at the Paducah Super 8.

303. As further described above, both the Wyndham Brand Defendants and VIDHI, LLC, directly participated in operation and control of the Paducah Super 8 in ways that that facilitated sex trafficking at this hotel.

304. Both Wyndham Brand Defendants and VIDHI, LLC derived benefits from operating the Paducah Super 8 in ways that they knew or should have known facilitated sex trafficking, including through increased revenue received from rental of hotel rooms to sex traffickers.

305. VIDHI, LLC, knew or at least should have known that this hotel-operating venture was engaged in and facilitating sex trafficking because, as further described above, it observed the

"red flags" associated with this activity through its on-the-ground role, it directly interacted with T.W.'s trafficker, and the signs of the trafficking were sufficiently numerous, obvious, and persistent over time that it should have been aware of these signs if had exercised ordinary diligence.

306. The Wyndham Brand Defendants knew or at least should have known that this hotel-operating venture was engaged in and facilitating sex trafficking because, as further described above, they maintained close supervision over the Paducah Super 8 such that they knew or should have known about the numerous, obvious, and persistent "red flags" of the sex trafficking of T.W. and other victims at this hotel and further because they retained control over aspects of hotel operations related to the detection of and response to sex trafficking yet failed to exercise ordinary diligence in response to the known problem of sex trafficking.

### III.    Vicarious liability (The Wyndham Brand Defendants)

307. The Wyndham Brand Defendants are vicariously liable for the TVPRA violations of VIDHI, LLC.

308. At all times relevant to this lawsuit, VIDHI, LLC and the hotel staff at the Paducah Super 8 acted as the agents of the Wyndham Brand Defendants and were within the scope of agency.

309. As further described above, this agency relationship resulted because:

   a. The Wyndham Brand Defendants retained and exercised pervasive control over the means and methods that VIDHI, LLC used to operate the Paducah Super 8;

   b. The Wyndham Brand Defendants exercised control over the Paducah Super 8 through their own direct involvement in operations.

   c. The Wyndham Brand Defendants did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools used.

65

d. The control the Wyndham Defendants exercised covered virtually all aspects of hotel operations, including internal operating functions.

e. The control the Wyndham Defendants exercised dictated the specific manner in which franchisee and hotel staff must carry out many day-to-day functions.

f. The control the Wyndham Defendants exercised significantly exceeded what was necessary for to protect its registered trademarks.

g. The Wyndham Brand Defendants exercised control over the specific instrumentalities and aspects of operations that caused T.W.'s harm, such as through detailed control over room reservations, training of hotel staff, reporting of sex trafficking, housekeeping services, and hotel internet.

## IV.    Perpetrator liability (Mata Pita)

310. T.W. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591 because her trafficker caused her to engage in commercial sex (1) while she was a minor; and (2) through the use of force, fraud, and coercion.  Thus. T.W. is entitled to bring a civil action under 18 U.S.C. §1595(a) against Mata Pita as a "perpetrator."

311. Mata Pita knew or recklessly disregarded the fact that T.W.'s trafficker was causing her to engage in commercial sex at the Paducah ABV Inn both while she was a minor and through use of force, fraud, and coercion because:

a. Mata Pita through its on-the-ground role of its hotel staff, directly observed the obvious signs associated with T.W.'s trafficking at the Paducah ABV Inn and had frequent and familiar interactions with her trafficker.

b. Mata Pita, through the on-the-ground role of its hotel staff, had repeated opportunities to observe T.W. while she was a minor.

312. Mata Pita is a "perpetrator" under 18 U.S.C. §1591(a)(1) because it harbored T.W. by continually renting hotel rooms to her trafficker.

313. Mata Pita is a "perpetrator" under 18 U.S.C. §1591(a)(2) it knowingly benefited from knowingly facilitating, assisting, or supporting her trafficker while knowing or recklessly disregarding that he would cause her to engage in commercial sex while a minor or through the use of force, fraud, or coercion, by:

a. renting him rooms on an ongoing basis that he used to cause T.W. to engage in commercial sex;

b.  providing him with his preferred rooms to make it easier for him to operate; and by developing a familiar relationship; and

c. creating an understanding he could operate openly without concern for interference or disruption by hotel staff.

### V.      Beneficiary liability (Mata Pita and the ABV Brand Defendants)

314. Because T.W. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591, she is entitled to bring a claim against Mata Pita and the ABV Brand Defendants as "beneficiaries" under §1595(a).

315. Mata Pita and the ABV Brand Defendants are liable as beneficiaries because they knowingly benefited from participating in a venture that they knew or should have known was engaged in sex trafficking through their role in the continuous business relationship between the Paducah ABV Inn and the traffickers operating there, including T.W.'s trafficker ("Venture 1").

316. Mata Pita knowingly benefited from participation in this continuous business because it directly received revenue every time this business relationship was renewed through continued rental of rooms to these sex traffickers, including T.W.'s trafficker.

317. The ABV Brand Defendants knowingly benefited from participation in this continuous business relationship because they received increased revenue every time a room at the Paducah ABV Inn was rented to a trafficker, including T.W.'s trafficker, as a result of the payments they received from Mata Pita, which were primarily determined based on gross room revenue.

318. Mata Pita participated in this continuous business relationship through its on-the-ground role at the Paducah ABV Inn.

319. The ABV Brand Defendants participated in this continuous business relationship through their central role in the rental of rooms and their oversight of, control, and participation in

aspects of hotel operations that related to the detection of and response to sex trafficking at the Paducah ABV Inn.

320. This continuous business relationship facilitated traffickers in facilitating their victims and specifically facilitated the trafficking T.W.

321. Mata Pita, knew or should have known that this continuous business relationship was facilitating sex trafficking at the Paducah ABV Inn because, as further described below:

    a.  Through its on-the-ground role of its hotel staff, it directly observed the obvious signs associated with T.W.'s trafficking at the Paducah ABV Inn and had frequent and familiar interactions with her trafficker.

    b.  Through the on-the-ground role of its hotel staff, it had repeated opportunities to observe T.W. while she was a minor.

    c.  Through the on-the-ground role of its hotel staff, it received notice of the "red flags" of sex trafficking through guest complaints, monitoring of surveillance footage, on-site law enforcement activity, and other tools it used to monitor the Paducah ABV Inn.

322. Mata Pita also had constructive knowledge that this venture was facilitating sex trafficking at the Paducah ABV Inn because, as further described above, it failed to respond with reasonable diligence to the known problem of sex trafficking in hotels and at its hotel specifically and because it failed to act with reasonable diligence in response to the obvious "red flags" of sex trafficking at the Paducah ABV Inn, including the "red flags" of T.W.'s own trafficking. The signs of T.W.'s trafficking were sufficiently numerous, obvious, prevalent, and frequent that they would have been detected by a hotel operated using reasonable prudence.

323. The ABV Brand Defendants knew or should have known that this continuous business relationship was facilitating sex trafficking at the Paducah ABV Inn because, as further described above:

    a.  There were obvious signs associated with the trafficking at the Paducah ABV Inn, including T.W.'s trafficking, that were readily observable and that matched known "red flags" of sex trafficking in hotels.

b. The ABV Brand Defendants closely oversaw, monitored, and supervised the Paducah ABV Inn.

c. Based on the tools the ABV Brand Defendants used to oversee, monitor, and supervise this hotel, they were on notice of these obvious red flags of trafficking at the Paducah ABV Inn, including the activity associated with T.W.'s trafficking.

d. The knowledge of the hotel staff is also imputed to the ABV Brand Defendants because of an agency relationship that formed as a result of the control the ABV Brand Defendants exercised at the Paducah ABV Inn.

324. The ABV Brand Defendants also had at least constructive knowledge that this venture was facilitating sex trafficking because, as further described above:

a. They knew about a widespread problem of sex trafficking in hotels and in their own operations;

b. They retained control over relevant aspects of operations at the Paducah ABV Inn.

c. They failed to respond with reasonable prudence to the problem of sex trafficking in their operations.

d. They failed to respond with ordinary prudence to "red flags" of sex trafficking at the Paducah ABV Inn, including T.W.'s trafficking.

e. They operated in ways in that they knew or at least should have known were attracting business from traffickers and leading to sex trafficking at their hotels.

f. The signs of T.W.'s trafficking were sufficiently numerous, obvious, prevalent, and frequent that they would have been detected by a hotel operated using reasonable prudence.

325. The ABV Brand Defendants and Mata Pita also participated in a commercial hotel-operating venture with one another that facilitated sex trafficking at the Paducah ABV Inn ("Venture 2").

326. The ABV Brand Defendants and Mata Pita had a longstanding business relationship pursuant to which they jointly participated, as further described above, in operation of the Paducah ABV Inn with a shared goal of maximizing revenue, including gross room revenue.

327. Venture 2 violated the TVRPA because victims—including T.W.—were harbored, maintained, provided, and exploited at the Paducah ABV Inn.

328. Both the ABV Brand Defendants and Mata Pita directly participated in operation and control of the Paducah ABV Inn in ways that facilitated sex trafficking at the hotel.

329. Both ABV Brand Defendants and Mata Pita derived benefits from operating the Paducah Super 8 in a way that they knew or should have known facilitated sex trafficking, including through receipt of increased revenue derived from rental of hotel rooms to sex traffickers.

## VI.    Vicarious liability (The ABV Brand Defendants)

330. The ABV Brand Defendants are vicariously liable for the TVPRA violations of Mata Pita.

331. At all times relevant to this lawsuit, Mata Pita and the hotel staff at the Paducah ABV Inn acted as the agents of the ABV Brand Defendants and were within the scope of agency.

332. As further described above, this agency relationship resulted because:

g.  The ABV Brand Defendants retained and exercised pervasive control over the means and methods that Mata Pita used to operate the Paducah ABV Inn;

h.   The ABV Brand Defendants exercised control over the Paducah ABV Inn through their own direct involvement in operations.

i.  The ABV Brand Defendants did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools used.

j.  The control the ABV Defendants exercised covered virtually all aspects of hotel operations, including internal operating functions.

k.  The control the ABV Defendants exercised dictated the specific manner in which franchisee and hotel staff must carry out many day-to-say functions.

l.  The control the ABV Defendants exercised significantly exceeded what was necessary for to protect its registered trademarks.

m. The ABV Brand Defendants exercised control over the specific instrumentalities and aspects of operations that caused T.W.'s harm, such as through detailed control over room reservations, training of hotel staff, reporting of sex trafficking, housekeeping services, and hotel internet.

## TOLLING OF LIMITATIONS

333. To the extent Defendants assert an affirmative defense of limitations, T.W. invokes the discovery rule. At the time she was harmed and through at least October 2014, T.W. was under coercion and control of traffickers who abused and manipulated her. Thus, T.W. did not discover and could not reasonably have discovered the legal cause of her injury more than ten years before she filed this lawsuit. While she was under the control of her trafficker, T.W. —through no fault of her own—lacked the information to bring a claim because she did not know both her injury and the cause of her injury. This lack of information was due to no fault on the part of T.W. but rather was a direct result of T.W. being kept under the control of her traffickers, which Defendants facilitated.

334. At the time T.W. was harmed, she did not know that she was the victim of human trafficking as that term is defined by law, that her injury arose from being trafficked at Defendants' hotel or that she was a person trafficked, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in a position to discover the legal cause of her injury, more than ten years before suit was filed..

335. To the extent Defendants assert an affirmative defense of limitations, T.W. invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking, T.W. faced extraordinary circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit, and those circumstances did not end more than 10 years before T.W. filed this lawsuit.

336. To the extent Defendants assert an affirmative defense of limitations, T.W. also invokes the continuing tort doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct. T.W. was subject to continuous trafficking at Defendants' hotels through at least October 2014, which is not more than 10 years before T.W. filed this lawsuit. This continuous

trafficking resulted from Defendants' continuous facilitation of trafficking and Defendants' ongoing venture with one another and with criminal traffickers at the subject hotels.

337. T.W.'s claims against VIDHI, LLC relate back to the filing of the Original Complaint because, upon information and belief, VIDHI, LLC had notice of this lawsuit and knew or should have known that but for a mistake in identity it would have been named as a defendant given its operational role at the Paducah Super 8 during the relevant period. A representative of Ky Motel provided a copy of the Complaint in this case to VIDHI, LLC upon receipt.

## DAMAGES

338. Jane Doe T.W. seeks the following damages, joint and severally, from all Defendants:

    a.  Actual damages;

    b.  Direct damages;

    c.  Incidental and consequential damages;

    d.  Mental anguish and emotional distress damages (until trial and in the future)

    e.  Lost earnings and lost earning capacity;

    f.  Loss of self-esteem and self-worth;

    g.  Necessary medical expenses;

    h.  Physical pain and suffering;

    i.  Physical impairment;

    j.  Emotional impairment;

    k.  Unjust enrichment;

    l.  Exemplary/Punitive damages;

    m.  Attorneys' fees;

    n.  Costs of this action; and

    o.  Pre- and post-judgment interest at the maximum legal rates.

## JURY DEMAND

339. Jane Doe (T.W.) requests a trial by jury.

**REQUEST FOR RELIEF**

WHEREFORE, T.W. requests that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for T.W. against all Defendants jointly and severally for such actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which T.W. may be justly entitled.

Respectfully submitted,

**PROVOST UMPHREY LAW FIRM, L.L.P.**

*/s/Guy Fisher*
Guy Fisher (pro hac vice)
Bryan O. Blevins, Jr. (pro hac vice)
350 Pine Street, Suite 1100
Beaumont, TX 77701
(409) 835-6000
gfisher@pulf.com
bblevins@pulf.com

E. Douglas Richards
401 Lewis Hargett Circle, Suite 210
Lexington, Kentucky 40503
(859) 229-5851
Edrichards714@yahoo.com

Michael Hamilton (pro hac vice)
PROVOST UMPHREY LAW FIRM, LLP
420 Hillsboro Pike, #303
Nashville, TN 37215
(615) 297-1932
mhamilton@pulf.com

Annie McAdams (pro hac vice)
**ANNIE MCADAMS PC**
2900 North Loop West, Suite. 1130
Houston, Texas 77092
(713) 785-6262
annie@mcadamspc.com

### *ATTORNEYS FOR PLAINTIFF*

### CERTIFICATE OF SERVICE

I certify that this document was filed on March 21, 2025, using the Court's CM/ECF system

which will send notification of this filing to all counsel of record.

*/s/ Guy Fisher*
Guy Fisher